## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**MYPAQ HOLDINGS LTD.,**
**Patent Owner/Appellant**

Appeal Nos. 2023-2024[1]

**v.**                                                                                        2023-2025

**SAMSUNG ELECTRONICS CO., LTD.,**
**DELL TECHNOLOGIES INC.,**
**ANKER INNOVATIONS LTD.,**
**Petitioners/Appellees**

**Proceeding Nos.: IPR2022-00311[2] and IPR2022-00312[3]**

### NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely

filed June 8, 2023, in the United States Patent and Trademark Office in connection with the above

identified *Inter Partes Review* proceedings.  Pursuant to 35 U.S.C. § 143, a Certified List is this day

being forwarded to the Federal Circuit.

July 24, 2023                                       Respectfully submitted,

By: *Macia L. Fletcher*
              Macia L. Fletcher
              Paralegal
              Mail Stop 8
              P.O. Box 1450
              Alexandria, VA 22313-1450
              571-272-9035

              Under Secretary of Commerce for Intellectual Property and
              Director of the United States Patent and Trademark Office

---

[1] Appeal No. 2023-2024 (Lead) is consolidated with Appeal No. 2023-2025 (Member Case) pursuant to Court Order (Dkt. No. 8) and Note to File (Dkt. No. 9) dated June 26, 2023.
[2] *Inter Partes* Review No. IPR2022-01134 was joined with *Inter Partes* Review No. IPR2022-00311.
[3] *Inter Partes* Review No. IPR2022-01131 was joined with *Inter Partes* Review No. IPR2022-00312.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for

Appellant and Appellees this 24th day of July 2023, as follows:

| <u>PATENT OWNER</u>: | <u>PETITIONER (Samsung Electronics)</u>: |
|---|---|
| James Carmichael<br>Stephen McBride<br>Minghui Yang<br>CARMICHAEL IP, PLLC<br>jim@carmichaelip.com<br>stevemcbride@carmichaelip.com<br>mitch@carmichaelip.com | Eliot Damon Williams<br>Eric J. Faragi<br>Neil P. Sirota<br>BAKER BOTTS LLP<br>eliot.williams@bakerbotts.com<br>eric.faragi@bakerbotts.com<br>neil.sirota@bakerbotts.com<br><br><u>PETITIONER (Dell Technologies)</u>:<br><br>Paula D. Heyman<br>Kevin J. Meek<br>Brett J. Thompsen<br>MCDERMOTT WILL & EMERY LLP<br>pheyman@mwe.com<br>kmeek@mwe.com<br>bthompsen@mwe.com<br><br>Thomas A. Brown<br>DELL INC.<br>tom.brown@dell.com<br><br>Eliot Damon Williams<br>BAKER BOTTS LLP<br>eliot.williams@bakerbotts.com<br><br><u>PETITIONER (Anker Innovations)</u>:<br><br>Eric C. Cohen<br>Jason Xu<br>RIMON, P.C.<br>eric.cohen@rimonlaw.com<br>jason.xu@rimonlaw.com |

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>July 24, 2023</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**SAMSUNG ELECTRONICS CO., LTD, DELL TECHNOLOGIES INC.,**
**and ANKER INNOVATIONS LTD.,**
**Petitioner,**
v.

**MYPAQ HOLDINGS LTD.,**
**Patent Owner.**

**Case: IPR2022-00311[1]**
**Patent No. 8,477,514 B2**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*

---

[1] *Inter Partes* Review No. IPR2022-01134 was joined with *Inter Partes* Review No. IPR2022-00311.

**Prosecution History ~ IPR2022-00311**

| Date | Document |
|---|---|
| 12/14/2021 | Petition for Inter Partes Review |
| 12/14/2021 | Petitioner's Power of Attorney (Dell) |
| 12/14/2021 | Petitioner's Power of Attorney (Samsung) |
| 12/21/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 1/3/2022 | Patent Owner's Power of Attorney |
| 1/3/2022 | Patent Owner's Mandatory Notices |
| 3/21/2022 | Patent Owner's Preliminary Response |
| 4/11/2022 | Patent Owner's Updated Mandatory Notices |
| 4/18/2022 | Petitioners' Authorized Reply to Patent Owner's Preliminary Response |
| 4/25/2022 | Patent Owner's Sur-Reply in Support of Patent Owner's Preliminary Response |
| 5/23/2022 | Scheduling Order |
| 5/23/2022 | Decision - Institution of Inter Partes Review |
| 7/19/2022 | Parties' Stipulation to Modify Trial Due Dates 1, 2 and 3 |
| 7/26/2022 | Notice of Deposition - Kiaei |
| 8/4/2022 | Petitioner's Power of Attorney (Dell) |
| 8/4/2022 | Petitioners' Updated Mandatory Notices |
| 8/29/2022 | Patent Owner's Response |
| 10/3/2022 | Decision - Institution of Inter Partes Review and Motion for Joinder |
| 10/6/2022 | Notice of Joint Stipulation to Modify Due Dates 2-3 |
| 10/6/2022 | Notice of Deposition - Ferrese |
| 10/14/2022 | Petitioners' Updated Mandatory Notices |
| 11/18/2022 | Petitioners' Reply |
| 12/30/2022 | Patent Owner's Sur-Reply |
| 1/6/2023 | Patent Owner's Request for Oral Argument |
| 1/9/2023 | Petitioners' Oral Hearing Request |
| 1/19/2023 | Order - Setting Oral Argument |
| 2/22/2023 | Patent Owner's Updated List of Exhibits |
| 3/10/2023 | Oral Hearing Transcript |
| 5/17/2023 | Final Written Decision |

**Prosecution History ~ IPR2022-01134**

| Date | Document |
|---|---|
| 6/15/2022 | Petition for Inter Partes Review |
| 6/15/2022 | Petitioner's Power of Attorney (Anker Innovations) |
| 6/15/2022 | Petitioner's Motion for Joinder |
| 6/21/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 6/27/2022 | Patent Owner's Power of Attorney |
| 6/27/2022 | Patent Owner's Mandatory Notices |
| 7/1/2022 | Patent Owner's Statement of Non-Opposition to Motion for Joinder |

**Prosecution History ~ IPR2022-00311**

| Date | Document |
|------|----------|
| 10/3/2022 | Decision - Institution of Inter Partes Review and Motion for Joinder |

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

<u>July 24, 2023</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**SAMSUNG ELECTRONICS CO., LTD, DELL TECHNOLOGIES INC.,**
**and ANKER INNOVATIONS LTD.,**
**Petitioner,**
v.

**MYPAQ HOLDINGS LTD.,**
**Patent Owner.**

**Case: IPR2022-00312[1]**
**Patent No. 7,675,759 B2**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Macia L. Fletcher*

*Certifying Officer*



---

[1] *Inter Partes* Review No. IPR2022-01131 was joined with *Inter Partes* Review No. IPR2022-00312.

**Prosecution History ~ IPR2022-00312**

| Date | Document |
| --- | --- |
| 12/14/2021 | Petition for Inter Partes Review |
| 12/14/2021 | Petitioner's Power of Attorney (Dell) |
| 12/14/2021 | Petitioner's Power of Attorney (Samsung) |
| 12/21/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 1/3/2022 | Patent Owner's Power of Attorney |
| 1/3/2022 | Patent Owner's Mandatory Notices |
| 3/21/2022 | Patent Owner's Preliminary Response |
| 4/11/2022 | Patent Owner's Updated Mandatory Notices |
| 4/18/2022 | Petitioners' Authorized Reply to Patent Owner's Preliminary Response |
| 4/25/2022 | Patent Owner's Sur-Reply in Support of Patent Owner's Preliminary Response |
| 5/23/2022 | Scheduling Order |
| 5/23/2022 | Decision - Institution of Inter Partes Review |
| 7/19/2022 | Parties' Stipulation to Modify Trial Due Dates 1, 2 and 3 |
| 7/26/2022 | Notice of Deposition - Kiaei |
| 8/4/2022 | Petitioner's Power of Attorney (Dell) |
| 8/4/2022 | Petitioners' Updated Mandatory Notices |
| 8/29/2022 | Patent Owner's Response |
| 10/3/2022 | Decision - Institution of Inter Partes Review and Motion for Joinder |
| 10/6/2022 | Notice of Joint Stipulation to Modify Due Dates 2-3 |
| 10/6/2022 | Notice of Deposition - Ferrese |
| 10/14/2022 | Petitioners' Updated Mandatory Notices |
| 11/18/2022 | Petitioners' Reply |
| 12/30/2022 | Patent Owner's Sur-Reply |
| 1/6/2023 | Patent Owner's Request for Oral Argument |
| 1/9/2023 | Petitioners' Request for Oral Hearing |
| 1/19/2023 | Order - Setting Oral Argument |
| 2/22/2023 | Patent Owner's Updated List of Exhibits |
| 4/19/2023 | Oral Hearing Transcript |
| 5/17/2023 | Final Written Decision |

**Prosecution History ~ IPR2022-01131**

| Date | Document |
| --- | --- |
| 6/15/2022 | Petition for Inter Partes Review |
| 6/15/2022 | Petitioner's Power of Attorney (Anker Innovations) |
| 6/15/2022 | Petitioner's Motion for Joinder |
| 6/21/2022 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 6/27/2022 | Patent Owner's Power of Attorney |
| 6/27/2022 | Patent Owner's Mandatory Notices |
| 7/1/2022 | Patent Owner's Statement of Non-Opposition to Motion for Joinder |

**Prosecution History ~ IPR2022-00312**

| Date | Document |
|------|----------|
| 10/3/2022 | Decision - Institution of Inter Partes Review and Motion for Joinder |

Trials@uspto.gov                                    Paper 29
571-272-7822                               Date: May 17, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SAMSUNG ELECTRONICS CO., LTD, DELL TECHNOLOGIES INC.,
and ANKER INNOVATIONS LTD.,[1]
Petitioner,

v.

MYPAQ HOLDINGS LTD.,
Patent Owner.

———————————

IPR2022-00311
Patent 8,477,514 B2

———————————

Before KRISTINA M. KALAN, DANIEL J. GALLIGAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges.*

GALLIGAN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

———————————

[1]  Anker Innovations Ltd. filed a motion for joinder and a petition in
IPR2022-01134 and has been joined as a petitioner in this proceeding.

IPR2022-00311
Patent 8,477,514 B2

## I. INTRODUCTION

In this *inter partes* review, Samsung Electronics Co., Ltd. ("Samsung"), Dell Technologies Inc. ("Dell"), and Anker Innovations Ltd. ("Anker") (collectively "Petitioner") challenge the patentability of claims 1–20 of U.S. Patent No. 8,477,514 B2 (Ex. 1001, "the '514 patent"), which is assigned to MyPAQ Holdings Ltd. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review. For the reasons discussed below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–20 of the '514 patent are unpatentable. *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

### A. Procedural History

Samsung and Dell filed a Petition (Paper 3, "Pet.") challenging claims 1–20 of the '514 patent on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–12, 14–17, 19, 20 | 102(a), (b)[2] | Chagny[3] |
| 1–20 | 103(a) | Chagny |
| 1–10, 16, 17, 19, 20 | 102(a), (b) | Hwang[4] |
| 11, 12, 14–17, 19, 20 | 103(a) | Hwang, Chagny |
| 18 | 103(a) | Hwang |
| 13, 18 | 103(a) | Hwang, Chagny |

---

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011) amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the '514 patent was filed before this date, we refer to the pre-AIA versions of §§ 102 and 103. Ex. 1001, code (22).

[3] Ex. 1004, US 6,873,136 B2, issued March 29, 2005 ("Chagny").

[4] Ex. 1006, US 2004/0174152 A1, published September 9, 2004 ("Hwang").

IPR2022-00311
Patent 8,477,514 B2

Pet. 8–9.  Patent Owner filed a Preliminary Response.  Paper 7.  With our authorization, Samsung and Dell filed a reply to the Preliminary Response (Paper 9) addressing discretionary denial issues, and Patent Owner filed a sur-reply (Paper 10).  We instituted trial on the asserted grounds of unpatentability.  Paper 11 ("Inst. Dec."), 29.

After institution, Anker filed a motion for joinder and a petition in IPR2022-01134.  We joined Anker as a petitioner in this proceeding. Paper 18.

During the trial, Patent Owner filed a Response (Paper 17, "PO Resp."), Petitioner filed a Reply (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply").

An oral hearing was held on February 24, 2023, a transcript of which appears in the record.  Paper 28 ("Tr.").

Petitioner relies on testimony from Dr. Sayfe Kiaei.  Exs. 1002 (Declaration), 1026 (Reply Declaration).  Patent Owner relies on testimony from Dr. Frank Ferrese.  Ex. 2018.  The parties have entered in the record transcripts for depositions of these declarants.  Exs. 2020, 2021 (Kiaei Deposition), 1027 (Ferrese Deposition).

### B.  Real Parties in Interest

Petitioner identifies the following as real parties in interest:  Samsung, Dell, Samsung Electronics America, Inc., Samsung Semiconductor, Inc., Samsung Austin Semiconductor, LLC, Dell Inc., and Anker.  Pet. 1; IPR2022-01134, Paper 2 at 1.

Patent Owner identifies itself as the real party in interest and notes that "Transpacific IP Group Limited has an ownership interest in MyPAQ." Paper 5 at 1; Paper 8 at 1.

IPR2022-00311
Patent 8,477,514 B2

### C. Related Matters

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters, including *MyPAQ Holdings Ltd. v. Samsung Electronics Co., Ltd.*, 6:21-CV-00398 (W.D. Tex.) ("district court litigation").  Pet. 1; Paper 8 at 1.  We are concurrently issuing a final written decision in IPR2022-00312, involving related U.S. Patent 7,675,759 B2.  *See* Ex. 1001, code (63) (related application data showing that the '514 patent is a continuation of a continuation-in-part of Patent 7,675,759 B2).

### D. The '514 Patent and Illustrative Claims

The '514 patent discloses a power system having a power converter with an adaptive controller that can change an internal operating characteristic (such as switching frequency) of the power converter based on signals about the load to which it provides power.  Ex. 1001, code (57), 6:51–7:4, 9:28–38.

Petitioner challenges all 20 claims of the '514 patent.  Pet. 8–9. Claims 1, 6, 11, and 16 are independent.  Claims 1 and 6 are illustrative of the claimed subject matter and are reproduced below.

> 1. A power converter coupled to a load, comprising:
>
> a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof; and
>
> a power converter controller configured to receive a signal from said load indicating a system operational state of said load and control an internal operating characteristic of said power converter as a function of said signal.
>
> 6. A power system, comprising:
>
> a power system controller configured to provide a signal characterizing a power requirement of a processor system; and
>
> a power converter coupled to said processor system, comprising:

4

IPR2022-00311
Patent 8,477,514 B2

> a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof, and

> a power converter controller configured to receive a signal from said power system controller to control an internal operating characteristic of said power converter as a function of said signal.

## II. ANALYSIS

### A. Principles of Law

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (citing *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990)).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary

considerations, if in evidence.[5] *Graham v. John Deere Co. of Kan. City*, 383
U.S. 1, 17–18 (1966).

## B. Level of Ordinary Skill in the Art

Petitioner contends that a person of ordinary skill in the art
("POSITA") would have had "either (i) a Masters of Science in Electrical
Engineering, or an equivalent field, or (ii) a Bachelor of Science in Electrical
Engineering or an equivalent field as well as at least two years of experience
in the design of power electronics." Pet. 9 (citing Ex. 1002 ¶ 35).

At institution, we found this definition to be consistent with the scope
and content of the '514 patent and the asserted prior art, but we omitted the
open-ended phrase "at least" to avoid introducing vagueness as to the
amount of experience. Inst. Dec. 12.

Patent Owner does not dispute part (ii) of Petitioner's proposed skill
level, but for part (i), Patent Owner argues that "a Master and Bachelor
degree in Electrical Engineering alone would not necessarily focus enough
on power electronics to qualify as a POSITA." PO Resp. 16. Relying on
Dr. Ferrese's testimony, Patent Owner argues that,

> [t]o qualify as a POSITA based entirely on education, a person
> would need to demonstrate a significant focus on power
> electronics while obtaining their Master and/or Bachelor
> degrees, for example, through taking higher level courses
> focused on power electronics, publishing on the topic of power
> electronics, performing lab work or internships in the field of
> power electronics, or similar.

PO Resp. 16–17 (citing Ex. 2018 ¶ 45). Patent Owner also argues that "a
person with a Master and Bachelor degree in many 'equivalent fields' to

---

[5] The parties do not present arguments related to objective evidence of
nonobviousness (i.e., secondary considerations) as to any of the challenged
claims.

6

IPR2022-00311
Patent 8,477,514 B2

Electrical Engineering would not be expected to have any significant exposure to power electronics" and that such a person would need "independent expertise in power electronics (through work or otherwise) to qualify as a POSITA." PO Resp. 17 (citing Ex. 2018 ¶ 46).

We agree with Patent Owner that some degree of familiarity with power electronics would be necessary for a POSITA given the subject matter at issue, and we understood this to be implicit in part (i) of Petitioner's definition. To address Patent Owner's concern, we clarify that a person with a Master of Science in Electrical Engineering or an equivalent field would need experience in power electronics to qualify as a POSITA. We are reluctant to use Patent Owner's formulation of "some independent *expertise* in power electronics" (PO Resp. 17 (emphasis added)) because it could be read to include an expert level of skill rather than an ordinary level of skill.

Thus, we determine that a POSITA would have had either (i) a Master of Science in Electrical Engineering, or an equivalent field, and experience in power electronics or (ii) a Bachelor of Science in Electrical Engineering or an equivalent field as well as two years of experience in the design of power electronics.

We would reach the same determinations on Petitioner's patentability challenges in §§ II.D–E below even if we adopted Patent Owner's assessment of a person with a Master of Science degree and "some independent *expertise* in power electronics (through work or otherwise)," which is a higher level of skill.

## C.  Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b).

7

IPR2022-00311
Patent 8,477,514 B2

Both parties state that they interpret the claims according to "their ordinary and customary meaning," and neither party proposes express constructions in the claim construction sections of their papers. Pet. 9; PO Resp. 16. In its arguments against Petitioner's unpatentability contentions, however, Patent Owner proposes constructions for "system operational state" and "core state." PO Resp. 18–22, 37–38. We discuss each of these terms below.

### 1. "System Operational State"

Claim 1 recites "a power converter controller configured to receive a signal from [a] load indicating a system operational state of said load."

Petitioner contends that a signal indicating the activity level of the processor (load) is a signal "indicating a system operational state of said load," as recited in claim 1. Pet. 18.

Patent Owner counters that a person of ordinary skill in the art "would understand that the term 'system operational state' as it pertains to engineering systems, refers to the way in which the system as a whole is being employed or utilized." PO Resp. 18 (citing Ex. 2018 ¶ 52). Patent Owner argues that examples of signals indicating system operational states from the '514 patent show that such "signal[s] indicate[] the current or future operational state of the load in a particular context, not simply the current activity level of the processor." PO Resp. 18–20 (citing Ex. 1001, 9:14–27; Ex. 2018 ¶ 52). According to Patent Owner, "the system operational state is not merely a measure of power level during a low power state[;] it is a state that is driven by various factors, including external requirements, and is ultimately dependent on the context in which the system is being utilized." PO Resp. 21 (citing Ex. 2018 ¶ 54).

IPR2022-00311
Patent 8,477,514 B2

We do not agree with Patent Owner's interpretation of the term "system operational state of said load." As an initial matter, Patent Owner does not direct us to, and we do not find, a definition of "system operational state" of a load in the '514 patent. As noted above, Patent Owner's proposed definition is that "the term 'system operational state' as it pertains to engineering systems, refers to the way in which the system as a whole is being employed or utilized." PO Resp. 18 (citing Ex. 2018 ¶ 52). Claim 1, however, recites "a system operational state *of said load*" (emphasis added), not the system as a whole. Patent Owner's proposed construction, therefore, is not consistent with the claim language. Patent Owner points to examples disclosed in the '514 patent in an attempt to narrow the meaning of the claim term and, as further discussed below, to distinguish the prior art. *See* PO Resp. 18–20 ("The '514 Patent provides examples of signals indicating system operational states that include signals . . . ." (citing Ex. 1001, 9:14–27)). But the '514 patent states that these are non-limiting examples. Ex. 1001, 9:11–23 ("Further examples indicating a system operational state include, without limitation . . . .").

One passage cited by Patent Owner states the following:

> It should also be taken into account that there are loads with different operating states. For example, a server configured to process financial data may operate at a higher level of criticality during normal business hours, and revert to a lower processing state at another time of day. The aforementioned system may require a higher level of performance from the power converter during such periods of high criticality, which may compromise operating efficiency, but which may admit higher operating efficiency during substantial periods of time in the lower processing state.

Ex. 1001, 5:8–17, *quoted in* PO Resp. 20. Patent Owner argues that this passage "illustrates the difference between operational states and system

IPR2022-00311
Patent 8,477,514 B2

activity at a particular moment" because, according to Patent Owner, "[i]n this example, the system operational state may be critical or non-critical depending on the performance constraints at particular time of day." PO Resp. 20 (citing Ex. 2018 ¶ 53). We disagree. The '514 patent passage above effectively correlates processor activity and criticality by saying that, in a period of "high criticality," the load requires a higher performance level from the power converter than when the load is in a "lower processing state." Ex. 1001, 5:8–17. Thus, this example shows that a "lower processing state" of a data processing server is a "system operational state" of that server, notwithstanding Patent Owner's labeling this as a "non-critical" operational state. *See* PO Resp. 20.

Patent Owner argues that "two processors in two different systems may have the same activity level at some point in time" but may be in different system operational states because, for example, speed is critical with one processor and energy efficiency is critical with the other. PO Resp. 21–22 (citing Ex. 2018 ¶¶ 55–56). Similarly, Dr. Ferrese posits an analogy in which two vehicles are traveling at the same speed but one is carrying a person to a hospital and the other is carrying a family on a road trip. Ex. 2018 ¶ 55. Dr. Ferrese states that, even though these two vehicles "in a given instant appear to be operating identically," they "can actually have significantly different system operational states resulting in different preferences in terms of how they are operated and controlled." Ex. 2018 ¶ 55. These hypotheticals are not persuasive, as they would introduce subjectivity into the claim construction, requiring inquiry into the purpose or intent of a processor's operation. Furthermore, these hypotheticals are not helpful in resolving the controversy because Petitioner relies on Chagny's different activity levels as disclosing different system operational states, as

10

IPR2022-00311
Patent 8,477,514 B2

discussed below in section II.D.2.c. Thus, we need not opine on whether one activity level of a processor could result in multiple system operational states.

In addition, we decline to define the system operational state of a load to include "external requirements," as urged by Patent Owner (PO Resp. 21), because this ignores the plain language of claim 1, which recites "a system operational state *of said load*" (emphasis added), not states external to the load.

For the reasons discussed above, we determine that a signal "indicating a system operational state of said load" encompasses a signal indicating the activity level of a processor. *See* Ex. 1001, 5:8–17. We need not further construe this claim term to resolve the patentability issues before us. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).[6]

---

[6] Our Rules require us to consider "[a]ny prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the *inter partes* review proceeding." 37 C.F.R. § 42.100(b). Patent Owner entered into the record an email from a law clerk in the district court litigation laying out in a table "preliminary claim constructions" for some terms of the '514 patent before a *Markman* hearing. Ex. 2028. That district court case was stayed before the court issued its final claim construction determinations. Tr. 11:4–10. We have considered the preliminary claim constructions in Exhibit 2028, and we determine that they do not impact the analysis in this proceeding.

IPR2022-00311
Patent 8,477,514 B2

### 2. "Core State"

Claim 4 depends from claim 1 and recites that the "load is a processor and said system operational state is dependent on one of a core state and a performance state of said processor." Claim 9 depends from claim 6 and recites that the "power requirement of a processor system is dependent on one of a core state and a performance state of said processor system."

Petitioner contends that "the 'core state' as described in the '514 Patent background specifies the activity level (e.g., the rate at which instructions are executed) of the processor." Pet. 23 (citing Ex. 1001, 5:44–57; Ex. 1002 ¶ 79).

Patent Owner argues that the "core state (C-state) and performance state (P-state) of a processor are defined in the industry standard titled, 'Advanced Configuration and Power Interface' which is incorporated by reference into the '514 Patent." PO Resp. 37 (citing Ex. 1001, 5:22–27; Ex. 2022 (Advanced Configuration and Power Interface (ACPI) Specification, Revision 3.0, September 2, 2004)). According to Patent Owner, the '514 patent "defines 'core state' as a 'C-state' and uses the terms interchangeably." PO Sur-reply 22–23 (citing Ex. 1001, 5:44–46, 8:7–9, 9:11–15, 25:28–30, 25:65–26:2, Fig. 12; Ex. 2018 ¶¶ 90–96; Ex. 2020, 66:18–25).

Petitioner counters that the claims recite "a core state," not "a C-state as defined in ACPI," and that the '514 patent provides that "a C-state is merely an *example* of a core state." Pet. Reply 25 (citing Ex. 1001, 9:12–14).

We agree with Petitioner. Claims 4 and 9 recite "core state," not "C-state." The specification of the '514 patent identifies a "C-state" as a type of "core state." Ex. 1001, 5:44–46 ("Another processor state indicator,

IPR2022-00311
Patent 8,477,514 B2

the core state ('C-state') . . . ."), 25:28–30 ("Turning now to FIG. 12,
illustrated is a diagram of an embodiment of processor core states ('C-
states') in accordance with the principles of the present invention
illustrated.").  Figure 12 of the '514 patent, which "illustrates a diagram of
an embodiment of processor core states in accordance with the principles of
the present invention," includes the caption "ACPI C-STATES – IDLE
POWER MANAGEMENT."  Ex. 1001, 8:7–9.  That the '514 patent
explains the concept of core states by reference to C-states as defined in
ACPI ("ACPI C-states"), however, does not mean that the term "core state"
is necessarily limited to ACPI C-states.  The specification of the '514 patent
elsewhere shows that the ACPI C-states are merely examples within the
broader category of core states.  For instance, the '514 patent states that
"examples indicating a system operational state include, without limitation, a
signal providing a performance state or a core state of a processor *such as a
P-state or C-state*."  Ex. 1001, 9:11–23 (emphasis added).  Given the '514
patent's description of C-states as exemplary core states, we do not agree
with Patent Owner's argument that the recited "core state" should be limited
to ACPI C-states.

We need not further construe the term "core state" to resolve the
patentability issues before us.  *See Realtime Data*, 912 F.3d at 1375.

### D.  Anticipation by Chagny
### (Claims 1–12, 14–17, 19, 20)

Petitioner asserts that Chagny anticipated claims 1–12, 14–17, 19,
and 20.  Pet. 8, 13–39.  Patent Owner opposes.  PO Resp. 18–39; PO
Sur-reply 6–7, 9–25.

IPR2022-00311
Patent 8,477,514 B2

### 1. Chagny

Chagny discloses a voltage regulator module ("VRM") that provides a regulated direct current ("DC") voltage output to power a processor of an information handling system. Ex. 1004, code (57). An embodiment is shown in Figure 2A, which is reproduced below.



**FIG. 2A**

In Chagny's Figure 2A above, VRM 200 receives a DC voltage input 205 and generates a regulated DC voltage output 295, which provides power to processor 292 included in information handling system device 290. Ex. 1004, 3:52–59. VRM 200 includes, among other things, controller module 210 operable to receive activity input 202 indicative of levels of activity of processor 292 and to select a switching frequency of VRM 200 responsive to activity input 202 so that the switching frequency "dynamically matches the level of activity" of processor 292. Ex. 1004, 3:60–65, 4:66–5:3, 5:9–12.

IPR2022-00311
Patent 8,477,514 B2

### 2. *Claim 1*

### a) *Preamble*

Claim 1 is directed to "[a] power converter coupled to a load."

Petitioner identifies Chagny's VRM 200 as a "power converter" and argues that "VRM 200 is coupled to provide power to a load including processor 292 and software program 296." Pet. 13–14 (citing Ex. 1004, 3:54–60, 4:35–37, 7:36–41, Fig. 2A; Ex. 1002 ¶¶ 52–53).[7]

During the trial, Patent Owner did not dispute Petitioner's contentions for this subject matter. *See* PO Resp. 18–23 (arguments for claim 1); *see also* Paper 12 at 9 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."); *In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016) (explaining that the patent owner waived an issue presented in its preliminary response that it failed to renew in its response during trial); Consolidated Trial Practice Guide 52 (Nov. 2019), *available at* https://www.uspto.gov/TrialPracticeGuideConsolidated ("Once a trial is instituted, the Board may decline to consider arguments set forth in a preliminary response unless they are raised in the patent owner response.").

Petitioner's contentions for the preamble are persuasive. We find that Chagny's VRM 200 is a power converter because it is "operable to receive a direct current (DC) voltage input 205 and generate a regulated DC voltage output 295." Ex. 1004, 3:54–56; *see* Pet. 13–14 (discussing this disclosure). This is consistent with the '514 patent's description of the operation of power converters. *See, e.g.*, Ex. 1001, 2:67–3:4 ("In an exemplary

---

[7] Petitioner and Dr. Kiaei italicize the names of references. We omit this emphasis when quoting Petitioner's arguments and Dr. Kiaei's testimony.

application, the power converters have the capability to convert an unregulated dc input voltage such as five volts to a lower, regulated, dc output voltage such as 2.5 volts to power a load.").

We also find that Chagny's processor 292 and software program 296 are a "load" to which VRM 200 is coupled because Chagny's VRM 200 is coupled to and provides power to processor 292 in the same way that the power converter described in the '514 patent is coupled to and provides power to a microprocessor. *Compare* Ex. 1001, 10:12–15 ("The power converter . . . provides power to a system (not shown) such as a microprocessor coupled to an output thereof."), *with* Ex. 1004, 3:54–58 (disclosing that "VRM 200 is operable to . . . generate a regulated DC voltage output 295," which "provides power to a processor 292").

Based on Petitioner's persuasive argument and evidence, summarized and addressed above, we find that Chagny describes the subject matter of the preamble.[8]

### b) *Power Switch*

Claim 1 recites that the power converter comprises "a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof."

Petitioner argues that Chagny describes this subject matter because charge switch 220 within VRM 200 is a power switch that conducts for a duty cycle to provide regulated DC voltage output 295 at the output of VRM 200. Pet. 14–16 (citing Ex. 1004, 1:51–59, 5:34–42, 5:44–51, 4:63–65, 6:45–49, Fig. 2A; Ex. 1002 ¶¶ 54–61).

---

[8] Because Petitioner has shown that Chagny describes subject matter recited in the preamble, we need not decide whether the preamble is limiting.

IPR2022-00311
Patent 8,477,514 B2

Patent Owner does not dispute Petitioner's contentions for this subject matter.

Petitioner's contentions are persuasive. Chagny discloses that power switch 220, controlled by charge control signal 212, is closed (i.e., conducts) during a charge cycle. Ex. 1004, 5:34–40. Chagny explains that "DC voltage input 205 is 'chopped' by the charge switch 220 to generate the switched DC voltage output 225," which is then filtered to generate regulated DC voltage output 295. Ex. 1004, 5:40–42, 5:48–51.

Based on Petitioner's persuasive argument and evidence, we find that Chagny describes "a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof."

*c)   Power Converter Controller*

Claim 1 recites that the power converter comprises "a power converter controller configured to receive a signal from said load indicating a system operational state of said load and control an internal operating characteristic of said power converter as a function of said signal."

Petitioner provides the annotated version of Chagny's Figure 2A reproduced below to illustrate its contentions for this subject matter.



Pet. 17.  Chagny's Figure 2A is a diagram of a VRM with a selectable switching frequency.  Ex. 1004, 3:17–19.  In the annotated version of Chagny's Figure 2A above, Petitioner identifies controller module 210 (gray) within VRM 200 as a power converter controller, and Petitioner illustrates with purple highlighting a signaling path from processor 292 ("load") to software program 296, I/O controller hub 280, and controller module 210 to show "a signal from said load indicating a system operational state of said load."  Pet. 17.

Petitioner contends that software program 296 receives a signal from processor 292 indicating the processor's activity level and sends "activity input 202" to controller module 210.  Pet. 17–19 (citing Ex. 1004, 4:18–20, 4:35–43, 4:59–67, 5:62–64, Fig. 2A; Ex. 1002 ¶¶ 62–66).  Petitioner

contends that "'activity input 202' is 'indicative of the activity level of the processor 292' (i.e., indicating a system operational state of the load)." Pet. 18 (citing Ex. 1004, 4:40–43, 5:11–12). Petitioner argues that Chagny's controller module changes the switching frequency of VRM 200 based on activity input 202 and, therefore, that Chagny discloses "control[ling] an internal operating characteristic of said power converter as a function of said signal." Pet. 19 (citing Ex. 1004, 3:59–65, 4:46–49, 4:66–5:18; Ex. 1002 ¶¶ 67–69).

Relying on its proposed construction for "system operational state," Patent Owner argues that "the activity level of Chagny's processor does not indicate the system operational state." PO Resp. 22. For the reasons discussed above in section II.C.1, we do not adopt Patent Owner's interpretation of "system operational state," and, thus, we do not agree with Patent Owner's arguments based on its proposed construction.

Chagny discloses that "activity input 202 [is] indicative of the activity level of the processor 292." Ex. 1004, 5:9–12. Therefore, Chagny's activity input 202 is a signal indicating the activity level of a processor, which is within the scope of a signal "indicating a system operational state of said load" under the construction set forth above in section II.C.1.

Chagny further explains that "processor 292 loading, usage or activity level will vary depending on the number of instructions executed within a predefined time interval." Ex. 1004, 4:18–20. Chagny discloses high, medium, and low activity levels. Ex. 1004, 4:31–33. Even applying Patent Owner's proposed claim construction, Chagny's low activity level shows how the processor "is being employed or utilized" (PO Resp. 18) consistent with the '514 patent's disclosure of a "lower processing state" for a server. Ex. 1001, 5:8–17; *see* above § II.C.1 (discussing this disclosure).

IPR2022-00311
Patent 8,477,514 B2

We agree with Petitioner that Chagny's controller module 210 changes the switching frequency of VRM 200 based on activity input 202. *See* Pet. 19 (citing Ex. 1004, 4:46–49, 4:66–5:18; Ex. 1002 ¶¶ 67–69). In particular, Chagny discloses that frequency selector module 215 of controller module 210 "is operable to receive the activity input 202 . . . and select a switching frequency 216 from a plurality of switching frequencies as an output, which dynamically matches the level of activity of the processor 292." Ex. 1004, 4:66–5:3; *see also* Ex. 1004, 5:9–12 ("Thus the controller module 210 dynamically changes the switching frequency 216 of the VRM 200 responsive to the activity input 202 indicative of the activity level of the processor 292.").

Based on Petitioner's persuasive argument and evidence, we find that Chagny describes "a power converter controller configured to receive a signal from said load indicating a system operational state of said load and control an internal operating characteristic of said power converter as a function of said signal."

### d)   Conclusion for Claim 1

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claim 1 and, therefore, that Chagny anticipated claim 1.

### 3.   Claim 6

Independent claim 6 is directed to a "power system, comprising" "a power system controller" and "a power converter," which in turn comprises "a power switch" and "a power converter controller." To illustrate its contentions, Petitioner provides the annotated version of Chagny's Figure 2A reproduced below.

IPR2022-00311
Patent 8,477,514 B2



Pet. 25.  Chagny's Figure 2A is a diagram of a VRM with a selectable switching frequency.  Ex. 1004, 3:17–19.  In the annotated version of Chagny's Figure 2A reproduced above, Petitioner identifies software program 296 (with or without I/O controller hub 280) (shaded green) as the claimed "power system controller."  Pet. 25–26 & n.4.  Petitioner identifies VRM 200 (shaded blue) as the claimed "power converter," controller module 210 (shaded gray) as the claimed "power converter controller," and charge switch 220 (shaded orange) as the claimed "power switch." Pet. 25–27.

Petitioner argues that Chagny's software program 296 monitors processor 292 (shaded pink) and generates the activity input, which is a "signal characterizing a power requirement of a processor system," as recited in claim 6.  Pet. 24–26 (citing Ex. 1004, 4:18–20, 4:35–37, 4:40–43, 4:46–61, 5:10–12, 5:62–64, Fig. 2A; Ex. 1002 ¶¶ 86–89).

21

IPR2022-00311
Patent 8,477,514 B2

Petitioner argues that Chagny's VRM 200 is coupled to processor 292 to provide the processor power and, therefore, is a "power converter coupled to said processor system," as recited in claim 6.  Pet. 26 (citing Ex. 1004, 3:52–60, Fig. 2A; Ex. 1002 ¶ 90); *see* Ex. 1004, 3:56–59 ("[T]he regulated DC voltage output 295 provides power to a processor 292 included in an information handling system device 290.").  For the limitation of claim 6 reciting "a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof," Petitioner refers to its contentions for the same limitation of claim 1.  Pet. 27.  For the limitation of claim 6 reciting "a power converter controller configured to receive a signal from said power system controller to control an internal operating characteristic of said power converter as a function of said signal," Petitioner refers to its contentions for the "power converter controller" of claim 1 and argues that controller module 210 controls the switching frequency ("internal operating characteristic") of VRM 200 based on activity input 202.  Pet. 27–28 (citing Ex. 1004, 4:62–5:18; Ex. 1002 ¶¶ 92–94.

Based on Petitioner's persuasive contentions and evidence and for the reasons given for similar subject matter in claim 1, we find that Chagny describes "a power converter" that is "coupled to said processor system" and that has "a power switch" and "a power converter controller" with the functionality for these components recited in claim 6.

Patent Owner argues that Chagny's software program 296 is not the "power system controller" of claim 6.  PO Resp. 23–26, 28–32.  Patent Owner argues that activity input 202 indicates the level of processor activity but does not "characterize any particular power requirement" and, therefore, that Chagny's software program 296 does not "provide a signal

IPR2022-00311
Patent 8,477,514 B2

characterizing a power requirement of a processor system," as recited of the "power system controller."  PO Resp. 24.

We disagree.  Chagny discloses that software program 296 "monitors the processor 292 loading" and, "[b]ased on the processor 292 loading and/or the forecasted values, the software program 296 generates the activity input 202 indicative of levels of activity of the processor 292."  Ex. 1004, 4:35–43.  Chagny explains that "processor 292 loading, usage or activity level will vary depending on the number of instructions executed within a predefined time interval" and, therefore, that the "demand for power required by the processor 292 is advantageously controlled by limiting the number of instructions executed for a predefined time period."  Ex. 1004, 4:18–20, 5:62–64.  Furthermore, as noted above for claim 1, Chagny discloses that frequency selector module 215 of controller module 210 "is operable to receive the activity input 202 . . . and select a switching frequency 216 from a plurality of switching frequencies as an output, which dynamically matches the level of activity of the processor 292."  Ex. 1004, 4:66–5:3; *see also* Ex. 1004, 5:9–12 ("Thus the controller module 210 dynamically changes the switching frequency 216 of the VRM 200 responsive to the activity input 202 indicative of the activity level of the processor 292.").  Thus, Chagny discloses that activity input 202 indicates the power required by processor 292; even Patent Owner agrees that a person of ordinary skill in the art "would understand that 'a signal characterizing a power requirement' indicates how much power is required." PO Sur-reply 10 (citing Ex. 1027, 85:10–86:2).  We agree with Petitioner's contentions (Pet. 24–26) and find that Chagny's activity input 202 is a "signal characterizing a power requirement of a processor system," as recited in claim 6.

IPR2022-00311
Patent 8,477,514 B2

Patent Owner argues that the "the power system controller of the ['514] Patent controls the overall power system," whereas Chagny's software program 296 "does not control the power system, and is limited to reporting the activity level of the processor." PO Resp. 29–30. We disagree. The claimed "power system controller" exerts control over the power system by performing the function recited in the claim, specifically providing a signal to a power converter controller, which controls an internal operating characteristic of the power converter in response to the signal. *See* Inst. Dec. 18; *see also* Ex. 1004, 5:9–12 ("Thus the controller module 210 dynamically changes the switching frequency 216 of the VRM 200 responsive to the activity input 202 indicative of the activity level of the processor 292."). This is consistent with the '514 patent's description that the "power system controller . . . induces the power converter to enter a power converter operational state." Ex. 1001, 26:59–61. Chagny's software program 296 exerts control in the same manner by providing activity input 202 to frequency selector module 215 of controller module 210, which changes the switching frequency ("internal operating characteristic") of VRM 200 in response to activity input 202. Ex. 1004, 4:35–37, 4:40–43, 4:62–63, 4:66–5:3, 5:9–12.

Patent Owner also argues that Chagny's software program 296 is not a power system controller because it runs on device 290, which "corresponds to Chagny's load." PO Resp. 30. But as Petitioner points out, "[t]he '514 Patent includes embodiments where 'the power system controller' is constructed as 'an element' of a server (i.e., the load)." Pet. 26 n.3 (citing Ex. 1001, 13:12–13, 21:65–22:8, 25:23–27, Fig. 11). We agree with Petitioner because the '514 patent states that "the power system controller PSC may be constructed as an element of one or more servers SVR," which

24

are the loads in Figure 11.  Ex. 1001, 22:2–8, 25:24–27, Fig. 11; *see also*
Ex. 1001, 13:12–13 (stating that "a power system controller . . . may be
constructed as a component of the load").

For the reasons discussed above and based on Petitioner's contentions
and evidence, we find that Chagny describes the subject matter of claim 6
and, therefore, that Chagny anticipated claim 6.

### 4. *Claim 11*

Independent claim 11 is directed to a "power system, comprising"
"a power system controller" and "a power converter."

### a) *Power System Controller*

Claim 11 recites that the "power system controller" is "configured to
enable operation of components of a processor system to establish a state of
power drain thereof" and is "configured to provide a signal to identify
operation of said processor system in said state of power drain."

As with claim 6, Petitioner relies on Chagny's software program 296
as disclosing the claimed "power system controller."  Pet. 30.  Petitioner
argues that Chagny discloses that software program 296 sets two bits
(UREG_B1 272 and UREG_B2 274) in processor 292 that control the
maximum number of instructions that the processor can execute per clock
cycle.  Pet. 30–31 (citing Ex. 1004, 4:18–20, 5:57–64, 6:3–12; Ex. 1002
¶¶ 102–103).  Petitioner argues that, because processor power demand
depends on the processor's activity level, software program 296 establishes a
state of power drain by setting the processor's activity level.  Pet. 31 (citing
Ex. 1004, 4:18–20, 5:62–64; Ex. 1002 ¶¶ 102–103).

Patent Owner argues that "the claimed processor system contains a
number of components such as memory, hard drives, and specialized circuit
cards" and, therefore, that the term "components of a processor system" in

claim 11 "is broader than simply processor 292 and includes a number of peripheral components as well." PO Resp. 26 (citing Ex. 1001, 13:29–33; Ex. 2018 ¶ 64). According to Patent Owner, Chagny's software program 296 simply monitors the load "without knowledge of which components of the system are actually drawing power." PO Resp. 26 (citing Ex. 2018 ¶ 65). Patent Owner further argues that claim 11 "requires that the ***operation of the components*** of the processor system establish the state of power drain," meaning that "the claimed power system controller enables operation of processor system components and those components then establish the state of power drain." PO Resp. 28.

We disagree with Patent Owner's argument that the "power system controller" is required to have knowledge of which particular components of the processor system are drawing power. Claim 11 recites "a power system controller configured to enable operation of components of a processor system to establish a state of power drain thereof" and further recites that the "power system controller [is] configured to provide a signal to identify operation of said processor system in said state of power drain." Thus, the "state of power drain" refers to the power drain of the processor system as a whole and not the individual power drains of components of the processor system. This is consistent with the '514 patent specification, which explains that "a power system controller can enable operation of its principal components to establish a state of maximum power drain (e.g., substantially a maximum level of power drain that must be supported by the power system)." Ex. 1001, 13:39–43. This disclosure shows that the power drain measurement relates to what the power system must support, which is the processor system overall, not individual components of the processor system. Thus, we agree with Petitioner that claim 11 does not require

26

IPR2022-00311
Patent 8,477,514 B2

selective enabling of components to establish a separate power drain for each component of a processor system. *See* Pet. Reply 12–13.

We also do not agree with Patent Owner's argument that claim 11 requires considering "peripheral components." *See* PO Resp. 26 (citing Ex. 1001, 13:29–33; Ex. 2018 ¶ 64). The passage of the '514 patent cited by Patent Owner states that a "system such as a personal computer, processor system or a server *is often constructed* with a number of system components such as memory, hard drives, and specialized circuit cards that are specified and installed when the system is assembled for a particular application." Ex. 1001, 13:29–33 (emphasis added). This passage does not require the "processor system" recited in claim 11 to have any *particular* components. Claim 11 recites "enabl[ing] operation of components of a processor system to establish a state of power drain thereof" and, therefore, also does not recite particular components.

Patent Owner also argues that Petitioner's position is that "'processor system' is limited to the internal components of a processor itself, and not, as discussed in the specification and claims, external components such as memory or hard drives." PO Sur-reply 12 (citing Pet. Reply 11–12). We disagree. Petitioner's contention is that a person of ordinary skill in the art would have understood that Chagny's processor 292 is a processor system with multiple components. Pet. Reply 11–12 (citing Ex. 1026 ¶ 22; Ex. 1002 ¶ 132; Ex. 1015 (1990 publication titled *Microprocessor Data Book*), 4–6, Fig. 1.1). Patent Owner does not dispute, and indeed appears to acknowledge, that there are "internal components of a processor." *See* PO Sur-reply 13 ("Nothing in the '514 Patent indicates that 'processor system' refers to the internal components of a processor as Petitioners urge."). We find that a person of ordinary skill in the art would have understood that

IPR2022-00311
Patent 8,477,514 B2

Chagny's processor 292 has multiple components, consistent with Petitioner's contention and with the evidence of record. *See* Pet. Reply 11–12; Ex. 1015, 5 (Fig. 1.1 (depicting a CPU with multiple components)); Ex. 1026 ¶ 22 (Dr. Kiaei's testimony, citing Exhibit 1015, that a person of ordinary skill in the art "would have understood that Chagny's processor 292 . . . [is a] processor system[] with multiple components").

Based on Petitioner's contentions, we find that Chagny's software program 296 "enable[s] operation of components of a processor system to establish a state of power drain thereof," as recited in claim 11, by setting UREG_B1 272 and UREG_B2 274 bits in processor 292 "to control the maximum number of instructions executed per clock cycle." Ex. 1004, 5:57–61; *see* Pet. 30–31 (discussing this disclosure). Chagny explains that the "demand for power required by the processor 292 is advantageously controlled by limiting the number of instructions executed for a predefined time period." Ex. 1004, 5:62–64. Given this correlation between instruction execution and power consumption, by controlling the number of instructions that processor 292 can execute, Chagny's software program 296 enables processor 292 (including its constituent components) to establish a state of power drain by operating at a particular level. *See* Ex. 1002 ¶¶ 102 (Dr. Kiaei's testimony that power demand "depends directly on the activity level of processor 292").

Based on Petitioner's contentions, we also find that Chagny's software program 296 "provide[s] a signal to identify operation of said processor system in said state of power drain" by setting activity level bits GPO1 and GPO2 of activity input 202, which "define up to 4 activity levels of the processor 292." Ex. 1004, 4:46–50; *see* Pet. 31–32 (discussing this disclosure); *see also* Ex. 1002 ¶¶ 105–106 (Dr. Kiaei's testimony that "the

activity level identified by the 'activity input 202' signal corresponds directly to the state of power drain of the processor system").

We disagree with Patent Owner's argument that Chagny's software program 296 "does not control the power system, and is limited to reporting the activity level of the processor" (PO Resp. 29–30) because, as explained above for claim 6, Chagny's software program 296 controls the power system by performing the functions recited of the claimed "power system controller."

Based on Petitioner's persuasive contentions and evidence and for the reasons discussed above, we find that Chagny describes a "power system controller" that is "configured to enable operation of components of a processor system to establish a state of power drain thereof" and is "configured to provide a signal to identify operation of said processor system in said state of power drain."

*b) Power Converter*

Claim 11 recites

a power converter, coupled to said processor system, comprising a power converter controller configured to receive said signal from said power system controller, to sense a power level of said state of power drain in response to said signal, and to control an internal operating characteristic of said power converter as a function of said power level.

Petitioner's contentions for this subject matter are similar to its contentions for the "power converter controller" limitations of claims 1 and 6. Pet. 33–36. Petitioner argues that Chagny's VRM 200 is a power converter and that controller module 210 is a power converter controller. Pet. 33. Petitioner argues that frequency selector module 215 within controller module 210 "senses the activity input 202 signal and thereby the

power level of the state of power drain as indicated by the activity input 202 signal." Pet. 35 (citing Ex. 1002 ¶ 112). Petitioner contends that Chagny's controller module 210 controls the switching frequency ("internal operating characteristic") based on activity input 202, thereby describing "control[ing] an internal operating characteristic of said power converter as a function of said power level," as recited in claim 11. Pet. 36 (citing Ex. 1004, 4:66–5:18; Ex. 1002 ¶¶ 115–116).

Patent Owner does not dispute Petitioner's contentions for the "power converter controller" of claim 11. *See* PO Resp.

Based on Petitioner's persuasive contentions and evidence and for the reasons discussed for similar subject matter in claims 1 and 6, we find that Chagny describes the "power converter" of claim 11.

### c) *Conclusion for Claim 11*

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claim 11 and, therefore, that Chagny anticipated claim 11.

### 5. *Claim 16*

Independent claim 16 recites a "method of operating a power system" having four steps that correspond to operations recited in claim 11. Petitioner refers to its contentions for claim 11 and argues that Chagny discloses methods for operating a power system. Pet. 38 (citing Ex. 1004, 2:40–43; Ex. 1002 ¶¶ 121–124).

Patent Owner argues that Chagny does not disclose "enabling operation of components of a processor system to establish a state of power drain thereof" for the same reasons given for the corresponding operation recited in claim 11. PO Resp. 25–28. For the reasons explained above in section II.D.4.a, we disagree with this argument.

IPR2022-00311
Patent 8,477,514 B2

We agree with Petitioner that its contentions and evidence for claim 11 show that Chagny describes the subject matter of claim 16, and we find, therefore, that Chagny anticipated claim 16.

### 6. *Claims 2, 7, 12, 17*

As discussed above, independent claims 1 and 6 each recite that the power converter comprises "a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof." Claims 2 and 7 depend, respectively, from claims 1 and 6, and recite "wherein said power converter controller is further configured to provide another signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said signal."

Unlike independent claims 1 and 6, independent claims 11 and 16, from which claims 12 and 17 depend, respectively, do not recite a "power switch." Claim 12 recites that the "power converter further comprises a power switch configured to conduct for a duty cycle to provide an output characteristic at an output thereof." Claim 17 recites "inducing a power switch of said power converter to conduct for a duty cycle to provide an output characteristic at an output thereof." Chagny discloses this subject matter for the reasons explained in section II.D.2.b.

Similar to claims 2 and 7, claim 12 recites "said power converter controller further configured to control said duty cycle of said power switch dependent on said output characteristic and in accordance with said power level," and claim 17 recites "controlling said duty cycle of said power switch dependent on said output characteristic and in accordance with said power level."

IPR2022-00311
Patent 8,477,514 B2

a) *Petitioner's Arguments*

To illustrate its contentions for these claims, Petitioner provides the annotated version of Chagny's Figure 2A reproduced below.



Pet. 20.  Chagny's Figure 2A is a diagram of a VRM with a selectable switching frequency.  Ex. 1004, 3:17–19.  As relevant to the discussion for these claims, in the annotated version of Chagny's Figure 2A reproduced above, Petitioner identifies signal 212 (shaded purple) to charge switch 220 (shaded orange) as a signal to control the duty cycle of the power switch, and Petitioner identifies a connection (shaded pink) from output 295 to controller module 210 as "feedback."  Pet. 20.

Petitioner argues that Chagny discloses controlling the duty cycle of charge switch 220 as a function of feedback from output 295 and in accordance with activity input 202.  Pet. 20–21 (citing Ex. 1004, 4:62–5:2, 5:34–46, 9:5–7, 10:14–16, Fig. 2A; Ex. 1002 ¶¶ 70–74).

32

First, as to the requirement to control the duty cycle "as a function of said output characteristic" or "dependent on said output characteristic," Petitioner refers to its discussion for claim 1 explaining how the duty cycle of charge switch 220 determines the voltage level for output 295.  Pet. 21; *see* Pet. 14–16 (explaining that "for a buck power converter, the output voltage is equal to the input voltage times the duty cycle of the high-side switch").  Petitioner relies on Chagny's disclosure that "controller module 210 receives the regulated DC voltage output 295 as a feedback input for regulating the output of the VRM 200."  Ex. 1004, 4:63–65, *cited in* Pet. 21.  Petitioner argues that,

> [b]ecause it is the duty cycle of charge switch 220 that determines the output voltage, and because Chagny explicitly states that controller module 210 regulates the DC output voltage as a function of the feedback, a [person of ordinary skill in the art] would have understood that controller module 210 is configured to control the duty cycle of charge switch 220 as a function of the feedback from the regulated DC voltage output 295 (i.e., as function of said output characteristic).

Pet. 21 (citing Ex. 1002 ¶ 72).  Thus, Petitioner argues, Chagny discloses controlling the duty cycle "as a function of" or "dependent on" output 295 ("said output characteristic").  Pet. 21.

Second, as to the requirement to control the duty cycle "in accordance with said signal" or "said power level," Petitioner relies on Chagny's disclosure that frequency selector module 215 receives activity input 202 and selects switching frequency 216 to match the activity level of processor 292 and that FET driver module 218 receives switching frequency 216 and generates charge control signal 212 having that frequency.  Ex. 1004, 4:66–5:3, 5:28–31, *cited in* Pet. 21.  In particular, Chagny discloses that "FET driver module 218 is operable to receive the selected value of the switching

frequency 216 and generate the charge and discharge control signals 212 and 214, each having the switching frequency 216." Ex. 1004, 5:28–31. Chagny further discloses that charge control switch 220 responds to charge control signal 212 by generating switched DC voltage output 225 having switching frequency 216. Ex. 1004, 3:66–4:2, 6:46–49, Fig. 3 (step 340). Figure 2A shows that frequency selector module 215 and FET driver module 218 are part of controller module 210. Ex. 1004, 4:62–63. Based on these disclosures, Petitioner argues that Chagny discloses controlling the duty cycle of charge switch 220 "in accordance with" activity input 202, which is the "signal" of claims 1 and 6 and represents the "power level" in claims 11 and 16. Pet. 21, 37.

### b) Patent Owner's Arguments

Patent Owner argues that "activity input 202 sets the switching frequency, not the duty cycle," that switching frequency and duty cycle "are separate concepts," that "the duty cycle is independent of the frequency," and that "Chagny does not even discuss duty cycles." PO Resp. 33 (citing Ex. 2018 ¶ 82; Ex. 1004, 5:28–31, 4:66–5:3; Ex. 2020, 65:6–15, 86:23–87:18).

In its Sur-reply, Patent Owner argues that Petitioner "cannot rely on knowledge of a POSITA to prove anticipation by Chagny." PO Sur-reply 17. Patent Owner also argues that "Chagny does not discuss how the conduction period is determined or what the duty cycle is." PO Sur-reply 19.

### c) Analysis

As an initial matter, there is no dispute that the "duty cycle is a ratio represented by a conduction period of a power switch to a switching period thereof." Ex. 1001, 2:57–59; *see* Tr. 42:1–10 (Patent Owner's counsel

agreeing with the definition of duty cycle set forth in the '514 patent). In other words, the duty cycle is the "ratio of on-time to the total switching period." Ex. 1002 ¶ 38. We find that Chagny describes a duty cycle because Chagny discloses that charge switch 220 is turned on and off. *See, e.g.*, Ex. 1004, 5:38–40 ("The opening and closing of the charge and discharge switches 220 and 230 is controlled by the charge and discharge control signals 212 and 214 respectively."). Patent Owner agrees that charge switch 220 is turned on and off. *See* Tr. 43:23–44:1 (Q: "Is Patent Owner disputing that there is a conduction time in Chagny that the FET is turned on and off?"; A: "The FET is turned on and off, yes, so that's correct."); *see also* Tr. 45:11–12 (Patent Owner's counsel stating that "it certainly is turning the FET on and off"). Thus, Chagny discloses that power switch 220 has a duty cycle notwithstanding Patent Owner's argument that "Chagny does not even discuss duty cycles." *See* PO Resp. 33.

As to Patent Owner's argument that "activity input 202 sets the switching frequency, not the duty cycle" (PO Resp. 33), we agree with Petitioner that "[t]here is no requirement that said signal indicating system operational state must 'set' the duty cycle." *See* Pet. Reply 19–20. Petitioner contends that, because the duty cycle of charge switch 220 determines the output voltage and because that output voltage is then used as feedback to regulate the output voltage (Ex. 1004, 4:63–65), a person of ordinary skill in the art would have understood that the duty cycle of charge switch 220 is controlled "as a function of the feedback from the regulated DC voltage output 295 (i.e., as function of said output characteristic)." Pet. 21 (citing Ex. 1002 ¶ 72; Ex. 1009, 17–18).

As to Patent Owner's argument that Petitioner "cannot rely on knowledge of a POSITA to prove anticipation by Chagny"

IPR2022-00311
Patent 8,477,514 B2

(PO Sur-reply 17), we understand that Petitioner is relying on what a person of ordinary skill in the art would have understood from Chagny's disclosure. This is appropriate and indeed necessary because "[a]nticipation is established when 'one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was disclosed in that single reference.'" *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1338 (Fed. Cir. 2017) (quoting *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192–93 (Fed. Cir. 2003)). We also credit Dr. Kiaei's unrebutted testimony that, "for a buck power converter, the output voltage is equal to the input voltage times the duty cycle of the high-side switch (referred to as charge switch [220] in Chagny)." Ex. 1002 ¶ 57. As noted above, Chagny discloses that "controller module 210 receives the regulated DC voltage output 295 as a feedback input for regulating the output of the VRM 200." Ex. 1004, 4:63–65, *cited in* Pet. 21. Thus, we find that Chagny discloses controlling the duty cycle as a function of the output voltage in order to regulate the output voltage as part of the feedback loop.

As to Patent Owner's argument that "Chagny does not discuss how the conduction period is determined or what the duty cycle is" (PO Sur-reply 19), the claims do not recite any particular value for the duty cycle, and Patent Owner does not dispute Petitioner's arguments and Dr. Kiaei's testimony as to how the duty cycle is controlled to regulate the output voltage, as discussed in the previous paragraph.

As for controlling the duty cycle "in accordance with" the signal "indicating a system operational state" or the power level, Petitioner's contention is that charge and discharge control signals 212 and 214 have the switching frequency 216 that is selected based on activity input 202 and,

36

therefore, that Chagny discloses controlling the duty cycle "in accordance with" activity input 202 based on the relationship between frequency and period of the duty cycle. Pet. 21 (citing Ex. 1004, 4:66–5:2, 5:34–46; Ex. 1002 ¶ 73); Pet. Reply 20 (citing Ex. 1026 ¶ 31). The switching frequency is the inverse of the switching period. Ex. 1026 ¶ 31. We credit Dr. Kiaei's unrebutted testimony that, "[a]s a matter of simple math, the duty cycle can therefore also be described as a function of both the conduction period and the *switching frequency*." Ex. 1026 ¶ 31. By disclosing setting the switching frequency and, thus, the switching period, Chagny discloses that the duty cycle is controlled "in accordance" with activity input 202, upon which the switching frequency is based.

In sum, we find persuasive Petitioner's contentions for claims 2, 7, 12, and 17. We find that Chagny discloses controlling the duty cycle of charge switch 220 as a function of the feedback from the regulated DC voltage output 295 based on Chagny's disclosure that "controller module 210 receives the regulated DC voltage output 295 as a feedback input for regulating the output of the VRM 200." Ex. 1004, 4:63–65. We also find that Chagny discloses controlling the duty cycle of charge switch 220 in accordance with the signal indicating the system operational state or the power level based on Chagny's disclosure that frequency selector module 215 receives activity input 202 and selects switching frequency 216 to match the activity level of processor 292 and that FET driver module 218 receives switching frequency 216 and generates charge signal 212 having that frequency. Ex. 1004, 4:66–5:3, 5:28–31.

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claims 2, 7, 12, and 17 and, therefore, that Chagny anticipated these claims.

IPR2022-00311
Patent 8,477,514 B2

### 7. *Claims 3, 8, 14, 19*

Claims 3, 8, and 14 depend, respectively, from claims 1, 6, and 11 and recite "wherein said power converter controller is configured to adjust said internal operating characteristic over a period of time." Claim 19 depends from claim 16 and recites "wherein said controlling said internal operating characteristic comprises occurs over a period of time."

Petitioner argues that Chagny discloses dynamically changing the switching frequency in response to activity input 202, which may be periodically updated. Pet. 22 (citing Ex. 1004, 4:43–45, 4:66–5:3, 5:9–12). Petitioner contends that a person of ordinary skill in the art "would have understood that Chagny's power converter controller is configured to adjust the switching frequency over a period of time as the processor loading (and thus activity input 202) changes." Pet. 22 (citing Ex. 1004, 4:18–20, 5:65–66; Ex. 1002 ¶¶ 75–77).

Patent Owner argues that "the '514 Patent is clear that it is beneficial to adjust operating characteristics over gradual periods of time" whereas "Chagny's controller module 210[] causes an instant response to the activity input that causes a change in the frequency." PO Resp. 35 (citing Ex. 1001, 16:52–17:14; Ex. 2018 ¶¶ 83, 86). Claims 3, 8, 14, and 19, however, do not recite a "gradual" time period or any specific time period at all. As Petitioner correctly points out (Pet. Reply 22–23), the '514 patent explains that the timescales for changing operating characteristics vary, giving as an example that "the switching frequency of a power conversion stage or the timing delay between power switch conduction intervals can be readily changed on a much faster time scale, ultimately on a cycle-by-cycle basis." Ex. 1001, 16:52–61. Thus, we disagree with Patent Owner's argument that changes have to be gradual.

Petitioner's contentions are persuasive. Chagny discloses that "activity input 202 may be updated on a periodic basis, e.g., once every millisecond, on an event basis or on an on-demand basis." Ex. 1004, 4:43–45. Chagny discloses that "controller module 210 dynamically changes the switching frequency 216 of the VRM 200 responsive to the activity input 202 indicative of the activity level of the processor 292." Thus, Chagny discloses adjusting the switching frequency over a period of time. As activity input changes, the switching frequency changes accordingly.

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claims 3, 8, 14, and 19 and, therefore, that Chagny anticipated these claims.

### 8. *Claims 4, 9*

Claim 4 depends from claim 1 and recites "wherein said load is a processor and said system operational state is dependent on one of a core state and a performance state of said processor." Claim 9 depends from claim 6 and recites "wherein said power requirement of a processor system is dependent on one of a core state and a performance state of said processor system."

Petitioner argues that the core state "specifies the activity level (e.g., the rate at which instructions are executed) of the processor" and that Chagny's disclosure of various activity levels (low, medium, high) for its processor describes the subject matter of claim 4. Pet. 23–24 (citing Ex. 1001, 5:44–61; Ex. 1004, 4:23–30, 4:43–49, 6:3–4; Ex. 1002 ¶¶ 79–82). For claim 9, Petitioner argues that "the processor power requirement depends on the activity level of the processor." Pet. 28 (citing Ex. 1004, 4:18–20, 5:62–64; Ex. 1002 ¶¶ 97–98).

IPR2022-00311
Patent 8,477,514 B2

Patent Owner argues that, as a matter of claim construction, the recited "core state" should be limited to ACPI C-states. *See* PO Resp. 37; PO Sur-reply 22–23. We disagree for the reasons given in section II.C.2.

Patent Owner also argues that Chagny "does not teach using C-states or P-states to define the system operational state" and that "it is not possible for the system of Chagny to ascertain the P-state or C-state based on its signal 202 indicative of processor activity level." PO Resp. 38. Putting aside whether the recited "core states" are limited to ACPI C-states, Patent Owner's arguments are not commensurate in scope with claims 4 and 9. For example, claim 1 recites "a power converter controller configured to receive a signal from said load indicating a system operational state of said load," and dependent claim 4 recites "wherein said load is a processor and said system operational state is dependent on one of a core state and a performance state of said processor." Claim 4 does not recite that the "core state" itself needs to be reported to the power converter controller or that the power converter controller must be able to "ascertain" the core state of the processor. Rather, there is a signal "indicating a system operational state of said load," and the "system operational state is dependent on . . . a core state." Similarly, claim 6 recites "a power system controller configured to provide a signal characterizing a power requirement of a processor system," and dependent claim 9 recites that the "power requirement . . . is dependent on . . . a core state." Thus, claim 9 also does not require the system to know or determine the core state.

Patent Owner characterizes the core states of the '514 patent as follows:

> The core state (or C-state) in the '514 Patent is either a sleep mode (where the activity level of the processor is zero) or (in

state C0), "full operational level" (when the activity level of the processor can be anything). At best, a core state discloses that the activity level of the processor is zero because the system is in sleep mode. Thus, Chagny's activity level is not a core state as required by claims 4 and 9.

PO Resp. 39 (citing Ex. 1001, 5:44–54). Thus, according to Patent Owner, an operational processor has a core state different from a processor in sleep mode.

We are persuaded by Petitioner's contention for claim 4 that "the activity level of processor 292 (i.e., system operational state of the load) at any of the activity levels disclosed by Chagny (e.g., low, medium, high) is dependent on at least a core state of the processor 292." Pet. 23–24 (citing Ex. 1002 ¶¶ 80–81). We agree because the activity levels (low, medium, and high (Ex. 1004, 4:23–30)) show that Chagny's processor is in an operational core state "when the activity level of the processor can be anything," according to Patent Owner. *See* PO Resp. 39. Thus, Chagny's activity level ("system operational state") is "dependent on" the processor being in an operational "core state." Similarly, for claim 9, Chagny shows that the processor's power demand is based on the processor's activity level (Ex. 1004, 4:18–20, 5:62–64), as discussed for claim 6, and, therefore, the power requirement for Chagny's processor is dependent on an operational core state.

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claims 4 and 9 and, therefore, that Chagny anticipated these claims.

### 9. *Claims 5, 10, 15, 20*

Claims 5, 10, 15, and 20 depend, respectively, from claims 1, 6, 11, and 16 and recite "wherein said internal operating characteristic is selected

IPR2022-00311
Patent 8,477,514 B2

from the group consisting of: . . . a switching frequency of said power converter." Petitioner refers to its discussion of the "power converter controller" limitation of claim 1, in which Petitioner identifies Chagny's switching frequency 216 as the recited "internal operating characteristic." Pet. 19, 24. Patent Owner does not dispute Petitioner's contentions for these claims. We find that Chagny's switching frequency 216 describes "a switching frequency of said power converter."

Based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claims 5, 10, 15, and 20 and, therefore, that Chagny anticipated these claims.

### E. Obviousness Based on Chagny
### (Claims 1–20)

Petitioner asserts that claims 1–20 would have been obvious over Chagny. Pet. 8, 40–44. As the Court of Appeals for the Federal Circuit has stated, "a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness.'" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (citing *In re Fracalossi*, 681 F.2d 792 (CCPA 1982)). Because we find that Chagny anticipated claims 1–12, 14–17, 19, and 20, we also conclude that the subject matter of claims 1–12, 14–17, 19, and 20 would have been obvious based on the teachings of Chagny.

Claims 13 and 18 are the only claims included in this obviousness ground that are not in the Chagny anticipation ground. Claims 13 and 18 depend, respectively, from claim 11 and 16 and recite "wherein said signal is provided upon startup of said processor system."

Petitioner argues that a person of ordinary skill in the art "would have found it obvious that the generation and provision of Chagny's activity

input 202 signal (i.e., said signal) would occur throughout the operating time of Chagny's information handling system device 290, including upon startup." Pet. 43–44 (citing Ex. 1002 ¶¶ 138–140). In support of this contention, Petitioner relies on Chagny's disclosure that "activity input 202 may be updated on a periodic basis, e.g., once every millisecond, on an event basis or on an on-demand basis." Ex. 1004, 4:43–45, *cited in* Pet. 43. Petitioner argues that "startup of information handling system device 290 as a whole[] would be among the 'event basis' or 'on-demand basis' upon which Chagny updates and provides the activity input 202 signal (i.e., provides said signal)." Pet. 44 (citing Ex. 1004, 4:40–45; Ex. 1002 ¶ 140).

In its Response, Patent Owner generally alleges that Petitioner's obviousness contentions improperly gap-fill missing limitations with the knowledge of a person of ordinary skill in the art, but Patent Owner does not directly respond to Petitioner's articulated reasoning with respect to claims 13 and 18. PO Resp. 40–41 (citing *DSS Tech. Mgmt. Inc. v. Apple Inc.*, 885 F.3d 1367, 1377 (Fed. Cir. 2018); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 851 F.3d 1270, 1274–75 (Fed. Cir. 2017); *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016)).

We find Petitioner's obviousness contentions for claims 13 and 18 persuasive. Claim 11 recites that the power system controller is "configured to enable operation of components of a processor system to establish a state of power drain thereof, said power system controller configured to provide a signal to identify operation of said processor system in said state of power drain," and we find Chagny describes this subject matter for the reasons discussed above in section II.D.4.a. Claims 13 and 18 recite the time at which the signal is provided, specifically "upon startup." Petitioner's contention is simply that it would have been obvious for Chagny's activity

IPR2022-00311
Patent 8,477,514 B2

input 202 to be provided throughout the operation of Chagny's system 290, including upon startup. Pet. 43–44. Petitioner's contention is persuasively supported by Dr. Kiaei's testimony (Ex. 1002 ¶ 140) and Exhibit 1007 (US Patent 6,748,545 B1 ("Helms")).

Patent Owner specifically addresses Petitioner's evidence for claims 13 and 18 for the first time in its Sur-reply and argues that "it is not clear what the relevance of EX1007 [(Helms)] is." PO Sur-reply 24. We disagree.

Dr. Kiaei explains, relying on Helms, that "it was well known in the art that a microprocessor would send control signals to an adaptive power supply coupled to that microprocessor as soon as the microprocessor was powered up to a level where its control signal was valid." Ex. 1002 ¶ 140 (citing Ex. 1007, 3:57–64, 4:28–40, 4:50–58, Fig. 3). Helms explains that "[p]ersons of skill in the art are familiar with the power-good signal," which "is asserted and maintained" after "power is initially applied to a computer system" and when "the voltage rails in the system are stable." Ex. 1007, 4:50–55.

As noted above, Chagny discloses that "activity input 202 may be updated on a periodic basis, e.g., once every millisecond, on an event basis or on an on-demand basis." Ex. 1004, 4:43–45. Dr. Kiaei testifies that a person of ordinary skill in the art "would have found it obvious that the startup of Chagny's processor 292 (during the startup of information handling system device 290 as a whole) would be among the 'event basis' or 'on-demand basis' upon which Chagny updates and provides the activity input 202 signal (i.e., provides said signal)." Ex. 1002 ¶ 140. Indeed, Chagny's disclosure that activity input 202 may be updated as frequently as "once every millisecond" suggests essentially continuous updating during

operation, which would begin at startup, consistent with Dr. Kiaei's testimony that activity input 202 would be provided "throughout the operating time of Chagny's information handling system device 290, including upon startup." Ex. 1002 ¶ 140.

This is not a situation in which Petitioner has merely made an unsubstantiated assertion of obviousness. *See DSS Tech.*, 885 F.3d at 1377 (relying on "ordinary creativity" "as a wholesale substitute for reasoned analysis and evidentiary support"). Rather, Petitioner provides articulated reasoning with ample supporting evidence to show that, in the context of Chagny, it would have been obvious to provide activity input 202 upon startup of the processor.

Patent Owner also argues that Petitioner incorrectly interprets "upon startup" to mean "thereafter." PO Sur-reply 25 (citing Pet. Reply 27). This argument appears to be directed to the grounds based on Hwang based on Patent Owner's citation of page 27 of the Reply, which addresses Hwang. To the extent this argument is directed to Petitioner's contentions with respect to Chagny, we disagree. Claim 11, from which claim 13 depends, recites that the power system controller is "configured to enable operation of components of a processor system to establish a state of power drain thereof, said power system controller configured to provide a signal to identify operation of said processor system in said state of power drain." Thus, the base claim recites that the components establish a state of power drain, which must take place before there is "a signal to identify operation of said processor system in said state of power drain." The '514 patent confirms this order of operations, explaining as follows:

> Upon power-up of such a system, or during its continued operation, a power system controller can enable operation of its

IPR2022-00311
Patent 8,477,514 B2

> principal components to establish a state of maximum power
> drain (e.g., substantially a maximum level of power drain that
> must be supported by the power system). The power system
> controller can be configured to provide a signal to the power
> system to identify operation of the system in such a state of a
> maximum power drain.

Ex. 1001, 13:39–46. Thus, the claims and the specification of the '514

patent both demonstrate that "upon startup of said processor system" in

claims 13 and 18 includes the time period after the components have been

enabled to establish a state of power drain.

Based on Petitioner's contentions and evidence, we conclude that the

subject matter of claims 1–20 would have been obvious based on the

teachings of Chagny.

### F.  Remaining Grounds

As noted above in § I.A, Petitioner presents additional challenges to

the claims in this proceeding based on Hwang, alone and in combination

with Chagny. Because we determine that all challenged claims are

unpatentable as discussed above, we need not separately assess the

patentability of these claims based on the remaining grounds in this

proceeding. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and

not dismissed under this chapter, the Patent Trial and Appeal Board shall

issue a final written decision with respect to the patentability of any patent

claim challenged by the petitioner and any new claim added under section

316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990

(Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not

address issues that are not necessary to the resolution of the proceeding.").

IPR2022-00311
Patent 8,477,514 B2

### III. CONCLUSION[9]

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–20 of the '514 patent are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–12, 14–17, 19, 20 | 102(a), (b) | Chagny | 1–12, 14–17, 19, 20 | |
| 1–20 | 103(a) | Chagny | 1–20 | |
| 1–10, 16, 17, 19, 20 | 102(a), (b) | Hwang[10] | | |
| 11, 12, 14–17, 19, 20 | 103(a) | Hwang, Chagny | | |
| 18 | 103(a) | Hwang | | |
| 13, 18 | 103(a) | Hwang, Chagny | | |
| **Overall Outcome** | | | 1–20 | |

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[10] As explained above, because we determine that the challenged claims are unpatentable on other grounds, we decline to address the remaining grounds based on Hwang alone or on Hwang in combination with Chagny.

IPR2022-00311
Patent 8,477,514 B2

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–20 of the '514 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00311
Patent 8,477,514 B2

PETITIONER:

Eliot D. Williams
Neil Sirota
Brett Thompsen
Frank Zhu
Paula Heyman
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
brett.thomsen@bakerbotts.com
frank.zhu@bakerbotts.com
paula.heyman@bakerbotts.com


Ping Wang
Eric Cohen
RIMON PC
ping.wang@rimonlaw.com
eric.cohen@rimomlaw.com


PATENT OWNER:

James T. Carmichael
Stephen McBride
Minghui Yang
CARMICHAEL IP, PLLC
jim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

Trials@uspto.gov                                                      Paper 29
571-272-7822                                               Date: May 17, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAMSUNG ELECTRONICS CO., LTD, DELL TECHNOLOGIES INC.,
and ANKER INNOVATIONS LTD.,[1]
Petitioner,

v.

MYPAQ HOLDINGS LTD.,
Patent Owner.

_____

IPR2022-00312
Patent 7,675,759 B2

_____

Before KRISTINA M. KALAN, DANIEL J. GALLIGAN, and
ELIZABETH M. ROESEL, *Administrative Patent Judges.*

GALLIGAN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1] Anker Innovations Ltd. filed a motion for joinder and a petition in
IPR2022-01131 and has been joined as a petitioner in this proceeding.

IPR2022-00312
Patent 7,675,759 B2

# I.  INTRODUCTION

In this *inter partes* review, Samsung Electronics Co., Ltd. ("Samsung"), Dell Technologies Inc. ("Dell"), and Anker Innovations Ltd. ("Anker") (collectively "Petitioner") challenge the patentability of claims 1–20 of U.S. Patent No. 7,675,759 B2 (Ex. 1001, "the '759 patent"), which is assigned to MyPAQ Holdings Ltd. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, we determine that Petitioner has proven by a preponderance of the evidence that claims 1–20 of the '759 patent are unpatentable.  *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

## A.  Procedural History

Samsung and Dell filed a Petition (Paper 3, "Pet.") challenging claims 1–20 of the '759 patent on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–3, 5–13, 15–20 | 102(a), (b)[2] | Hirst[3] |
| 1–3, 5–13, 15–20 | 103(a) | Hirst |
| 1, 2, 4–6, 11, 14–16, 20 | 102(a), (b) | Chagny[4] |
| 1, 2, 4–6, 11, 14–16, 20 | 103(a) | Chagny |

---

[2]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011) amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013.  Because the '759 patent was filed before this date, we refer to the pre-AIA versions of §§ 102 and 103.  Ex. 1001, code (22).
[3]  US 6,294,904 B1, issued Sept. 25, 2001 (Ex. 1003).
[4]  US 6,873,136 B2, issued Mar. 29, 2005 (Ex. 1004).

IPR2022-00312
Patent 7,675,759 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 3, 12, 13, 19 | 103(a) | Chagny, Clark[5] |
| 1, 2, 4–6, 11, 14–16, 20 | 103(a) | Hwang[6] |

Pet. 10.  Patent Owner filed a Preliminary Response.  Paper 7.  With our authorization, Samsung and Dell filed a reply to the Preliminary Response (Paper 9) addressing discretionary denial issues, and Patent Owner filed a sur-reply (Paper 10).  We instituted trial on the asserted grounds of unpatentability.  Paper 11 ("Inst. Dec.") at 30.

After institution, Anker filed a motion for joinder and a petition in IPR2022-01131.  We joined Anker as a petitioner in this proceeding.  Paper 18.

During the trial, Patent Owner filed a Response (Paper 17, "PO Resp."), Petitioner filed a Reply (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply").

An oral hearing was held on February 24, 2023, a transcript of which appears in the record.  Paper 28 ("Tr.").

Petitioner relies on testimony from Dr. Sayfe Kiaei.  Exs. 1002 (Declaration), 1026 (Reply Declaration).  Patent Owner relies on testimony from Dr. Frank Ferrese.  Ex. 2018.  The parties have entered in the record transcripts for depositions of these declarants.  Exs. 2020, 2021 (Kiaei Deposition), 1027, 1028 (Ferrese Deposition).

### B.  Real Parties in Interest

Petitioner identifies the following as real parties in interest:  Samsung, Dell, Samsung Electronics America, Inc., Samsung Semiconductor, Inc.,

---

[5]  US 6,664,775 B1, issued Dec. 16, 2003 (Ex. 1005).
[6]  US 2004/0174152 A1, published Sept. 9, 2004 (Ex. 1006).

IPR2022-00312
Patent 7,675,759 B2

Samsung Austin Semiconductor, LLC, Dell Inc., and Anker.  Pet. 1;
IPR2022-01131, Paper 2 at 1.

Patent Owner identifies itself as the real party in interest and notes
that "Transpacific IP Group Limited has an ownership interest in MyPAQ."
Paper 5 at 1; Paper 8 at 1.

### C.  Related Matters

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various
related matters, including *MyPAQ Holdings Ltd. v. Samsung Electronics
Co., Ltd.*, 6:21-CV-00398 (W.D. Tex.) ("district court litigation").  Pet. 1;
Paper 8 at 1.  We are concurrently issuing a final written decision in
IPR2022–00311, involving related U.S. Patent 8,477,514 B2.

### D.  The '759 Patent and Illustrative Claims

The '759 patent discloses a power system having a power converter
with an adaptive controller that can change an internal operating
characteristic (such as switching frequency) of the power converter based on
signals about the load to which it provides power.  Ex. 1001, code (57),
5:34–55, 7:33–43.

Petitioner challenges all 20 claims of the '759 patent.  Pet. 10.
Claims 1, 6, and 16 are independent.  Claim 1 is illustrative of the claimed
subject matter and is reproduced below with added formatting and bracketed
identifiers for claim recitations.

> 1.  [pre] A power converter coupled to a power system
> controller configured to receive a signal indicating a system
> operational state of a load coupled thereto, comprising:
>
> [a] a power switch configured to conduct for a duty cycle
> to provide a regulated output characteristic at an output thereof;
> and

4

IPR2022-00312
Patent 7,675,759 B2

[b] a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state,

[c] said controller further configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command,

[d] thereby regulating an internal operating characteristic of said power converter to improve an operating efficiency thereof as a function of said system operational state.

## II.  ANALYSIS

### A.  *Principles of Law*

To establish anticipation, each and every element in a claim, arranged as recited in the claim, must be found in a single prior art reference. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Although the elements must be arranged or combined in the same way as in the claim, "the reference need not satisfy an *ipsissimis verbis* test," i.e., identity of terminology is not required. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (citing *In re Bond*, 910 F.2d 831, 832–33 (Fed. Cir. 1990)).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary

considerations, if in evidence.[7]  *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### B.  Level of Ordinary Skill in the Art

Petitioner contends that a person of ordinary skill in the art ("POSITA") "would have had either (i) a Master of Science in Electrical Engineering, or an equivalent field, or (ii) a Bachelor of Science in Electrical Engineering or an equivalent field as well as at least two years of experience in the design of power electronics."  Pet. 10 (citing Ex. 1002 ¶ 35).

At institution, we found this definition to be consistent with the scope and content of the '759 patent and the asserted prior art, but we omitted the open-ended phrase "at least" to avoid introducing vagueness as to the amount of experience.  Inst. Dec. 10–11.

Patent Owner does not dispute part (ii) of Petitioner's proposed skill level, but for part (i), Patent Owner argues that "a Master and Bachelor degree in Electrical Engineering alone would not necessarily focus enough on power electronics to qualify as a POSITA."  PO Resp. 17.  Relying on Dr. Ferrese's testimony, Patent Owner argues that,

> [t]o qualify as a POSITA based entirely on education, a person would need to demonstrate a significant focus on power electronics while obtaining their Master and/or Bachelor degrees, for example, through taking higher level courses focused on power electronics, publishing on the topic of power electronics, performing lab work or internships in the field of power electronics, or similar.

PO Resp. 17 (citing Ex. 2018 ¶ 45).  Patent Owner also argues that "a person with a Master and Bachelor degree in many 'equivalent fields' to Electrical

---

[7]  The parties do not present arguments related to objective evidence of nonobviousness (i.e., secondary considerations) as to any of the challenged claims.

Engineering would not be expected to have any significant exposure to power electronics" and that such a person would need "independent expertise in power electronics (through work or otherwise) to qualify as a POSITA." PO Resp. 17–18 (citing Ex. 2018 ¶ 46).

We agree with Patent Owner that some degree of familiarity with power electronics would be necessary for a POSITA given the subject matter at issue, and we understood this to be implicit in part (i) of Petitioner's definition. To address Patent Owner's concern, we clarify that a person with a Master of Science in Electrical Engineering or an equivalent field would need experience in power electronics to qualify as a POSITA. We are reluctant to use Patent Owner's formulation of "some independent *expertise* in power electronics" (PO Resp. 17–18 (emphasis added)) because it could be read to include an expert level of skill rather than an ordinary level of skill.

Thus, we determine that a POSITA would have had either (i) a Master of Science in Electrical Engineering, or an equivalent field, and experience in power electronics or (ii) a Bachelor of Science in Electrical Engineering or an equivalent field as well as two years of experience in the design of power electronics.

We would reach the same determinations on Petitioner's patentability challenges in §§ II.D–G below even if we adopted Patent Owner's assessment of a person with a Master of Science degree and "some independent *expertise* in power electronics (through work or otherwise)," which is a higher level of skill.

### C. *Claim Construction*

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b).

Both parties state that they interpret the claims according to "their ordinary and customary meaning," and neither party proposes express constructions in the claim construction sections of their papers. Pet. 10; PO Resp. 16. In its arguments against Petitioner's unpatentability contentions, however, Patent Owner proposes constructions for "system operational state" and "core state." PO Resp. 18–22, 54–55. We discuss each of these terms below.

### 1. *"System Operational State"*

Independent claims 1, 6, and 16 recite "a signal indicating a system operational state of [a/said] load."

Petitioner contends that a power consumption signal indicating whether a load is in a normal or standby mode and a signal indicating the activity level of a processor (load) are signals "indicating a system operational state of a load." Pet. 15, 41–42.

Patent Owner counters that a person of ordinary skill in the art "would understand that the term 'system operational state' as it pertains to engineering systems, refers to the way in which the system as a whole is being employed or utilized." PO Resp. 18–19 (citing Ex. 2018 ¶ 51); *see also* PO Resp. 46 (similar assertion that "the term 'system operational state' as it pertains to engineering systems, refers to the way in which the system is being employed or utilized (i.e., operated)" (citing Ex. 2018 ¶ 94)). Patent Owner argues that examples of signals indicating system operational states from the '759 patent show that such "signal[s] indicate[] the current or

8

IPR2022-00312
Patent 7,675,759 B2

future operational state of the load in a particular context, not simply the current activity level of the processor." PO Resp. 18–20, 46–47 (citing Ex. 1001, 7:16–28; Ex. 2018 ¶¶ 51, 94). According to Patent Owner, "the system operational state is not merely a measure of power level during a low power state[;] it is a state that is driven by various factors, including external requirements, and is ultimately dependent on the context in which the system is being utilized." PO Resp. 48 (citing Ex. 2018 ¶ 96); *see also* PO Resp. 21–22 (similar argument (citing Ex. 2018 ¶ 52)).

We do not agree with Patent Owner's interpretation of the term "system operational state of said load." As an initial matter, Patent Owner does not direct us to, and we do not find, a definition of "system operational state" of a load in the '759 patent. As noted above, Patent Owner's proposed definition is that "the term 'system operational state' as it pertains to engineering systems, refers to the way in which the system as a whole is being employed or utilized." PO Resp. 18–19 (citing Ex. 2018 ¶ 51). Claims 1, 6, and 16, however, recite "a system operational state *of [a/said] load*" (emphasis added), not the system as a whole. Patent Owner's proposed construction, therefore, is not consistent with the claim language. Patent Owner points to examples disclosed in the '759 patent in an attempt to narrow the meaning of the claim term and, as further discussed below, to distinguish the prior art. *See* PO Resp. 19–20 ("The '759 Patent provides examples of signals indicating system operational states including signals . . . ." (citing Ex. 1001, 7:17–28)); *see also* PO Resp. 46–47 (similar argument citing Ex. 1001, 7:16–28). But the '759 patent states that these are non-limiting examples. Ex. 1001, 7:16–17 ("Further examples indicating a system operational state include, without limitation . . . .").

One passage cited by Patent Owner states the following:

9

IPR2022-00312
Patent 7,675,759 B2

> It should also be taken into account that there are loads
> with different operating states. For example, a server configured
> to process financial data may operate at a higher level of
> criticality during normal business hours, and revert to a lower
> processing state at another time of day. The aforementioned
> system may require a higher level of performance from the power
> converter during such periods of high criticality, which may
> compromise operating efficiency, but which may admit higher
> operating efficiency during substantial periods of time in the
> lower processing state.

Ex. 1001, 3:55–64, *quoted in* PO Resp. 20–21, 47. Patent Owner argues that

this passage "illustrates the difference between operational states and system

activity at a particular moment" because, according to Patent Owner, "[i]n

this example, the system operational state may be in a critical or non-critical

state depending on the given performance constraints at a particular time of

day." PO Resp. 20–21; *see also* PO Resp. 47 (similar argument). We

disagree. The '759 patent passage above effectively correlates processor

activity and criticality by saying that, in a period of "high criticality," the

load requires a higher performance level from the power converter than

when the load is in a "lower processing state." Ex. 1001, 3:55–64. Thus,

this example shows that a "lower processing state" of a data processing

server is a "system operational state" of that server, notwithstanding Patent

Owner's labeling this as a "non-critical state." *See* PO Resp. 21.

Patent Owner argues that "two processors in two different systems

may have the same activity level at some point in time" but may be in

different system operational states because, for example, speed is critical

with one processor and energy efficiency is critical with the other. PO

Resp. 48–49 (citing Ex. 2018 ¶¶ 97–98). Similarly, Dr. Ferrese posits an

analogy in which two vehicles are traveling at the same speed but one is

carrying a person to a hospital and the other is carrying a family on a road

IPR2022-00312
Patent 7,675,759 B2

trip. Ex. 2018 ¶ 97. Dr. Ferrese states that, even though these two vehicles "in a given instant appear to be operating identically," they "can actually have significantly different system operational states resulting in different preferences in terms of how they are operated and controlled." Ex. 2018 ¶ 97. These hypotheticals are not persuasive, as they would introduce subjectivity into the claim construction, requiring inquiry into the purpose or intent of a processor's operation. Furthermore, these hypotheticals are not helpful in resolving the controversy because Petitioner relies on the different activity levels in the prior art as disclosing different system operational states, as discussed below in sections II.D.2.b and II.G.2.a. Thus, we need not opine on whether one activity level of a processor could result in multiple system operational states.

In addition, we decline to define the system operational state of a load to include "external requirements," as urged by Patent Owner (PO Resp. 21–22, 48), because this ignores the plain language of the independent claims, which recite "a system operational state *of [a/said] load*" (emphasis added), not states external to the load.

For the reasons discussed above, we determine that a signal "indicating a system operational state of said load" encompasses a signal indicating the activity level of a load, including whether the load is in standby or normal mode. *See* Ex. 1001, 3:55–64. We need not further construe this claim term to resolve the patentability issues before us. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy,

IPR2022-00312
Patent 7,675,759 B2

and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).[8]

### 2. "Core State"

Claims 4 and 14 depend, respectively, from claims 1 and 6 and recite that the "load includes a processor and said system operational state depends on one of a core state and a performance state of said processor."

Petitioner contends that "[t]he '759 Patent background explains that a 'core state' is 'under software operating system control' and relates to 'various levels of a processor sleep state,' achieved by 'halting instruction execution' among other items." Pet. 51 (citing Ex. 1001, 4:23–39; Ex. 1002 ¶ 154).

Patent Owner argues that the "core state (C-state) and performance state (P-state) of a processor are defined in the industry standard titled, 'Advanced Configuration and Power Interface' which is incorporated by reference into the '759 Patent." PO Resp. 55 (citing Ex. 1001, 4:1–6; Ex. 2022 (Advanced Configuration and Power Interface (ACPI) Specification, Revision 3.0, September 2, 2004)). According to Patent Owner, the '759 patent "defines 'core state' as a 'C-state' and uses the terms

---

[8] Our Rules require us to consider "[a]ny prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the *inter partes* review proceeding." 37 C.F.R. § 42.100(b). Patent Owner entered into the record an email from a law clerk in the district court litigation laying out in a table "preliminary claim constructions" for some terms of the '759 patent before a *Markman* hearing. Ex. 2024. That district court case was stayed before the court issued its final claim construction determinations. Tr. 11:4–10. We have considered the preliminary claim constructions in Exhibit 2024, and we determine that they do not impact the analysis in this proceeding.

IPR2022-00312
Patent 7,675,759 B2

interchangeably." PO Sur-reply 19–21 (citing Ex. 1001, 4:1–6, 4:23–25, 7:16–19, 21:6–16, Fig. 12; Ex. 2018 ¶¶ 112–117; Ex. 2020, 66:18–25).

Petitioner counters that the claims recite "a core state," not "a C-state as defined in ACPI," and that the '759 patent provides that "a C-state is merely an ***example*** of a core state." Pet. Reply 30–31 (citing Ex. 1001, 7:16–17).

We agree with Petitioner. Claims 4 and 14 recite "core state," not "C-state." The specification of the '759 patent identifies a "C-state" as a type of "core state." Ex. 1001, 4:23–25 ("Another processor state indicator, the core state ('C-state') . . . ."). This, however, does not mean that the term "core state" is necessarily limited to C-states as defined in ACPI ("ACPI C-states"). The specification of the '759 patent elsewhere shows that the ACPI C-states are merely examples within the broader category of core states. For instance, the '759 patent states that "examples indicating a system operational state include, without limitation, a signal providing a performance state or a core state of a processor *such as a P-state or C-state*." Ex. 1001, 7:16–28 (emphasis added). Given the '759 patent's description of C-states as exemplary core states, we do not agree with Patent Owner's argument that the recited "core state" should be limited to ACPI C-states.

We need not further construe the term "core state" to resolve the patentability issues before us. *See Realtime Data*, 912 F.3d at 1375.

### D. Anticipation by Chagny
#### (Claims 1, 2, 4–6, 11, 14–16, 20)

Petitioner asserts that Chagny anticipated claims 1, 2, 4–6, 11, 14–16, and 20. Pet. 10, 40–57. Patent Owner opposes. PO Resp. 45–58; PO Sur-reply 7–8, 11–13, 15–16, 19–21.

IPR2022-00312
Patent 7,675,759 B2

### 1.  Chagny

Chagny discloses a voltage regulator module ("VRM") that provides a regulated direct current ("DC") voltage output to power a processor of an information handling system.  Ex. 1004, code (57).  An embodiment is shown in Figure 2A, which is reproduced below.



**FIG. 2A**

Chagny's Figure 2A shows VRM 200, which receives a DC voltage input 205 and generates a regulated DC voltage output 295, which provides power to processor 292 included in information handling system device 290. Ex. 1004, 3:52–59.  VRM 200 includes, among other things, controller module 210 operable to receive activity input 202 indicative of levels of activity of processor 292 and to select a switching frequency of VRM 200 responsive to activity input 202 so that the switching frequency "dynamically matches the level of activity" of processor 292.  Ex. 1004, 3:60–65, 4:66–5:3, 5:9–12.

14

IPR2022-00312
Patent 7,675,759 B2

### 2.  Claim 1

#### a)  Overview of Petitioner's Contentions and
Findings for Certain Limitations

Claim 1 is directed to a "power converter" that is "coupled to a power system controller" and that comprises "a power switch" and "a controller," and claim 1 recites functionality for the claimed components.  Petitioner provides the annotated version of Chagny's Figure 2A reproduced below to illustrate its contentions.[9]



Pet. 46.  Chagny's Figure 2A is a diagram of a VRM with a selectable switching frequency.  Ex. 1004, 3:17–19.  In the annotated version of Chagny's Figure 2A reproduced above, Petitioner identifies VRM 200 (outlined in blue) as the claimed "power converter," charge switch 220

---

[9] Petitioner and Dr. Kiaei italicize the names of references.  We omit this emphasis when quoting Petitioner's arguments and Dr. Kiaei's testimony.

(shaded orange) as the claimed "power switch," and controller module 210 (shaded gray) as the claimed "controller" of the power converter. Pet. 40–41, 43, 45–46. Petitioner identifies processor 292 (shaded pink) as the recited "load" and also identifies software program 296 (shaded green) alone or with I/O controller hub (ICH) 280 (shaded green) as the recited "power system controller." Pet. 40–42.

### (1) Preamble

As to the preamble ("power converter coupled to a power system controller configured to receive a signal indicating a system operational state of a load coupled thereto"), Petitioner argues that Chagny's VRM 200 is a "power converter" that is coupled to processor 292 ("a load"). Pet. 40–41 (citing Ex. 1004, code (57), 3:54–58, Fig. 2a; Ex. 1002 ¶ 127). Patent Owner does not dispute this assertion. *See* PO Resp. We find that Chagny's VRM 200 is a power converter because it is "operable to receive a direct current (DC) voltage input 205 and generate a regulated DC voltage output 295." Ex. 1004, 3:54–56; *see* Pet. 40–41 (discussing this disclosure). This is consistent with the '759 patent's description of the operation of power converters. *See, e.g.*, Ex. 1001, 1:46–50 ("In an exemplary application, the power converters have the capability to convert an unregulated dc input voltage such as five volts to a lower, regulated, dc output voltage such as 2.5 volts to power a load.").

Petitioner contends that Chagny's software program 296 is a "power system controller" that receives a signal from processor 292 indicating the activity level of processor 292, i.e., the system operational state of the load, and Petitioner annotates this in the figure above with a caption for the arrow (purple) between processor 292 and software program 296. Pet. 41–42 (citing Ex. 1004, 4:18–20, 4:35–37, 4:40–43; Ex. 1002 ¶ 128). Patent

Owner disputes Petitioner's contentions for the "power system controller" as discussed below. *See* PO Resp. 51–54.

### (2) Recitation 1a

Claim 1 recites that the power converter has "a power switch configured to conduct for a duty cycle to provide a regulated output characteristic at an output thereof" (recitation 1a). Petitioner argues that Chagny describes this subject matter because charge switch 220 within VRM 200 is a power switch that conducts for a duty cycle to provide regulated DC voltage output 295 at the output of VRM 200. Pet. 43–45 (citing Ex. 1004, 1:51–59, 5:34–42, 5:44–51, 4:63–65, 6:45–49, Fig. 2A; Ex. 1002 ¶¶ 131–137). Patent Owner does not dispute Petitioner's contentions for recitation 1a. *See* PO Resp. 49–51.

Petitioner's contentions for recitation 1a are persuasive. According to the '759 patent, the "duty cycle is a ratio represented by a conduction period of a power switch to a switching period thereof." Ex. 1001, 1:36–38; *see* Tr. 42:1–10 (Patent Owner's counsel agreeing with the definition of duty cycle set forth in the '759 patent); *see also* Ex. 1002 ¶ 38 (Dr. Kiaei's undisputed testimony that the duty cycle is the "ratio of on-time to the total switching period"). We find that Chagny describes a duty cycle because Chagny discloses that charge switch 220 is turned on and off, which results in a conduction period, non-conduction period, and a switching period. *See, e.g.*, Ex. 1004, 5:38–40 ("The opening and closing of the charge and discharge switches 220 and 230 is controlled by the charge and discharge control signals 212 and 214 respectively."). Thus, Chagny discloses that power switch 220, controlled by charge control signal 212, is closed (i.e., conducts) during a charge cycle. Ex. 1004, 5:34–40. Patent Owner agrees that charge switch 220 is turned on and off. *See* Tr. 43:23–44:1 (Q: "Is Patent Owner

disputing that there is a conduction time in Chagny that the FET is turned on and off?"; A: "The FET is turned on and off, yes, so that's correct."); *see also* Tr. 45:11–12 (Patent Owner's counsel stating that "it certainly is turning the FET on and off"). Thus, Chagny discloses that power switch 220 has a duty cycle notwithstanding Patent Owner's argument that "Chagny does not even discuss duty cycles." *See* PO Resp. 50.

Petitioner also shows that Chagny's power switch is configured "to provide a regulated output characteristic at an output thereof," as claimed. Pet. 44–45 (citing Ex. 1002 ¶ 136; Ex. 1004, Fig. 2A, 4:63–65, 5:44–51). Our finding is supported by Chagny's disclosure that "DC voltage input 205 is 'chopped' by the charge switch 220 to generate the switched DC voltage output 225," which is then filtered to generate regulated DC voltage output 295. Ex. 1004, 5:40–42, 5:48–51. Thus, we find that Chagny describes the subject matter of recitation 1a.

*(3) Recitation 1b*

Claim 1 recites that the power converter has "a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state" (recitation 1b). Petitioner contends Chagny describes this subject matter by disclosing controller module 210 receiving activity input 202 from software program 296 and I/O controller hub (ICH) 280 and "select[ing] different switching frequency states (i.e., power converter operational states) based on activity input 202." Pet 46–47 (citing Ex. 1004, 4:46–49, 4:66–5:3, 5:9–12; Ex. 1002 ¶¶ 138–140). Patent Owner agrees that Chagny discloses a controller within VRM 200 (PO Resp. 51), but Patent Owner disputes Petitioner's contentions with respect to "power system

controller" and "system operational state." *See* PO Resp. 45–49, 51–54. Thus, we further address recitation 1b in section II.D.2.b.3 below.

*(4) Recitation 1c*

Claim 1 recites that the controller is "further configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command" (recitation 1c). Petitioner argues that Chagny discloses controlling the duty cycle of charge switch 220 as a function of feedback from output 295 and in accordance with activity input 202. Pet. 47–49 (citing Ex. 1004, 3:60–4:7, 4:62–5:2, 5:28–31, 5:34–46, 9:5–7, 10:14–16, Fig. 2A; Ex. 1002 ¶¶ 141–145). We discuss these contentions further below in addressing Patent Owner's arguments.

*(5) Recitation 1d*

Claim 1 recites "thereby regulating an internal operating characteristic of said power converter to improve an operating efficiency thereof as a function of said system operational state" (recitation 1d). Petitioner argues that Chagny describes this subject matter by disclosing that controller module 210 changes the switching frequency of VRM 200 based on activity input 202 to save power. Pet. 49–50 (citing Ex. 1004, 2:59–61, 3:9–10, 4:41–43, 5:3–23; Ex. 1002 ¶¶ 146–148). Aside from its arguments regarding the system operational state, which we address below, Patent Owner does not dispute Petitioner's contentions for recitation 1d. *See* PO Resp. Petitioner's contentions are persuasive. Chagny discloses that, "[t]o improve efficiency, the VRM advantageously changes the switching frequency of the VRM in accordance with the activity of the processor." Ex. 1004, 2:59–61; *see also* Ex. 1004, 5:16–18 ("When the activity of the processor 292 is low, the switching frequency 216 is selected to be low 130

to save power."). Thus, we find that Chagny discloses "regulating an internal operating characteristic of said power converter to improve an operating efficiency thereof as a function of said system operational state."

### b) *Patent Owner's Arguments and Our Analysis*

Patent Owner makes the following three arguments regarding claim 1: (1) Chagny does not disclose "a signal indicating a system operational state of a load" as in recitations 1pre and 1b (PO Resp. 45–49); (2) Chagny does not disclose controlling a duty cycle of the power switch "in accordance with said command" to enter a power converter operational state as in recitation 1c (PO Resp. 49–51); and (3) Chagny does not disclose a "power system controller" in recitations 1pre and 1b (PO Resp. 51–54). We address each argument below.

### (1) *System Operational State*

As noted above, Petitioner relies on signals between software program 296 and processor 292 indicating the activity level of processor 292 to teach "a signal indicating a system operational state of a load." Pet. 41–42 (citing Ex. 1004, 4:18–20, 4:35–37, 4:40–43, Fig. 2A; Ex. 1002 ¶ 128).

Relying on its proposed construction for "system operational state," Patent Owner argues that "the activity level of Chagny's processor does not indicate the system operational state." PO Resp. 49. For the reasons discussed above in section II.C.1, we do not adopt Patent Owner's interpretation of "system operational state," and, thus, we do not agree with Patent Owner's arguments based on its proposed construction. For the reasons discussed below, we find that Petitioner has shown that Chagny discloses a signal "indicating a system operational state of said load" under our claim construction, which encompasses a signal indicating the activity level of a load. *See* section II.C.1 above.

20

IPR2022-00312
Patent 7,675,759 B2

Chagny discloses that "software program 296 . . . monitors the processor 292 loading." Ex. 1004, 4:35–37; *see* Pet. 41–42 (discussing this disclosure).  Chagny further explains that "processor 292 loading, usage or activity level will vary depending on the number of instructions executed within a predefined time interval." Ex. 1004, 4:18–20, *cited in* Pet. 41.  Thus, we find that software program 296, by monitoring processor 292's activity, receives a signal indicating the activity level of a processor, which is within the scope of a signal "indicating a system operational state of a load" under our construction.

Based on Petitioner's persuasive contentions and evidence and for the reasons discussed above, we find that Chagny discloses "a signal indicating a system operational state of a load."

*(2)  Controlling the Power Switch's Duty Cycle*

To illustrate its contentions for recitation 1c ("said controller further configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command"), Petitioner provides the annotated version of Chagny's Figure 2A reproduced below.



Pet. 48. Chagny's Figure 2A is a diagram of a VRM with a selectable switching frequency. Ex. 1004, 3:17–19. As relevant to recitation 1c, Petitioner's annotations identify signal 212 (shaded purple) to charge switch 220 (shaded orange) as a signal to control the duty cycle of the power switch and a connection (shaded pink) from output 295 to controller module 210 as "feedback." Pet. 48.

As to the requirement to control the duty cycle "as a function of said output characteristic," Petitioner refers to its discussion for recitation 1a explaining how the duty cycle of charge switch 220 determines the voltage level for output 295. Pet. 43–45 (explaining that "for a buck power converter, the output voltage is equal to the input voltage times the duty cycle of the high-side switch"), 48. Petitioner relies on Chagny's disclosure that "controller module 210 receives the regulated DC voltage output 295 as

a feedback input for regulating the output of the VRM 200." Ex. 1004, 4:63–65, *cited in* Pet. 48.  Petitioner argues that,

> [b]ecause it is the duty cycle of charge switch 220 that determines the output voltage, and because Chagny explicitly states that controller module 210 regulates the DC output voltage as a function of the feedback, a [person of ordinary skill in the art] would have understood Chagny to disclose that controller module 210 is configured to control the duty cycle of charge switch 220 as a function of the feedback from the regulated DC voltage output 295 (i.e., as function of said output characteristic).

Pet. 48–49 (citing Ex. 1002 ¶ 143).  Thus, Petitioner argues, Chagny discloses controlling the duty cycle "as a function of" output 295 ("said output characteristic").  Pet. 48–49.

As to the requirement to control the duty cycle "in accordance with said command," Petitioner relies on Chagny's disclosure that frequency selector module 215 receives activity input 202 and selects switching frequency 216 to match the activity level of processor 292 and that FET driver module 218 receives switching frequency 216 and generates charge control signal 212 having that frequency.  Ex. 1004, 4:66–5:2, 5:28–31, *cited in* Pet. 49.  In particular, Chagny discloses that "FET driver module 218 is operable to receive the selected value of the switching frequency 216 and generate the charge and discharge control signals 212 and 214, each having the switching frequency 216."  Ex. 1004, 5:28–31.  Chagny further discloses that charge control switch 220 responds to charge control signal 212 by generating switched DC voltage output 225 having switching frequency 216.  Ex. 1004, 3:66–4:2, 6:46–49, Fig. 3 (step 340).  Figure 2A shows that frequency selector module 215 and FET driver module 218 are part of controller module 210.  Ex. 1004, 4:62–63.  Based on these disclosures, Petitioner argues that Chagny discloses controlling the duty cycle of charge

switch 220 "in accordance with" activity input 202 ("said command").
Pet. 43–44, 49.

Patent Owner argues that "activity input 202 sets the switching frequency, not the duty cycle," that switching frequency and duty cycle "are separate concepts," that "the duty cycle is independent of the frequency," and that "Chagny does not even discuss duty cycles."  PO Resp. 50 (citing Ex. 2018 ¶ 104; Ex. 1004, 5:28–31, 4:66–5:3; Ex. 2020, 65:6–15, 86:23–87:11).

In its Sur-reply, Patent Owner argues that "[w]hether the limitation would be obvious to a POSITA in light of Chagny is immaterial" because Petitioner contends that Chagny discloses the limitation and anticipated claim 1.  PO Sur-reply 12.  Patent Owner also argues that "Chagny does not discuss how the conduction period is determined or what the duty cycle is."  PO Sur-reply 13.

As to Patent Owner's argument that "Chagny does not even discuss duty cycles" (PO Resp. 50), we find that Chagny discloses a duty cycle for power switch 220 for the reasons discussed above in section II.D.2.a.

As to Patent Owner's argument that "activity input 202 sets the switching frequency, not the duty cycle" (PO Resp. 50), we agree with Petitioner that "[t]here is no requirement that said command must 'set' the duty cycle."  *See* Pet. Reply 19.  Rather, claim 1 recites "a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command."  Petitioner contends that, because the duty cycle of charge switch 220 determines the output voltage and because that output voltage is then used as feedback to regulate the output voltage (Ex. 1004, 4:63–65), a person of ordinary skill in the art would have understood that the duty cycle of charge switch 220 is controlled

24

IPR2022-00312
Patent 7,675,759 B2

"as a function of the feedback from the regulated DC voltage output 295 (i.e., as function of said output characteristic)." Pet. 48–49 (citing Ex. 1002 ¶ 143; Ex. 1009, 17–18).

As to Patent Owner's argument that obviousness to a person of ordinary skill in the art is immaterial because Petitioner's ground is anticipation (PO Sur-reply 12), we understand that Petitioner is relying on what a person of ordinary skill in the art would have understood from Chagny's disclosure. *See* Pet. 43–45, 48–49. This is appropriate and indeed necessary because "[a]nticipation is established when 'one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim [limitation] was disclosed in that single reference.'" *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1338 (Fed. Cir. 2017) (quoting *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192–93 (Fed. Cir. 2003)). We also credit Dr. Kiaei's unrebutted testimony that, "for a buck power converter, the output voltage is equal to the input voltage times the duty cycle of the high-side switch (referred to as charge switch [220] in Chagny)." Ex. 1002 ¶ 134. As noted above, Chagny discloses that "controller module 210 receives the regulated DC voltage output 295 as a feedback input for regulating the output of the VRM 200." Ex. 1004, 4:63–65, *cited in* Pet. 48. Thus, we find that Chagny discloses controlling the duty cycle as a function of the output voltage in order to regulate the output voltage as part of the feedback loop.

As to Patent Owner's argument that "Chagny does not discuss how the conduction period is determined or what the duty cycle is" (PO Sur-reply 13), claim 1 does not recite any particular value for the duty cycle, and Patent Owner does not dispute Petitioner's arguments and Dr. Kiaei's

IPR2022-00312
Patent 7,675,759 B2

testimony as to how the duty cycle is controlled to regulate the output voltage, as discussed in the previous paragraph.

As for Patent Owner's argument regarding controlling the duty cycle "in accordance with said command," Petitioner's contention is that charge and discharge control signals 212 and 214 have the switching frequency 216 that is selected based on activity input 202 and, therefore, that Chagny discloses controlling the duty cycle "in accordance with" activity input 202 based on the relationship between frequency and period of the duty cycle. Pet. 49 (citing Ex. 1004, 4:66–5:2, 5:28–31, 5:34–46); Pet. Reply 19–20 (citing Ex. 1026 ¶ 24). The switching frequency is the inverse of the switching period. Ex. 1026 ¶ 24. We credit Dr. Kiaei's unrebutted testimony that, "[a]s a matter of simple math, the duty cycle can therefore also be described as a function of both the conduction period and the *switching frequency*." Ex. 1026 ¶ 24. By disclosing setting the switching frequency and, thus, the switching period, Chagny discloses that the duty cycle is controlled "in accordance with" activity input 202, upon which the switching frequency is based.

Based on Petitioner's contentions and evidence and for the reasons discussed above, we find that Chagny discloses controlling the duty cycle of charge switch 220 as a function of the feedback from the regulated DC voltage output 295 based on Chagny's disclosure that "controller module 210 receives the regulated DC voltage output 295 as a feedback input for regulating the output of the VRM 200." Ex. 1004, 4:63–65. We also find that Chagny discloses controlling the duty cycle of charge switch 220 in accordance with the command to enter a power converter operational state based on Chagny's disclosure that frequency selector module 215 receives activity input 202 and selects switching frequency 216 to match the activity

level of processor 292 and that FET driver module 218 receives switching
frequency 216 and generates charge signal 212 having that frequency.
Ex. 1004, 4:66–5:3, 5:28–31.

### (3) Power System Controller

As noted above, Petitioner relies on software program 296 alone or
with ICH 280 as the recited "power system controller." Pet. 40–42. Patent
Owner disputes this contention for various reasons with which we disagree,
as explained below. PO Resp. 51–54.

Patent Owner argues that "the power system controller of the '759
Patent controls the overall power system," whereas Chagny's software
program 296 "does not control the power system, and is limited to reporting
the activity level of the processor." PO Resp. 51–53. We disagree. The
claimed "power system controller" exerts control over the power system by
performing certain functions recited in the claim, specifically "receiv[ing] a
signal indicating a system operational state of a load" and providing "a
command . . . to enter a power converter operational state as a function of
said signal indicating said system operational state." This is consistent with
the '759 patent's description that the "power system controller . . . induces
the power converter to enter a power converter operational state." Ex. 1001,
21:39–41. Chagny's software program 296 exerts control in the same
manner by providing activity input 202 to frequency selector module 215 of
controller module 210, which changes the switching frequency ("internal
operating characteristic") of VRM 200 in response to activity input 202.
Ex. 1004, 5:9–12 ("Thus the controller module 210 dynamically changes the
switching frequency 216 of the VRM 200 responsive to the activity input
202 indicative of the activity level of the processor 292."); *see also*
Ex. 1004, 4:35–37, 4:40–43, 4:62–63, 4:66–5:3.

Patent Owner also argues that Chagny's software program 296 is not a power system controller because it runs on device 290, which the load, not the power system. PO Resp. 52–53. But as Petitioner points out, "[t]he '759 Patent includes embodiments where 'the power system controller' is constructed as an element of a server (i.e., the load)." Pet. 42 n.3 (citing Ex. 1001, 18:24–33, 20:58–61, Fig. 11). We agree with Petitioner because the '759 patent states that "the power system controller PSC may be constructed as an element of one or more servers SVR," which are the loads in Figure 11. Ex. 1001, 18:28–33, 20:58–61, Fig. 11; *see also* Inst. Dec. 23–24 (discussing this disclosure).

Based on Petitioner's contentions and evidence, and for the reasons discussed above, we find that Chagny's software program 296 is a "power system controller" as recited in claim 1. In particular, we find that Chagny's disclosure of software program 296 monitoring the activity of processor 292 describes "power system controller configured to receive a signal indicating a system operational state of a load coupled thereto." *See* Ex. 1004, 4:35–37 ("[S]oftware program 296, which may be included in the operating system (not shown) of the device 290, monitors the processor 292 loading."); *see* Pet. 41–42 (discussing this disclosure); *see also* PO Resp. 52–53 (noting that software program 296 "report[s] the activity level of the processor"). Based on this finding and the findings in sections II.D.2.a and b.1 above, we find that Chagny describes the subject matter recited in the preamble of claim 1.[10]

---

[10] Because Petitioner has shown that Chagny describes subject matter recited in the preamble, we need not decide whether the preamble is limiting.

As to recitation 1b ("a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state"), Chagny discloses that frequency selector module 215 of controller module 210 "is operable to receive the activity input 202 . . . and select a switching frequency 216 from a plurality of switching frequencies as an output, which dynamically matches the level of activity of the processor 292." Ex. 1004, 4:66–5:3; *see also* Ex. 1004, 5:9–12 ("Thus the controller module 210 dynamically changes the switching frequency 216 of the VRM 200 responsive to the activity input 202 indicative of the activity level of the processor 292."); *see* Pet. 46–47 (discussing this disclosure). Thus, we find that Chagny's disclosure of controller module 210 receiving activity input 202 and selecting different power converter switching frequencies based on that input describes "a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state."

### c) *Conclusion for Claim 1*

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claim 1 and, therefore, that Chagny anticipated claim 1.

### 3. *Independent Claims 6 and 16*

Independent claim 6 is directed to a "power system coupled to a load, comprising" "a power system controller" and "a power converter," which in turn comprises "a power switch" and "a controller." Independent claim 16 is directed to a "method of operating a power system coupled to a load" and recites steps that correspond to operations recited in claim 6.

IPR2022-00312
Patent 7,675,759 B2

Petitioner contends that the limitations of claims 6 and 16 are similar or the same as limitations of claim 1 and are disclosed by Chagny for the same reasons. Pet. 52–57. Patent Owner does not dispute this characterization and relies on the same arguments for these claims as it makes for claim 1. *See* PO Resp. 45–51.

We find Petitioner's contentions for claims 6 and 16 persuasive for the reasons discussed for claim 1, and, therefore, we find that Chagny anticipated claims 6 and 16.

### 4. Claims 2, 5, 11, 15, 20

Claims 2 and 11 depend, respectively, from claim 1 and 6 and recite "wherein said power converter is configured to enter said power converter operational state within a transition time from another power converter operational state." Petitioner argues that Chagny discloses a predefined time period "within which VRM 200 transitions from one switching-frequency state to another." Pet. 50–51 (citing Ex. 1004, 4:66–5:18; 5:62–66; Ex. 1002 ¶¶ 150–153); *see* Ex. 1004, 5:62–66 ("The demand for power required by the processor 292 is advantageously controlled by limiting the number of instructions executed for a predefined time period. This control mechanism ensures that the VRM 200 reacts responsively and on time according to the processor 292 demand.").

Claims 5, 15, and 20 depend, respectively, from claims 1, 6, and 16 and recite "wherein said power converter operational state is selected from the group consisting of: a fully operational power converter, a reduced redundancy power converter, and an idle power converter." Petitioner argues that "[t]he highest switching-frequency state of Chagny's VRM 200 represents a power converter state where all power converter components operate at full performance level (i.e., a fully operational power converter)."

30

IPR2022-00312
Patent 7,675,759 B2

Pet. 52 (citing Ex. 1004, 5:5–18, 5:23–26; Ex. 1002 ¶¶ 159–160); *see* Ex. 1004, 5:5–8 (disclosing that, for "low, medium and high activity levels there are 3 corresponding low 130, medium 140 and high 150 switching frequencies").

Apart from its arguments for the independent claims, Patent Owner does not dispute Petitioner's contentions that Chagny anticipated claims 2, 5, 11, 15, and 20.

Petitioner's contentions and evidence, summarized above, are persuasive, and we find that Chagny describes the subject matter of claims 2, 5, 11, 15, and 20 and, therefore, anticipated these claims.

### 5.  *Claims 4, 14*

Claims 4 and 14 depend, respectively, from claims 1 and 6 and recite "wherein said load includes a processor and said system operational state depends on one of a core state and a performance state of said processor."

Petitioner contends that "[t]he '759 Patent background explains that a 'core state' is 'under software operating system control' and relates to 'various levels of a processor sleep state,' achieved by 'halting instruction execution' among other items."  Pet. 51 (citing Ex. 1001, 4:23–39; Ex. 1002 ¶ 154).  Petitioner cites Chagny's disclosure of different processor activity levels and argues that "the activity level of processor 292 (i.e., system operational state of the load) at any of Chagny's activity levels (e.g., low, medium, high) is dependent on at least a core state of processor 292."  Pet. 51 (citing Ex. 1004, 4:23–30, 4:43–49, 5:57–61, 6:3–4; Ex. 1002 ¶¶ 155–157).

Patent Owner argues that, as a matter of claim construction, the recited "core state" should be limited to ACPI C-states.  *See* PO Resp. 55; PO Sur-reply 20–21.  We disagree for the reasons given in section II.C.2.

31

IPR2022-00312
Patent 7,675,759 B2

Patent Owner also argues that Chagny "does not teach using C-states or P-states to define the system operational state" and that "it is not possible for the system of Chagny to ascertain the P-state or C-state based on its signal 202 indicative of processor activity level."  PO Resp. 56.  Putting aside whether the recited "core states" are limited to ACPI C-states, Patent Owner's arguments are not commensurate in scope with claims 4 and 14. Claims 1 and 6 recite "a power system controller configured to receive a signal indicating a system operational state of [a/said] load," and dependent claims 4 and 14 recite "wherein said load includes a processor and said system operational state depends on one of a core state and a performance state of said processor."  Claims 4 and 14 do not recite that the "core state" itself needs to be reported to the power system controller or that the power system controller or any recited component must be able to "ascertain" the core state of the processor.  Rather, there is a signal "indicating a system operational state of [a/said] load," and the "system operational state depends on . . . a core state."

Patent Owner characterizes the core states of the '759 patent as follows:

> The core state (or C-state) in the '759 patent is either a sleep mode (where the activity level of the processor is zero) or (in state C0), "full operational level" (when the activity level of the processor can be anything, including zero).  Thus, at best, a core state discloses that the activity level of the processor is zero because the system is in sleep mode.

PO Resp. 57 (citing Ex. 1001, 4:26–34).  Thus, according to Patent Owner, an operational processor has a core state different from a processor in sleep mode.

IPR2022-00312
Patent 7,675,759 B2

We are persuaded by Petitioner's contention for claims 4 and 14 that "the activity level of processor 292 (i.e., system operational state of the load) at any of Chagny's activity levels (e.g., low, medium, high) is dependent on at least a core state of processor 292." Pet. 51 (citing Ex. 1002 ¶¶ 155–157). We agree because the activity levels (low, medium, and high (Ex. 1004, 4:23–30)) show that Chagny's processor is in an operational core state "when the activity level of the processor can be anything," according to Patent Owner. *See* PO Resp 57. Thus, Chagny's activity level ("system operational state") "depends on" the processor being in an operational "core state."

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Chagny describes the subject matter of claims 4 and 14 and, therefore, that Chagny anticipated these claims.

### E.  Obviousness Based on Chagny
#### (Claims 1, 2, 4–6, 11, 14–16, 20)

Petitioner asserts that claims 1, 2, 4–6, 11, 14–16, and 20 would have been obvious over Chagny. Pet. 10, 57–58. As the Court of Appeals for the Federal Circuit has stated, "a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness.'" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (citing *In re Fracalossi*, 681 F.2d 792 (CCPA 1982)). Because we find that Chagny anticipated claims 1, 2, 4–6, 11, 14–16, and 20, we also conclude that the subject matter of claims 1, 2, 4–6, 11, 14–16, and 20 would have been obvious based on the teachings of Chagny.

IPR2022-00312
Patent 7,675,759 B2

### F. *Obviousness Based on Chagny and Clark*
### *(Claims 3, 12, 13, 19)*

Petitioner asserts that claims 3, 12, 13, and 19 would have been obvious over the combined teachings of Chagny and Clark. Pet. 10, 58–64.

Apart from its arguments for the independent claims, Patent Owner does not dispute Petitioner's contentions of obviousness for claims 3, 12, 13, and 19 based on the combination of Chagny and Clark. *See* PO Resp. 58.

Below we summarize Petitioner's contentions, which we find persuasive.

Claims 3 and 12 depend, respectively, from claims 1 and 6 and recite "wherein said power system controller is configured to receive a signal indicating a power converter status of said power converter, said power converter operational state being a function of said power converter status." Claim 13 recites, "The power system as recited in claim 12 wherein said power converter status is selected from the group consisting of: a fully operational status, a failure likely status, a failed status, and an overloaded status."

Claim 19 depends from claim 16 and recites "receiving a signal indicating a power converter status of said power converter and generating said power converter operational state as a function thereof."

Clark discloses a device including a microprocessor (core logic 50) and a power converter (voltage regulator 40). Ex. 1005, 3:9–20, 3:31–33, Fig. 1. Petitioner relies on Clark's disclosure of signaling between the core logic 50 and voltage regulator 40. Pet. 61–62 (citing Ex. 1005, 3:44–60, 5:24–36, Fig. 1; Ex. 1002 ¶¶ 189–191). In particular, Clark discloses a signal called Vstable, which is sent from voltage regulator 40 to core logic 50 and indicates whether voltage regulator 40 is in a stable state or is

changing.  Ex. 1005, 5:24–36, Figs. 1, 2.  Clark also discloses that the core logic 50 can send a control word to voltage regulator 40 "to indicate the voltage potentials to be provided by voltage regulator 40."  Ex. 1005, 3:44–60, Fig. 1.

Petitioner argues that combining "Chagny's system to further include the control functions of Clark along with the 'control word' and 'Vstable' signals that Clark uses to communicate between the microprocessor and the power converter" "represents the use of a known technique (i.e., Clark's dynamic control of the power converter output voltage) to improve a similar device (i.e., Chagny's information handling system and voltage regulator module) in the same way."  Pet. 61 (citing Ex. 1005, 3:44–60, 5:24–36; Ex. 1002 ¶¶ 189–190).  Petitioner argues that a person of ordinary skill in the art would have had a reasonable expectation of success in combining these teachings because "Chagny is already configured to send control signals to its power converter based on the activity level of its processor."  Pet. 61 (citing Ex. 1004, 4:40–43, 5:9–12, Fig. 2A; Ex. 1002 ¶ 190).

For claims 3, 12, and 19, Petitioner argues that Clark's Vstable signal indicates the power converter status because it informs core logic 50 whether voltage regulator 40 has transitioned from one voltage to another.  Pet. 62–63 (citing Ex. 1005, 5:24–36, Fig. 2).  For claim 13, Petitioner argues that the Vstable signal indicates that voltage regulator 40 is stable and, therefore, "fully operational."  Pet. 64 (citing Ex. 1005, 5:27–36; Ex. 1002 ¶ 197).

Petitioner's contentions and evidence, summarized above, are persuasive.  Based on those contentions, we find that the combination of Chagny and Clark teaches the subject matter of claims 3, 12, 13, and 19 and that the "combination represents the use of a known technique (i.e., Clark's dynamic control of the power converter output voltage) to improve a similar

IPR2022-00312
Patent 7,675,759 B2

device (i.e., Chagny's information handling system and voltage regulator module) in the same way." *See* Pet. 61.

Based on Petitioner's persuasive contentions and evidence, we conclude that the subject matter of claims 3, 12, 13, and 19 would have been obvious based on the combined teachings of Chagny and Clark.

### G.    *Anticipation by Hirst*
### *(Claims 1, 6–10, 16–18)*

Petitioner asserts that Hirst anticipated claims 1–3, 5–13, 15–20. Pet. 10, 14–39. Patent Owner opposes. PO Resp. 18–44; PO Sur-reply 6–7, 9–11, 16–19. We address claims 1, 6–10, and 16–18 below. Because we have already determined claims 2, 3, 5, 11–13, 15, 19, and 20 are unpatentable based on the Chagny grounds, we need not address those claims here.

### *1.    Hirst*

Hirst discloses a multiple frequency switching power supply that can operate with a first switching frequency when a load is in a normal operating mode and with a second switching frequency when a load is in a standby operating mode. Ex. 1003, code (57), 3:17–23. Additional pertinent details of Hirst are discussed below.

### *2.    Claim 1*

### *a)    Preamble*

Claim 1 is directed to a "power converter coupled to a power system controller configured to receive a signal indicating a system operational state of a load coupled thereto." Petitioner provides the following annotated version of Hirst's Figure 1 to illustrate its contentions:

IPR2022-00312
Patent 7,675,759 B2



Pet. 15.  Figure 1 of Hirst above shows a block diagram of printer 10. Ex. 1003, 3:51–59 (with added annotations and shading).  Referring to the annotated version of Hirst's Figure 1 above, Petitioner argues that multiple frequency (MF) switching power supply 12 (shaded blue) is "a power converter," that controller 18 (shaded green) is "a power system controller," and that memory 16 (shaded red) and print engine 20 (shaded red) are individually or collectively "a load."  Pet. 14–15.  Petitioner argues that the normal and standby modes of Hirst's printer are different system operational states of the load.  Pet. 15 (citing Ex. 1003, 3:17–23, 4:32–41).  Petitioner argues that Hirst's power monitor 22 detects whether normal or decreased power consumption is occurring and provides this information to controller 18, as indicated by the arrow (shaded purple) from power monitor 22 to controller 18, which Petitioner identifies as "a signal indicating a system operational state of a load."  Pet. 15–16 (citing Ex. 1003, 4:32–41, 6:65–7:4, 8:27–33, Figs. 1, 3, 6).  For the reasons discussed below, Petitioner's contentions for the preamble are persuasive.

Relying on its proposed construction for "system operational state," Patent Owner argues that "the system operational state is not merely an

37

indication of normal or low power state." PO Resp. 21–22. For the reasons
discussed above in section II.C.1, we do not adopt Patent Owner's
interpretation of "system operational state," and, thus, we do not agree with
Patent Owner's arguments based on its proposed construction.

Patent Owner also argues that "the power draw of two identical
systems can be the same while they are in distinctly different system
operational states" such that "the power draw of the system at any given
time is not indicative of the system operational state of the system." PO
Resp. 23 (citing Ex. 2018 ¶ 56). This argument does not directly address
Petitioner's position because Petitioner relies on Hirst's disclosure of
different power draws as indicating different system operational states.
Pet. 15 (citing Ex. 1003, 3:17–23, 4:32–41). Hirst discloses that "power
consumption monitor 22 detects normal power consumption and provides
control signals to maintain normal power supply functions" and that,
"[w]hen the power consumption monitor 22 detects reduced power
consumption, signals from the power consumption monitor 22 place the
multiple frequency switching power supply 12 in a standby mode."
Ex. 1003, 4:33–41.

Patent Owner also argues that Hirst's "selection between normal and
standby modes is also in response to the output of the power converter, not
to a system operational state" and that "the system being in normal or
standby mode at a given instant is not indicative of how the system is being
utilized and therefore not indicative of the system operational state." PO
Resp. 22. We disagree. Hirst discloses that, when "no input data are present
at the data input port 14 and the print engine 20 is not active, power
consumption decreases." Ex. 1003, 4:35–38. Thus, the lower power

consumption that is detected indicates that the printer is not being utilized, i.e., a system operational state.

Based on Petitioner's persuasive contentions and evidence, we find that Hirst's MF switching power supply is a power converter because it provides DC-to-DC conversion. Ex. 1003, 3:55–59, *cited in* Pet. 14; *see also* Ex. 1003, 1:18–36 (providing background on buck and boosting DC-to-DC converters). This is consistent with the '759 patent's description of the operation of power converters. *See, e.g.*, Ex. 1001, 1:46–50 ("In an exemplary application, the power converters have the capability to convert an unregulated dc input voltage such as five volts to a lower, regulated, dc output voltage such as 2.5 volts to power a load."). We also find that Hirst's controller 18 is a power system controller that receives a signal indicating a system operational state from power consumption monitor 22 as discussed above.

Based on Petitioner's persuasive argument and evidence, we find that Hirst describes the subject matter recited in the preamble of claim 1.[11]

### b) *Recitation 1a*

Recitation 1a provides that the power converter comprises "a power switch configured to conduct for a duty cycle to provide a regulated output characteristic at an output thereof." Petitioner argues that Hirst's switching transistor 34 is the claimed "power switch." Pet. 18–19 (citing Ex. 1003, code (57), 1:18–28, 2:45–49, 5:18–20, 6:1–20, 6:45–51, Figs. 2–5; Ex. 1002 ¶¶ 64–66).

---

[11] Because Petitioner has shown that Hirst describes subject matter recited in the preamble, we need not decide whether the preamble is limiting.

Patent Owner does not dispute Petitioner's contentions for this subject matter.

Petitioner's contentions are persuasive. Hirst discloses that switching transistor 34 is turned ON and OFF and that "[a] pulse width of the ON portion of the duty cycle of the switching transistor 34 is varied in a conventional manner . . . to regulate the amount of charge that is transferred per cycle . . . and thus to maintain the desired output voltage $V_{OUT}$ at the output 38." Ex. 1003, 6:1–3, 6:8–14. Based on Petitioner's persuasive argument and evidence, therefore, we find that Hirst describes "a power switch configured to conduct for a duty cycle to provide a regulated output characteristic at an output thereof."

### c) Recitation 1b

Recitation 1b provides that the power converter comprises "a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state." Petitioner provides the following annotated version of Hirst's Figure 5 to illustrate its contentions for this subject matter:

IPR2022-00312
Patent 7,675,759 B2



Pet. 20.  Figure 5 of Hirst is a schematic diagram of an embodiment of a
multiple frequency switching power supply, and Petitioner provides
annotations for various components, including a gray box encompassing
pulse width modulation (PWM) circuit 40, first oscillator 46, second
oscillator 48, and switch 44. Ex. 1003, 7:63–65; Pet. 20.  As indicated by
the blue annotations, Petitioner argues that all components of Hirst Figure 5
except for controller 18 are the "power converter" of claim 1.  This is
consistent with Hirst's Figure 1, which shows controller 18 separate from
the multiple frequency switching power supply.  *See* Pet. 21 (referring to
controller 18 of Hirst's Figure 1).  Petitioner argues that the components
within the gray box are collectively the power converter "controller" of
recitation 1b.  In particular, Petitioner argues that controller 18 ("power
system controller") sends a command to the power converter controller (gray
box) to enter normal mode or standby mode (operational states) by
switching, respectively, between first oscillator 46 having a high clock

frequency and second oscillator 48 having a low clock frequency.  Pet. 21 (citing Ex. 1003, 3:17–23, 7:66–8:8, 8:27–33; Ex. 1002 ¶ 68).

For the reasons discussed below, we find that Petitioner shows persuasively that Hirst discloses recitation 1b.  Patent Owner disputes Petitioner's contentions for recitation 1b, and we address these arguments and provide our analysis below.  PO Resp. 24–34; PO Sur-reply 9–11.

### (1) Power converter operational state

Patent Owner argues that "[n]othing in Hirst indicates that Hirst's power converter enters a different power converter operational state as a function of switching between two frequencies."  PO Resp. 24 (citing Ex. 2018 ¶¶ 58–60).  We disagree.  Hirst states that "MF switching power supply 74 switches from the normal mode of operation using the first oscillator 46 having the first clock frequency $f_{HI}$ to the standby mode of operation using the second clock signal from the second oscillator 48 having the second clock frequency $f_{LO}$ in response to commands from the controller 18."  Ex. 1003, 7:65–8:5.  Thus, Hirst expressly discloses that the power supply switches operating modes.

Patent Owner cites various disclosures in the '759 patent to argue that the "simple binary switching capability of Hirst falls short of the more complex concept of a power converter operating state, which enables sophisticated methods of optimization, such as the use of multidimensional tables, described in the '759 Patent."  PO Resp. 27 (citing Ex. 1001, 11:19–12:38, 18:66–19:5, 19:15–18, Figs. 5A, 5B; Ex. 2018 ¶ 63).  The claims, however, do not recite "sophisticated methods of optimization" or require anything more complex than switching between two states.  Hirst's disclosure is consistent with the '759 patent's disclosure of "[a]n exemplary set of power converter operational states" in Table I.  Ex. 1001, 18:64–66.

IPR2022-00312
Patent 7,675,759 B2

As Petitioner correctly points out, "Table I lists 'reduced switching frequency' as the only difference between the second and third power converter operational states." Pet. Reply 13 (citing Ex. 1001, 18:66–19:3); *see* Ex. 1001, Table I in columns 19 and 20 (describing power converter operational state 3 as having the elements of operational state 2 "plus reduced switching frequency"). Patent Owner responds by arguing that, in the '759 patent, "[t]he power converter operational state is 'Fully Operational,' 'Reduced load,' etc." PO Sur-reply 10 (citing Ex. 1001, Table I). We find that Hirst discloses the same thing by providing "normal power supply" when "normal power consumption" is detected and switching to "standby mode" when "reduced power consumption" is detected. Ex. 1003, 4:33–41. Thus, Patent Owner's argument supports a finding that Hirst describes power converter operational states.

Patent Owner also argues that the '759 patent calls the switching frequency an "external characteristic" because the "switching frequency is used to set output voltage," which is an external characteristic. PO Resp. 26 (citing Ex. 1001, 19:5–7). We disagree because the '759 patent expressly states that "a switching frequency" is "an internal operating characteristic of a power converter." Ex. 1001, 18:66–19:5.

Patent Owner additionally argues that Hirst does not describe the subject matter of recitation 1b because "Hirst does not teach or disclose the signal indicating the system operational state." *See* PO Resp. 24. We disagree for the reasons discussed above for the preamble. *See* section II.G.2.a. above.

### (2) Power converter controller

Patent Owner argues that "there is only one controller in Hirst, not a separate power system controller and power converter controller as required

43

IPR2022-00312
Patent 7,675,759 B2

by claims 1 and 6 of the '759 Patent." PO Resp. 34. Patent Owner argues
that Hirst's controller 18, which Petitioner identifies as the "power system
controller," is the only controller and that "there is no corresponding
controller within the power converter." PO Resp. 32 (citing Ex. 2018 ¶ 70).
Patent Owner argues that the components identified by Petitioner as the
"controller" within the power converter "simply switch the input frequency
for the PWM from a high frequency to a low frequency depending on a
command signal from controller 18." PO Resp. 32 (citing Ex. 2018 ¶ 71).
Patent Owner also argues that "Hirst does not refer to this collection of
disparate components as a 'controller' and there is no logic associated with
these components that controls any functionality." PO Resp. 32.

As an initial matter, anticipation does not require that the prior art
reference use identical terminology as the claims. *Gleave*, 560 F.3d at 1334.
Thus, Hirst need not use the term "controller" to describe the components
Petitioner identifies as disclosing the recited power converter "controller."
Rather, we must determine whether a person of ordinary skill in the art
would have reasonably understood or inferred that Hirst describes the
claimed controller, and for the reasons discussed below, we find that Hirst
describes the controller. *See Akamai Techs., Inc. v. Cable & Wireless
Internet Servs., Inc.*, 344 F.3d 1186, 1192–93 (Fed. Cir. 2003) ("[T]he
dispositive question regarding anticipation is whether one skilled in the art
would reasonably understand or infer from the prior art reference's teaching
that every claim [limitation] was disclosed in that single reference." (quoting
*Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed.
Cir. 2003))).

In support of its argument that Hirst does not describe the claimed
controller, Patent Owner cites various disclosures in the '759 patent that

describe features and capabilities of the power converter's controller, such as "includ[ing] digital processing capability at least comparable to that of a low-end microprocessor" and "control[ling] the efficiency of a power converter using numerous different inputs." PO Resp. 28–30 (citing Ex. 1001, 6:14–16, 10:32–50, Fig. 3). These features and capabilities, however, are not recited in claim 1, which requires that the controller be "configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state" (recitation 1b) and "configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command" (recitation 1c).

We find that Hirst describes the subject matter of recitation 1b. Hirst discloses that "MF switching power supply 74" (power converter) "switches from the normal mode of operation using the first oscillator 46 having the first clock frequency $f_{HI}$ to the standby mode of operation using the second clock signal from the second oscillator 48 having the second clock frequency $f_{LO}$ *in response to commands from the controller 18*," which "permits the controller 18 to cause more than one MF switching power supply, such as the power supply 74, to enter the standby mode when the laser printer 10 of FIG. 1 enters the standby mode." Ex. 1003, 7:65–8:8 (emphasis added), *cited in* Pet. 21. Thus, we find that the components identified by Petitioner (PWM 40, first oscillator 46, second oscillator 48, and switch 44, as shown in the gray box in annotated Figure 5) collectively are configured to receive a command from controller 18 to switch power converter operational states between normal and standby modes, which is the power converter controller functionality of recitation 1b. Ex. 1003, 7:65–8:8; *see* Ex. 1002 ¶¶ 67–68

(explaining how PWM 40, first oscillator 46, second oscillator 48, and switch 44 operate as the claimed controller).

Patent Owner argues that Petitioner's allegation that "controller 18 (the power system controller) sends a command to the controller within the power converter to enter one of two power converter operational states" (Pet. 21) "emphasizes that controller 18 is the only element in Hirst performing any control functions." PO Resp. 33 (citing Ex. 2018 ¶ 73). According to Patent Owner, "the passages from Hirst cited by the Petition make clear that the components of Hirst are simply responding to controller 18's commands." PO Resp. 34 (citing Ex. 1003, 7:66–8:7). Claim 1, however, expressly recites that the power converter "controller" is "configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal." Thus, Petitioner's contentions directly address the claimed functionality.

### (3) Finding for recitation 1b

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Hirst describes a power converter that comprises "a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state."

### d) Recitation 1c

Recitation 1c provides that "said controller [is] further configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command."

Petitioner argues that, in Hirst, PWM 40 (a component of the power converter "controller") "controls the duty cycle of switching transistor 34 (i.e., the power switch) as a function of the feedback from the output voltage

(i.e., as a function of said output characteristic)" and also in accordance with the power system controller command setting the switching frequency. Pet. 22–23 (citing Ex. 1003, 2:59–65, 5:32–35, 6:8–18, 6:34–37, 7:66–8:9; Ex. 1002 ¶¶ 70–72).

During the trial, Patent Owner did not dispute Petitioner's contentions for this subject matter. *See* PO Resp. 18–34 (arguments for claim 1).

Petitioner's contentions are persuasive. Hirst discloses varying the duty cycle based on voltages sensed by voltage divider 37, which we find describes "control[ling] said duty cycle of said power switch as a function of said output characteristic." Ex. 1003, 6:8–14. Hirst also discloses that "the limits over which the duty cycle may be varied in the PWM circuit 40 are different when the PWM circuit 40 is driven by the first oscillator 46 than when the PWM circuit 40 is driven by the second oscillator 48," which we find describes "control[ling] said duty cycle of said power switch . . . in accordance with said command." Ex. 1003, 6:15–18.

*e)  Recitation 1d*

Recitation 1d provides "thereby regulating an internal operating characteristic of said power converter to improve an operating efficiency thereof as a function of said system operational state." Petitioner argues that Hirst discloses that regulating the switching frequency of the power supply based on the operating mode (high frequency for normal mode and low frequency for standby mode) improves the efficiency of the power converter. Pet. 23–24 (citing Ex. 1003, 1:46–48, 2:2–3, 3:17–24, 4:59–62, 7:66–8:8; Ex. 1002 ¶ 74; Ex. 1010, 2:15–34).

Patent Owner does not dispute Petitioner's contentions for this subject matter. *See* PO Resp. 18–34 (arguments for claim 1).

As discussed above in section II.G.2.c.1, we find that Hirst's switching frequency is an "internal operating characteristic." Hirst explains that an advantage to reducing a clock frequency is "a sharp increase in switching power supply efficiency because switching losses are dramatically reduced." Ex. 1003, 4:59–62. Therefore, we find that Hirst discloses "regulating an internal operating characteristic of said power converter to improve an operating efficiency thereof as a function of said system operational state."

### f)    Conclusion for Claim 1

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Hirst describes the subject matter of claim 1 and, therefore, that Hirst anticipated claim 1.

### 3.    Claim 6

Claim 6 is directed to a "power system coupled to a load, comprising" "a power system controller" and "a power converter," which in turn comprises "a power switch" and "a controller." As Petitioner points out, claim 6 recites essentially the same subject matter as claim 1, and Petitioner, therefore, refers to its claim 1 contentions. Pet. 27. Patent Owner raises the same arguments for claim 6 as for claim 1, which we have addressed above. *See* PO Resp. 18–34.

For the reasons discussed above in section II.G.2 for claim 1 and based on Petitioner's contentions and evidence, we find that Hirst describes the subject matter of claim 6 and, therefore, that Hirst anticipated claim 6.

### 4.    Claim 16

Claim 16 recites a "method of operating a power system coupled to a load, comprising" several steps that correspond to operations recited in claims 1 and 6. Petitioner argues that Hirst discloses methods to operate a

IPR2022-00312
Patent 7,675,759 B2

power system.  Pet. 35 (citing Ex. 1003, 1:13–15; Ex. 1002 ¶ 110); *see* Ex. 1003, 1:13–15 ("The invention relates to multiple frequency switching power supplies and methods to operate a switching power supply.").

The first step of claim 16 is "receiving a signal indicating a system operational state of said load."  Petitioner argues that Hirst discloses this step for the reasons explained for the preamble of claim 1, which recites a "power converter coupled to a power system controller configured to *receive a signal indicating a system operational state of a load coupled thereto*" (emphasis added).  Pet. 35.

The second and third steps of claim 16 are "generating a power converter operational state as a function of said system operational state" and "inducing a power converter to enter said power converter operational state."  Petitioner refers to its contentions for similar subject matter of claim 1 reciting "a controller configured to receive a command from said power system controller to enter a power converter operational state as a function of said signal indicating said system operational state."  Pet. 36–37 (citing Ex. 1003, 3:17–24, 7:66–8:9; Ex. 1002 ¶¶ 112–114).

For the fourth step of claim 16 reciting "providing a signal to control a duty cycle of a power switch of said power converter as a function of an output characteristic thereof and in accordance with said power converter operational state," Petitioner refers to its contentions for similar subject matter of claim 1 reciting "said controller further configured to provide a signal to control said duty cycle of said power switch as a function of said output characteristic and in accordance with said command."  Pet. 37 (citing Ex. 1002 ¶ 115).

Petitioner notes that the last clause of claim 16 reciting "thereby regulating an internal operating characteristic of said power converter to

49

improve an operating efficiency thereof as a function of said system operational state" is identical to recitation 1d.  Pet. 38.

Patent Owner raises the same arguments for claim 16 as for claim 1, which we address above.  *See* PO Resp. 18–27.

For the reasons discussed above in section II.G.2 for claim 1 and based on Petitioner's contentions and evidence, we find that Hirst describes the subject matter of claim 16 and, therefore, that Hirst anticipated claim 16.

### 5.  *Dependent Claims 7–10, 17, 18*

Claim 7 depends from claim 6, and as Petitioner notes, claim 7 "repeats each limitation of claim 6, but for '*another* load' and '*another* power converter' (and the associated states, signals, and command) under the control of the same 'power system controller.'"  Pet. 28 (citing Ex. 1007, 1 (comparison of claims 6 and 7)).  Claim 17 depends from claim 16 and also "repeats the limitations of claim 16 but for '*another* load' and '*another* power converter' performing the same steps recited in claim 16."  Pet. 38 (citing Ex. 1007, 2 (comparison of claims 16 and 17)).

Petitioner argues that Hirst's Figure 6 describes multiple power converters providing different voltages to different loads.  Pet. 29–30 (citing Ex. 1003, 4:20–31, 5:18–23, 8:9–12, 8:17–23, Fig. 6; Ex. 1002 ¶¶ 92–94).  Petitioner contends that Hirst "discloses that the frequency for each of the MF switching power supplies in Figure 6 is under the control of the same 'controller 18' (i.e., the power system controller)" and that controller 18 individually selects the frequency for each of the power supplies.  Pet. 30–31 (citing Ex. 1003, 7:63–8:8, 8:27–49; Ex. 1002 ¶ 95).  Petitioner argues that a person of ordinary skill in the art "would understand that, for *each* of the respective power supplies and loads, controller 18 receives a signal

IPR2022-00312
Patent 7,675,759 B2

indicating the system operational state of the load in the same manner described above for claim 1[pre] and 6[a]." Pet. 31 (citing Ex. 1002 ¶ 95).

Claim 8 depends from claim 7 and recites "wherein at least one of said system operational state and said another system operational state, and said power converter operational state and said another power converter operational state, are different." Petitioner argues that Hirst discloses normal and standby modes of power converter operation and also discloses that each of multiple power converters can be in a different state. Pet. 31–32 (citing Ex. 1003, 7:66–8:8, 8:42–49). Petitioner argues that Hirst also discloses that loads can have different system operational states. Pet. 32 (citing Ex. 1003, 4:27–31, 8:44–49).

Claim 9 depends from claim 7 and recites "wherein said power converter and said another power converter are configured to provide power to said load and said another load, respectively." Petitioner refers to its contentions for claim 6 and 7, which explain that Hirst's power converters provide power to different loads. Pet. 28–32.

Claim 10 depends from claim 7 and recites "wherein said power system controller is configured to sequentially operate said power converter and said another power converter." Claim 18 depends from claim 17 and similarly recites "wherein said power converter and said another power converter are operated sequentially." Petitioner argues that Hirst's disclosure of controlling power converters "in a preferred order" describes operating them sequentially. Pet. 33 (quoting Ex. 1003, 8:42–49; citing Ex. 1002 ¶ 102).

Patent Owner does not dispute Petitioner's contentions for claims 7–10, 17, 18 apart from its independent claim arguments, which we have addressed above in section II.G.2.

Petitioner's contentions are persuasive. Regarding the recitation of multiple power converters and multiple loads, Hirst discloses, with reference to Figure 6, controller 18 controlling multiple power converters (e.g., 96 and 98) that power different loads. *See, e.g.*, Ex. 1003, 8:9–12 ("FIG. 6 is a simplified block diagram of a group of power supplies 80 for the laser printer 10 of FIG. 1. Modern laser printers 10 include a number of power supplies 80, many or all of which may be switching power supplies."), 8:45–49 ("The controller 18 may switch all of the power supplies 84, 88, 96 and 98 together or may switch them in a preferred order, or may set them individually in response to power levels being drawn from each of them."). Based on these disclosures, we find that Hirst discloses power converters in different states based on the states of their loads and also discloses sequential operation of the power converters.

For the reasons discussed above and based on Petitioner's contentions and evidence, we find that Hirst describes the subject matter of claims 7–10, 17, and 18 and, therefore, that Hirst anticipated claims 7–10, 17, and 18.

### H. Obviousness Based on Hirst
### (Claims 1, 6–10, 16–18)

Petitioner asserts that claims 1–3, 5–13, and 15–20 would have been obvious over Hirst. Pet. 10, 39–40. Because we find that Hirst anticipated claims 1, 6–10, and 16–18, we also conclude that the subject matter of claims 1, 6–10, and 16–18 would have been obvious based on the teachings of Hirst. Because we have already determined claims 2, 3, 5, 11–13, 15, 19, and 20 are unpatentable based on the Chagny grounds, we need not address those claims here.

### I. Remaining Grounds

As noted above in § I.A, Petitioner presents additional challenges to

IPR2022-00312
Patent 7,675,759 B2

the claims in this proceeding. Because we determine that all challenged claims are unpatentable as discussed above, we need not separately assess the patentability of these claims based on the remaining grounds in this proceeding. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

IPR2022-00312
Patent 7,675,759 B2

### III. CONCLUSION[12]

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–20 of the '759 patent are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5–13, 15–20 | 102(a), (b) | Hirst[13] | 1, 6–10, 16–18 | |
| 1–3, 5–13, 15–20 | 103(a) | Hirst[14] | 1, 6–10, 16–18 | |
| 1, 2, 4–6, 11, 14–16, 20 | 102(a), (b) | Chagny | 1, 2, 4–6, 11, 14–16, 20 | |
| 1, 2, 4–6, 11, 14–16, 20 | 103(a) | Chagny | 1, 2, 4–6, 11, 14–16, 20 | |
| 3, 12, 13, 19 | 103(a) | Chagny, Clark | 3, 12, 13, 19 | |
| 1, 2, 4–6, | 103(a) | Hwang[15] | | |

---

[12] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[13] As explained above, because we determine that claims 2, 3, 5, 11–13, 15, 19, and 20 are unpatentable on other grounds, we do not address them here.

[14] *See* footnote 13.

[15] As explained above, because we determine these claims are unpatentable on other grounds, we do not address them here.

IPR2022-00312
Patent 7,675,759 B2

| 11, 14–16, 20 | | | | |
|---|---|---|---|---|
| **Overall Outcome** | | | 1–20 | |

## IV. ORDER

Accordingly, it is

ORDERED that claims 1–20 of the '759 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2022-00312
Patent 7,675,759 B2

PETITIONER:

Eliot D. Williams
Neil Sirota
Brett Thompsen
Frank Zhu
Paula Heyman
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
brett.thomsen@bakerbotts.com
frank.zhu@bakerbotts.com
paula.heyman@bakerbotts.com


Ping Wang
Eric Cohen
RIMON PC
ping.wang@rimonlaw.com
eric.cohen@rimomlaw.com


PATENT OWNER:

James T. Carmichael
Stephen McBride
Minghui Yang
CARMICHAEL IP, PLLC
jim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SAMSUNG ELECTRONICS CO., LTD., DELL TECHNOLOGIES INC.,
and ANKER INNOVATIONS LTD.,[1]
Petitioners,

v.

MYPAQ HOLDINGS LTD.,
Patent Owner.

---

Case IPR2022-00311
U.S. Patent No. 8,477,514

---

**PATENT OWNER'S NOTICE
OF APPEAL OF FINAL WRITTEN DECISION**

VIA P-TACTS
Patent Trial and Appeal Board

via U.S.P.S. Priority Mail Express
Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22324-1450

via CM/ECF
United States Court of Appeals for the Federal Circuit

---

[1] Anker Innovations Ltd. filed a motion for joinder and a petition in IPR2022-01134 and has been joined as a petitioner in this proceeding.

Case: 23-2024     Document: 20     Page: 115     Filed: 07/25/2023

Case: 23-2024     Document: 20     Page: 116     Filed: 07/25/2023

# INTRODUCTION

MYPAQ HOLDINGS LTD.'s ("Patent Owner") appeal stems from the Patent Trial and Appeal Board's Judgment Final Written Decision Determining All Challenged Claims Unpatentable *35 U.S.C. § 318(a)* entered on May 17, 2023 (Paper 29, "Final Written Decision") in the above-captioned *inter partes* review of United States Patent No. 8,477,514 ("the '514 Patent"). This notice of Patent Owner's appeal is timely filed within 63 days of the Final Written Decision. 37 C.F.R. § 90.3(a)(1).

# PATENT OWNER'S APPEAL

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141-143, 37 C.F.R. §§ 90.2 – 90.3, (a)(1) and Fed. Cir. R. 15, Patent Owner hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 17, 2023 (Paper 29) in IPR2022-00311.

# PATENT OWNER'S ISSUES ON APPEAL

Providing the information required by 37 C.F.R. 90.2(a)(3)(ii), Patent Owner states that the issues on appeal may include, but are not limited to: (1) the Board's finding of unpatentability of Claims 1-12, 14-17, 19, and 20 under 35 U.S.C. § 102 based on Chagny; (2) the Board's finding of unpatentability of Claims 1-20 under 35 U.S.C. § 103 based on Chagny; (3) any erroneous claim construction adopted and/or applied in connection with the aforementioned findings; and (4) any

findings that conflict with the evidence of record and are not supported by

substantial evidence.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2, a copy of this Notice of

Appeal is being filed simultaneously with the Patent Trial and Appeal Board, the

Clerk's Office for the United States Court of Appeals for the Federal Circuit (along

with the required docketing fees), and the Director of the Patent and Trademark

Office c/o the Office of the General Counsel at the below-identified address.

Respectfully submitted,


  /Stephen McBride/
Stephen McBride, Reg. No. 78,396
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons, VA 22182
(703) 646-9248


Date:    June 8, 2023

## CERTIFICATION OF FILING

The undersigned hereby certifies that, in addition to being electronically filed

through P-TACTS, a true and correct copy of **PATENT OWNER'S NOTICE OF**

**APPEAL OF FINAL WRITTEN DECISION** is being filed by U.S.P.S. Priority

Mail Express® with the Director on the date below at the following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22314-1450

The undersigned also hereby certifies that a true and correct copy of **PATENT**

**OWNER'S NOTICE OF APPEAL OF FINAL WRITTEN DECISION** and the

filing fee is being filed via CM/ECF with the Clerk's Office of the United States

Court of Appeals for the Federal Circuit on the date below.


Respectfully submitted,

/Stephen McBride/
Stephen McBride, Reg. No. 78,396
Carmichael IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons, VA 22182
Attorney for Patent Owner


Date: June 8, 2023

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing PATENT OWNER'S

NOTICE OF APPEAL OF FINAL WRITTEN DECISION was served by filing

this document through P-TACTS, as well as by email on June 8, 2023, on the

following counsel of record for Petitioner:

Eliot D. Williams
Neil Sirota
Eric J. Faragi
Frank Zhu
Paula Heyman
Brett Thompsen
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
eric.faragi@bakerbotts.com
frank.zhu@bakerbotts.com
pheyman@mwe.com
bthompsen@mwe.com
DLSamsung514IPR@BakerBotts.com
DLDell514IPR@BakerBotts.com

Ping Wang
Eric Cohen
RIMON PC
ping.wang@rimonlaw.com
eric.cohen@rimonlaw.com
Anker514IPR@rimonlaw.com

Respectfully submitted,

/Stephen McBride/

Date: June 8, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SAMSUNG ELECTRONICS CO., LTD., DELL TECHNOLOGIES INC.,
and ANKER INNOVATIONS LTD.,[1]
Petitioners,

v.

MYPAQ HOLDINGS LTD.,
Patent Owner.

---

Case IPR2022-00312
U.S. Patent No. 7,675,759

---

**PATENT OWNER'S NOTICE
OF APPEAL OF FINAL WRITTEN DECISION**

VIA P-TACTS
Patent Trial and Appeal Board

via U.S.P.S. Priority Mail Express
Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22324-1450

via CM/ECF
United States Court of Appeals for the Federal Circuit

---

[1] Anker Innovations Ltd. filed a motion for joinder and a petition in IPR2022-01131 and has been joined as a petitioner in this proceeding.

Case: 23-2024    Document: 20    Page: 121    Filed: 07/25/2023

## INTRODUCTION

MYPAQ HOLDINGS LTD.'s ("Patent Owner") appeal stems from the Patent Trial and Appeal Board's Judgment Final Written Decision Determining All Challenged Claims Unpatentable *35 U.S.C. § 318(a)* entered on May 17, 2023 (Paper 29, "Final Written Decision") in the above-captioned *inter partes* review of United States Patent No. 7,675,759 ("the '759 Patent"). This notice of Patent Owner's appeal is timely filed within 63 days of the Final Written Decision. 37 C.F.R. § 90.3(a)(1).

## PATENT OWNER'S APPEAL

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141-143, 37 C.F.R. §§ 90.2 – 90.3, (a)(1) and Fed. Cir. R. 15, Patent Owner hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered May 17, 2023 (Paper 29) in IPR2022-00312.

## PATENT OWNER'S ISSUES ON APPEAL

Providing the information required by 37 C.F.R. 90.2(a)(3)(ii), Patent Owner states that the issues on appeal may include, but are not limited to: (1) the Board's finding of unpatentability of Claims 1, 6-10, and 16-18 under 35 U.S.C. § 102 based on Hirst; (2) the Board's finding of unpatentability of Claims 1, 6-10, and 16-18 under 35 U.S.C. § 103 based on Hirst; (3) the Board's finding of

unpatentability of Claims 1, 2, 4-6, 11, 14-16, and 20 under 35 U.S.C. § 102 based

on Chagny; (4) the Board's finding of unpatentability of Claims 1, 2, 4-6, 11, 14-

16, and 20 under 35 U.S.C. § 103 based on Chagny; (5) the Board's finding of

unpatentability of Claims 3, 12, 13, and 19 based on 35 U.S.C. § 103 based on

Chagny and Clark; (6) any erroneous claim construction adopted and/or applied in

connection with the aforementioned findings; and (7) any findings that conflict

with the evidence of record and are not supported by substantial evidence.

Pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2, a copy of this Notice of

Appeal is being filed simultaneously with the Patent Trial and Appeal Board, the

Clerk's Office for the United States Court of Appeals for the Federal Circuit (along

with the required docketing fees), and the Director of the Patent and Trademark

Office c/o the Office of the General Counsel at the below-identified address.

Respectfully submitted,


  /Stephen McBride/
Stephen McBride, Reg. No. 78,396
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons, VA 22182
(703) 646-9248


Date:    June 8, 2023

Case: 23-2024      Document: 20      Page: 123      Filed: 07/25/2023

## CERTIFICATION OF FILING

The undersigned hereby certifies that, in addition to being electronically filed

through P-TACTS, a true and correct copy of **PATENT OWNER'S NOTICE OF**

**APPEAL OF FINAL WRITTEN DECISION** is being filed by U.S.P.S. Priority

Mail Express® with the Director on the date below at the following address:

> Director of the United States Patent and Trademark Office
> c/o Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22314-1450

The undersigned also hereby certifies that a true and correct copy of **PATENT**

**OWNER'S NOTICE OF APPEAL OF FINAL WRITTEN DECISION** and the

filing fee is being filed via CM/ECF with the Clerk's Office of the United States

Court of Appeals for the Federal Circuit on the date below.

Respectfully submitted,

/Stephen McBride/
Stephen McBride, Reg. No. 78,396
Carmichael IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons, VA 22182
Attorney for Patent Owner

Date: June 8, 2023

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing PATENT OWNER'S

NOTICE OF APPEAL OF FINAL WRITTEN DECISION was served by filing

this document through P-TACTS, as well as by email on June 8, 2023, on the

following counsel of record for Petitioner:

Eliot D. Williams
Neil Sirota
Eric J. Faragi
Frank Zhu
Paula Heyman
Brett Thompsen
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
neil.sirota@bakerbotts.com
eric.faragi@bakerbotts.com
frank.zhu@bakerbotts.com
pheyman@mwe.com
bthompsen@mwe.com
DLSamsung759IPR@BakerBotts.com
DLDell759IPR@BakerBotts.com

Ping Wang
Eric Cohen
RIMON PC
ping.wang@rimonlaw.com
eric.cohen@rimonlaw.com
Anker759IPR@rimonlaw.com

Respectfully submitted,

/Stephen McBride/

Date: June 8, 2023

Case: 23-2024    Document: 20    Page: 124    Filed: 07/25/2023