**2023-2024, 2023-2025**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

### MYPAQ HOLDINGS LTD.,

Appellant,

v.

### SAMSUNG ELECTRONICS CO., LTD., DELL TECHNOLOGIES INC., AND ANKER INNOVATIONS LTD.,

Appellees.

---

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board In Proceeding Nos.
IPR2022-00311, IPR2022-01134, IPR2022-00312, IPR2022-01131.

---

### REPLY BRIEF OF APPELLANT
### MYPAQ HOLDINGS LTD.

---

James T. Carmichael*
Stephen P. McBride
Minghui Yang*
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons Corner, VA 22182
(703) 646-9255
jim@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com
*Not admitted in Virginia

*Counsel for Appellant MyPAQ Holdings Ltd.*

November 24, 2023

## CERTIFICATE OF INTEREST

I certify the following information is accurate and complete to the best of my knowledge.

Respectfully submitted,

*/s/* Stephen P. McBride
*Counsel for Appellant MyPAQ Holdings Ltd.*

**1.     Represented Entity**

MyPAQ Holdings Ltd.

**2.     Real Party in Interest**

N/A

**3.     Parent Corporation and Stockholders**

N/A

**4.     Legal Representatives**

Other than counsel already entered an appearance in this court, the following counsel have made previous appearances in related or lower court proceedings:

James A. Engel and Katherine L. Allor of the firm Carmichael IP, PLLC

Jason A. Engel, Katherine L. Allor, Erik J. Halverson, and Dennis J. Magewski of the firm K&L Gates

**5.     Related Cases**

A Notice of Related Case Information was filed on July 31, 2023, ECF No. 4.

**6.     Organizational Victims and Bankruptcy cases**

N/A

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................ i

TABLE OF AUTHORITIES ............................................................ iv

I.  INTRODUCTION ................................................................. 1

II.  "CORE STATE" ................................................................... 1

    A.  The Patents Define "Core States" As "C-States" ................................ 1

    B.  The Prior Art Does Not Disclose "Core States" Under The Proper Construction ............................................ 10

III.  "UPON STARTUP" .............................................................. 12

    A.  The Board Erroneously Construed The Claim Term "Upon Startup" ............................................ 12

    B.  MyPAQ's Construction Is Correct .................................... 14

    C.  Under The Proper Construction, Chagny Does Not Teach This Limitation ............................................ 15

    D.  MyPAQ's Construction Is Properly Raised On Appeal .................... 16

IV.  "COMPONENTS OF A PROCESSOR SYSTEM" .................................. 18

    A.  MyPAQ's Construction Is Correct .................................... 18

    B.  The Board Applied The Wrong Construction ........................... 21

    C.  The Prior Art Does Not Disclose This Limitation Under The Proper Construction ............................................ 24

III.  "DUTY CYCLE" ................................................................. 25

    A.  The Board Applied The Wrong Construction ........................... 25

    B.  Chagny Does Not Disclose A Conduction Period Under The Agreed Construction ............................................ 27

# TABLE OF CONTENTS (Cont.)

IV.   "POWER SYSTEM CONTROLLER"......................................................28

     A.    MyPAQ's construction is correct ......................................................28

     B.    Chagny Does Not Disclose A "Power System Controller"
           Under The Proper Construction ........................................................32

     C.    MyPAQ Argued This Issue Below ....................................................32

V.    CONCLUSION ...................................................................................34

CERTIFICATE OF SERVICE................................................................35

CERTIFICATE OF COMPLIANCE.......................................................36

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AIA Eng'g Ltd. v. Magotteaux Intl. S/A*,
  657 F.3d 1264 (Fed. Cir. 2011) .......................................................... 8

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009) ........................................................8, 9

*Phillips v AWH Corporation*,
  415 F.3d 1303 (Fed. Cir. 2005) .........................................2, 4, 6, 9, 18

*SanDisk Corp. v. Kingston Tech. Co.*,
  695 F.3d 1348 (Fed. Cir. 2012) .......................................................... 3

*SkinMedia v. Histogen, Inc.*,
  727 F.3d 1187 (Fed. Cir. 2013) .......................................................... 7

*Transclean Corp. v. Bridgewood Servs., Inc.*,
  290 F.3d 1364 (Fed. Cir. 2002) ........................................................27

**FEDERAL CASES**

35 U.S.C. § 316 ......................................................................................12

## I.    INTRODUCTION

Appellees attempt to recast the claim construction legal issues raised in Appellant MyPAQ's brief as factual findings and argue those legal issues are new. The Court should not be misdirected. MyPAQ's legal arguments are not new. Each was raised before the Board. MyPAQ clearly explained and outlined the intrinsic record support for the plain meanings of the disputed terms. MyPAQ's claims construction arguments are properly before this Court on *de novo* review. The Board's holdings cannot be reconciled with the plain meaning of the disputed claim terms. Accordingly, this Court should reverse.

## II.    "CORE STATE"

### A.    The Patents Define "Core States" As "C-States"

The '514 and '759 Patents expressly define "core state" as "C-state":

> Another processor state indicator, the core state ("C-state"), also under software operating system control, affects

**Appx125 ['514 Patent], 5:44-45.**

> Another processor state indicator, the core state ("C-state"), also under software operating system control, affects

**Appx152 ['759 Patent], 4:24-25.**

> Turning now to FIG. **12**, illustrated is a diagram of an embodiment of processor <mark>core states ("C-states")</mark> in accordance with the principles of the present invention illustrated.

**Appx135, ['514 Patent], 25:28-30.**

This Court recognizes that "the inventor's lexicography governs." *Phillips v AWH Corporation*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). *Id.* Appellees disregard this central claim construction tenet by ignoring the Patents' clear lexicographic definitions. Appellee Br., 13-22.

The specifications' lexicographic definitions are consistent with the plain meaning of the term. Appellant Brief, 24-25. Both parties' experts testified that "core states" are synonymous with C-States, a term specific to the ACPI standard incorporated by reference into the specification. *See, e.g.,* Appx1930-1931 ['514 Ferrese Decl.], ¶91. For example, Appellees' own expert defined "core states" as C-states: "P state and C states, which are the performance and core states." Appx2036 [Kiaei Tr.], 67:20-24. Further, while Dr. Kiaei's testimony calls C1 and C4 "*core states*," the passage from the '514 Patent Dr. Kiaei discusses uses the term "*ACPI C-States*" to refer to states C0-C4, underscoring Dr. Kiaei's clear understanding that the two terms are synonymous. Appx135 ['514 Patent], 25:28-33 ("the diagram illustrates ACPI C-states including an active state C0…").

Appellees argue that MyPAQ mischaracterized Dr. Kiaei's express definition above, but in the additional testimony Appellees point to, Dr. Kiaei again defines "core states" as "C-states", stating "[t]he core state of the processor …. They [the inventors] call it a C state. … That's a core state" Appellee Br., 18-19, n.4 (quoting Appx2036 at 67:18-23). Thus, the passage Appellees cite shows their expert agreeing a second time that "core state" is synonymous with "C-state."

Appellees provide no affirmative construction for "core state" other than "including, but not limited to, ACPI C-States." Appellee Br., 13. Appellees provide no evidence for any construction other than an ACPI C-state.

Tellingly, Appellees fail to address the fact that the '514 and '759 Patents incorporate the ACPI standard by reference. Appellee Br., *passim*. "[A] document incorporated by reference becomes effectively part of the host document as if it were explicitly contained therein," *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1366 (Fed. Cir. 2012) (internal quotation omitted). Appellees avoid this topic because they have no explanation for how "core state" as used in these patent claims could possibly mean anything other than the ACPI C-State as defined and incorporated in the specification. Indeed, the specification incorporates the ACPI standard by reference precisely when introducing the concept of performance states and core states, Appx125, ['514 Patent], 5:19-52; Appx152, ['759 Patent], 3:65-4:39.

3

In a footnote, Appellees argue MyPAQ's opening brief did not connect the definition of "core states" to the specification's incorporation by reference of the ACPI standard. Appellee Br. 19, n.5. To the contrary, MyPAQ argued "[t]he challenged patents further indicate that the recited core states (C-states) are the C-States defined by the ACPI specification incorporated by reference into the challenged patents" (Appellant Br., 21) and that "core states (C-states) as defined in the '514 and '759 Patent have numerous requirements … laid out in the ACPI standard, which the '514 and '759 Patents incorporate by reference." Appellant Br., 34.

Appellees argue that the specification defines "an ACPI C-state [a]s an example of the claimed 'core state.'" Appellee Br., 14. Appellees' argument directly contradicts the specifications' lexicographic definitions and MyPAQ's unrebutted evidence of the plain and ordinary meaning of the term "core state." There is no basis to ignore a patentee's express lexicographic definition of a claim term. *Phillips*, 415 F.3d at 1316.

Further, Appellees' argument mischaracterizes the non-limiting intrinsic embodiments it cites. Each embodiment cited by Appellees is completely consistent with the patentees' lexicographic definition of "core states ('C-States')." For example, Appellees argue "the specifications state that 'examples indicating a system operational state include, without limitation, a signal providing a

4

performance state or a core state of a processor such as a P-state or C-state[.]" Appellee Br., 14. The bracketed period in Appellees' citation omits relevant text that clarifies the sentence is using "core state" synonymously with "C-state." Appx127 ['514 Patent], 9:11-23; App154 ['759 Patent], 7:16-32. *See* Appellant Br., 27-28. The complete sentence is clear that "such as" modifies the entire clause that Appellees omitted, and not just "P-state or C-state" as Appellees argue. The clause Appellees omitted clarifies that a "system operational state" can be a "core state ('C-State')" used to indicate something further about the power system as a whole, such as that the system is operating from emergency power or battery reserve, etc.

Appellees' other alleged support also fails. Appellees state that "Figure 12 of the '514 Patent 'illustrates a diagram of *an embodiment* of processor core states in accordance with the principles of the present invention[.]'" Appellee Br., 14-15 (citing Appx126 at 8:7-9) (emphasis added by Appellees). But the *diagram* is the embodiment; the quotation presented by Appellees does not suggest C-states are an embodiment of core states. To the contrary, when the specification later discusses Figure 12 in detail, it clearly and unequivocally defines "processor core states" as "C-states":

> Turning now to FIG. **12**, illustrated is a diagram of an embodiment of processor <mark>core states ("C-states")</mark> in accordance with the principles of the present invention illustrated.

Appx135, ['514 Patent], 25:28-30.
That definition controls. *Phillips*, 415 F.3d at 1316.

In the next sentence, the specification again confirms Fig. 12 is an embodiment of ACPI C-States, stating "the diagram [of Fig. 12] illustrates ACPI C-States." Appx135, ['514 Patent], 25:31-33. Thus Figure 12 is an illustration (i.e., embodiment) of ACPI C-States, or core states. Nothing in the description of Fig. 12 implies that ACPI C-States are merely an embodiment (as opposed to the definition) of core states.

Appellees argue that their cherry-picked, misleadingly truncated quotations "fall[ ] far short of the clear intent required for limiting the claim term 'core state' to only the ACPI C-states… ." Appellee Br., 15-16. But Appellees ignore the specifications' lexicographic definitions of "core state." Further, the patentee need only define the term once. *See Phillips*, 415 F.3d, 1316 ("the specification may reveal *a* special definition…") (emphasis added). The term need not be redefined every time it is used thereafter, as Appellees argue.

Appellees argue that "MyPAQ mischaracterizes" the patents because the sentence in the patents introducing the ACPI standard "makes no mention of 'core state' much less equates the ACPI C-states with 'core state.'" Appellee Br., 18-19.

Appellees' argument is misleading. While the sentence introducing the ACPI standard does not explicitly use the term "core state," it does introduce ACPI "P-states" and "C-states." Appx125, 5:22-27, Appx152, 4:1-6. The next sentence defines "P-states" as "the 'performance' state (or, alternatively, the 'power' state)" and the remainder of the paragraph discusses ACPI P-states. Appx125 ['541 Patent], 5:27-43; *see also* Appx152 ['759 Patent], 4:6-23. The next paragraph starts by defining "core states" as "C-states" with the remainder of the paragraph discussing ACPI C-states. Appx125 ['541 Patent], 5:44-59; *see also* Appx152 ['759 Patent], 4:24-29. Thus, the patents explicitly define "core state" as an ACPI C-state when the ACPI standard, P-states and C-states are introduced, incorporated by reference, and explained.

Appellees present no legal authority that the clear definitional statement "core states ('C-states')" does not govern the claim term's construction. Appellees' attempts to distinguish the legal authorities cited by MyPAQ are meritless. In *SkinMedia v. Histogen, Inc.*, 727 F.3d 1187, 1200 (Fed. Cir. 2013), the question before the Court was whether the modifier "i.e." changed the meaning of an otherwise clear definitional statement "beads (i.e., two-dimensions)." This Court held that it did not and the patentee's parenthetical definition controlled. *Id*. There is no modifier in the clear lexicographic definitions at issue here—the language is

simply "core states ('C-states')." Thus, the statements at issue are clearly intended as definitions. *Compare SkinMedia,* 727 F.3d at 1200.

MyPAQ cited *AIA Eng'g Ltd. v. Magotteaux Intl. S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) for the proposition that a patentee may define two terms as identical synonyms. Appellant Br., 24. Appellees do not challenge this fundamental claim construction principal. Appellee Br., 20-21. Instead, Appellees draw the false equivalence that the express definitions of "core state" as "C-state" does not control because "the term 'core state is used several times in the '514 and '759 Patents and many of those uses are without reference to an ACPI 'C-state.'" Appellee Br., 20-21. But again, there is no requirement that a term is repeatedly defined each time it is used. One express definition is enough. And Appellees' statement that "even when 'C-state' is linked to 'core state,' the specification indicated it as an example—not a synonym—of a core state" (Appellee Br., 21) is incorrect. The Patents repeatedly expressly define "core state" as "C-state". Appx125 ['514 Patent], 5:44-45. *See also* Appx152 ['759 Patent], 4:24-25, Appx135, ['514 Patent], 25:28-30.

Appellees attempt to distinguish *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009). Appellee Br., 21-22. But MyPAQ cited *Edwards* for the proposition that "[t]he interchangeable use of [ ] two terms is akin to a definition equating the two." Appellant Br., 25. Appellees never explain how "core

state ('C-state')" is anything other than an interchangeable use of the terms "core state" and "C-state".

Instead, Appellees argue that "the specification [in *Edwards*] referred to 'an intraluminal graft' as 'the graft' and used the same reference numeral 10 to refer to 'graft 10' and 'intraluminal graft 10.' No such link exists here." Appellee Br., 22. Appellees are incorrect. Not only do the present specifications expressly link "core state" and "C-state," (i.e., "core state ('C-state')") but they do so in a more direct and unambiguous manner than the definition in *Edwards*. Appx125 ['514 Patent], 5:44-45. *See also* Appx152 ['759 Patent], 4:24-25, Appx135, ['514 Patent], 25:28-30.

Appellees argue in a footnote that its own repeated use of the same definitional convention to define terms in its papers "lacks any relevance to the intrinsic record." Appellant Br., 20 n.6. Appellees' definition convention is relevant to the intrinsic record for at least two reasons. First, it demonstrates the plain meaning of the convention. The fact that patent judges, patent attorneys, and experts in the relevant field all routinely use the same definition convention to define terms is compelling evidence that the plain meaning of "core state ('C-State')" defines "core state" as "C-State" to POSITAs. Appellant Br., 32-33; Appx685 [Kiaei '514 Decl.] ¶¶1, 3. *See Phillips*, 415 F.3d at 1312-1313 ("the words of a claim are generally given their ordinary and customary meaning.") (internal citation and quotation omitted).

Second, the fact that Appellees' papers routinely use the same convention to define terms further highlights the glaring contradiction in Appellees' position.

### B. The Prior Art Does Not Disclose "Core States" Under The Proper Construction

Appellees argue that, under "the proper construction" of core state, the prior art discloses this limitation. Appellee Br., 22-25. But "core state" is a term of art specific to the ACPI standard. Nothing in any of the prior art has anything to do with the ACPI standard, much less core states. Appellant Br., 34-35. *See also* Appx2184-2185, 2415-2436 [ACPI Standard], §§2.5, 2.6, 8. Further, neither the Board nor Appellees provide any explanation of what a "core state" is, other than "including, but not limited to, ACPI C-states." Appellee Br., 13. Appellees provide no evidence that "core states ('C-States')" have any meaning outside of the ACPI standard.

Appellees argue that "the background sections of the '514 and '759 Patents explain that a 'core state' of a processor is 'under software operating system control' and 'affects [the processor's] level of power consumption[.]" Appellee Br., 23. But Appellees cite the '759 Patent at 4:23-25, which states "core state ('C-State')." Appx152 ['759 Patent], 4:23-25. *See also* Appx125 ['514 Patent], 5:44-46, Appx135, ['514 Patent], 25:28-30. Again, Appellees omit the part of the quote that defines "core state" as "C-state."

Further, core states are not limited to indicators that are "under software operating system control" and "affect [the processor's] level of power consumption." The remainder of the paragraph identifies additional C-State characteristics that Appellees never attempted to map to the prior art. Appx152 ['759 Patent], 4:23-39. *See also* Appx125 ['514 Patent], 5:44-58.

Appellees argue that its expert confirmed that a POSITA "would have understood that the 'core state' described in the '514 and '759 Patents specifies the activity level (e.g., the rate at which instructions are executed) of the processor." Appellee Br., 23. Appellees' expert commits the cardinal sin of hindsight bias. He interprets "core state" by referencing the prior art, which discloses signals that specify processor activity level (Appx720, ¶79, Appx4289, ¶154), while ignoring the patentees' lexicographic definitions of "core state." Nothing in the intrinsic record indicates core states ("C-states") specify processor activity level. While certain core states can halt instruction execution (Appx152 ['759 Patent], 4:35, Appx125 ['514 Patent], 5:55), stopping instructions from executing is different than "specify[ing] the activity level." Appx1951-1952 [Ferrese '514 Decl.], ¶132. Further, halting instruction execution is only one aspect of an ACPI C-state; neither the prior art nor Petitioner addresses any other aspects discussed in the Patents such as "gating internal clocks, disabling internal phase-locked loops, and disabling ports that respond to certain levels of interrupts" (Appx152 ['759 Patent], 4:33-39,

11

Appx125 ['514 Patent], 5:52-59). Petitioner completely ignores the additional requirements in the ACPI standard. The prior art has nothing to do with core states or the ACPI standard. Appx1913 [Ferrese '514 Decl.], ¶92; Appx2064 [Kiaei '514 Tr], 95:1-9, 95:19-24.

In a footnote, Appellees argue that if the Court adopts the Patents' lexicographic definition of "core state ('C-State')," it should remand. Appellee Br., 23, n.8. Remand is not required, and Appellees never contended the prior art suggested ACPI C-states. Reversal and rendering of judgment is the only appropriate result. MyPAQ has presented substantial evidence and argument showing that neither the Chagny nor Hwang references disclose core states, ACPI C-States or anything related to the ACPI standard (Appellant Br., 34-35). Appellees cannot prevail when they have completely failed to carry their burden under the correct construction. 35 U.S.C. § 316(e). The Court should reverse and render judgement.

## III.  "UPON STARTUP"

### A.    The Board Erroneously Construed The Claim Term "Upon Startup"

Appellees argue that the Board "correctly determined that 'upon startup of said processor system' in claims 13 and 18 at least includes the time period after the recited components of the processor system have been enabled to establish a state of power drain." Appellee Br., 27 (citing Appx45-46). According to Appellees, this

means that "the processor system is already in a state of power drain when 'said signal is provided *upon startup* of said processor system." Appellee Br., 28 (citing Appx137 ['514 Patent] at 29:15-16) (emphasis in original). But this supports MyPAQ's position. Claims 13 and 18 require the "signal to identify operation of said processor system in said state of power drain" to be sent "upon startup," not at some undefined time after startup. Appellant Br., 38-39; Appx136-137 ['514 Patent], claims 11, 13, 16, 18.

Appellees and the Board argue that "upon startup" could mean "immediately after startup." Appellee Br., 27; Appx45-46 [FWD]. This interpretation is not consistent with the '514 Patent specification, which explains that "power conversion efficiency" is optimized by determining the "actual power drains of a system in a particular application." Appx129 ['514 Patent], 13:35-46. The '514 Patent explains that this can be done at one of two times—either (1) "upon power-up of such a system" or (2) "during its continued operation." *Id.* The "signal … to identify operation of the system in such a state of a maximum power drain" is the signal that allows the power system to identify the "actual power drains" and therefore "optimize power conversion efficiency." *Id.* The signal is sent at time (1) (during power-up or startup) so that the power converter knows what the actual maximum power drain of the system is before it enters operation, thereby allowing for

13

optimization of power conversion efficiency during operation. Appx129 ['514 Patent], 13:29-43.

Thus, although the signal is only sent after the state of power drain is established, the signal is nonetheless sent during startup of the system as opposed to thereafter "during its continued operation." Appx129 ['514 Patent], 13:35-46.

### B.    MyPAQ's Construction Is Correct

Appellees argue that MyPAQ's construction is incorrect because "claims 13 and 18 refer to the startup of a 'processor system,' not the startup of a 'computer.'" Appellee Br., 31-32. The terms "processor system" and "computer" are used synonymously in the '514 Patent. Appx129 ['514 Patent], 13:29-33. Accordingly, either "processor system" or "computer" can be used in the construction.

Appellees argue that "nowhere does the specification mention a 'boot sequence'" but then admits that "the '514 Patent refers to a 'boot up.'" Appellee Br., 32, n.10. The terms "startup," "boot up," and "boot sequence" are synonyms. Appx1958-1959 [Ferrese '514 Decl.], ¶147. Accordingly, MyPAQ agrees that either "boot up" or "boot sequence" can be used in the construction. Further, Appellees' citation states "[t]his maximum load could be characterized at system boot up and communicated to the power supply, then stored, for example, in flash memory." Appellee Br., 32 (citing Appx133 ['514 Patent], 21:11-14). This supports MyPAQ's

14

construction in that it further demonstrates the signal is sent during the boot sequence because the maximum load (i.e., the maximum power drain) is "characterized at system boot up and communicated to the power supply." *Id.*

Appellees argue that "the cited portions of the Ferrese declaration address the operation of a prior art processor system for different invalidity grounds." Appellee Br., 33. Appellees' argument is unavailing. Dr. Ferrese was discussing the meaning of "upon startup" in the context of the intrinsic record regardless of the prior art being discussed. Appx1958-1959 ['514 Ferrese Decl.], ¶147.

## C. Under The Proper Construction, Chagny Does Not Teach This Limitation

Appellees cite the Board's finding that "Chagny's disclosure that activity input 202 [i.e., the claimed 'said signal'] 'may be updated as frequently as 'once every millisecond' suggests essentially continuous updating during operation, which would begin at startup." Appellee Br., 25 (quoting Appx44-45 [FWD] and Appx1056 [Chagny], 4:43-45). This citation highlights the error in the Board's analysis.

As the Board points out, Chagny only teaches providing activity input 202 "during operation." But the Board then conflates the system startup with system operation, stating that operation "would begin at startup." As discussed above, the '514 Patent explicitly distinguishes between system "operation" (as taught in

15

Chagny) and system "power-up" or "startup". Appx129 ['514 Patent], 13:39-46. Claims 13 and 18 recite sending a signal "upon startup of said processor system." Appx137 ['514 Patent], claims 13 and 18. Thus, signals sent "during operation" (as found by the Board) do not satisfy this claim.

Appellees identify nothing in Chagny or Hwang that would suggest sending activity input 202 during startup. While Appellees state that "Chagny discloses that its activity input 202 signal (i.e., 'said signal') 'may be updated … on an event basis or an on-demand basis'" (Appellee Br., 25 (quoting Appx44-45 [FWD]), nothing in Chagny indicates these events occur outside of normal operation. Chagny never discusses the startup of its system.

Under the legally correct construction of "upon startup", this limitation is completely missing from the proposed combination of Chagny and Hwang. Accordingly, Court should reverse the Board's finding that claims 13 and 18 are unpatentable.

### D.    MyPAQ's Construction Is Properly Raised On Appeal

Appellees argue that MyPAQ improperly raises the "upon startup" construction on appeal, but *Petitioners* raised this claim construction issue before the Board in their Reply. Appx541, ['514 Reply]. Further, MyPAQ took the same position in front

of the Board and the Board applied a contrary construction. Appx45-46 [FWD]. Thus, this issue is properly on appeal.

In their Reply before the Board, Petitioners argued that "the plain meaning of 'upon' is 'thereafter,' not 'during.'" Appx541, ['514 Reply]. Petitioners cited a dictionary definition and provided further argument to support its new construction. *Id.* (citing Appx1527 [Ex1028]).

MyPAQ's Sur-Reply before the Board expressly identified Petitioners' late claim construction, pointed out that it was never raised in the Petition, and discussed that Petitioners' definition was not the appropriate definition from the dictionary Petitioners relied upon. Appx576 ['514 Sur-Reply].

The Final Written Decision recognized that MyPAQ was responding to Petitioners' construction, stating "Patent Owner also argues that Petitioners incorrectly interprets 'upon startup' to mean 'thereafter.'" Appx45 ['514 FWD]. The Board chose to construe "upon startup" contrary to MyPAQ's arguments, stating "'upon startup of said processor system' in claims 13 and 18 includes the time period after the components have been enabled to establish a state of power drain." Appx45 ['514 FWD].

Therefore, this issue is properly presented to this Court.

## IV.   "COMPONENTS OF A PROCESSOR SYSTEM"

### A.    MyPAQ's Construction Is Correct

Appellees reframe MyPAQ's construction as whether the Board construed "'processor system' as limited to an individual 'processor' to the exclusion of other systems." Appellee Br, 34. The issue raised by MyPAQ is not whether the claim term "components of a processor system" must be limited to an individual processor (as reframed by Appellees). The issue is whether the claim term "components of a processor system" includes internal components of a processor. Appellant Br., 39-41.

Appellees argue that, in "holding that internal components of a processor meet the recited 'components of a processor system' element, the Board gave the terms their plain and ordinary meaning." Appellee Br., 34. But the plain and ordinary meaning is viewed "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Appellees' argument fails because it ignores the intrinsic record. Appellant Br., 41-50.

Appellees do not meaningfully address the arguments in MyPAQ's opening brief that the claims' requirement for a power system controller that "enables[s] operation of components to establish a state of power drain thereof" makes clear that the power system controller enables multiple components of a computer, not merely the processor. Appellant Br., 41-42. Nor do Appellees address the fact that the claims of

18

the '514 Patent use the terms "processor" and "processor system" separately, or the presumption that therefore arises that two different claim terms mean two different things. Appellant Br., 42.

Appellees' arguments do not address the issue identified by MyPAQ. Appellees argue "there is no dispute that a processor itself is a multi-component device." Appellee Br., 34-35. This is not the issue. Nothing in the '514 Patent discusses enabling *internal* components of a processor to establish a state of power drain. Instead, the intrinsic record discusses enabling external "[processor] system components such as memory, hard drives, and specialized circuit cards[.]" Appx129 ['514 Patent], 13:29-43, Appellant Br., 42-43. By doing so, the "power system controller can enable operation of its principal components [e.g., memory, hard drives, and specialized circuit cards] to establish a state of maximum power drain." *Id.* Indeed, the '514 Patent distinguishes between pre-existing indicators of processor power levels and the inventive indicators that establish the power drain of all components of a processor system. Appx125 ['514 Patent], 5:60-6:2; Appellant Br., 44-45.

Appellees argue that "[t]he '514 Patent contemplates that a 'processor system' may include a processor alone." Appellee Br., 34-35. Again, this is misdirection. The claims require "enabl[ing] operation of component**s** of a processor system" plural, not a single component. Appellant Br., 41. A processor is at best a single

19

component. Consistent with the specification, the claims require a "processor system" must establish the power drain of multiple components, not just a single processor.

Appellees quote one sentence from the specification in support of their construction. Appellee Br., 35. This sentence states "[t]he power converter also includes a controller 110, and provides power to a system (not shown) such as a microprocessor coupled to an output thereof." Appx127 ['514 Patent] at 10:12-15. Appellees' analysis fails because this section discusses prior art Fig. 1. Appx111, ['514 Patent], Fig. 1. By inventively providing for dynamic control of the entire processor system, the '514 Patent improves on prior art power systems that only control processor power states. Appellant Br., 44-45. The claims reflect this improvement because they require a "power system controller configured to enable operation of component**s** [plural] of a processor system." Appx136-137, ['514 Patent], Claims 11 and 16.

Appellees do not address the fact the Petition agreed with MyPAQ's construction by identifying that a "processor system" "includes other associated components such as 'memory' and various 'input/output devices.'" Appellant Br., 48-49 (quoting Appx209 ['514 Petition], n.6). Nor do Appellees address the extrinsic evidence identified by MyPAQ. Appellant Br., 49-50. Instead, Appellees' position relies entirely on its own extrinsic evidence.

Appellees argue that the "Board found that Chagny's processor 292, and the multiple [undisclosed] components that a POSITA would have understood to be included within that processor, are sufficient to disclose the claimed 'components of a processor system.'" Appellee Br., 35. But the Board did so under its erroneous construction of "components of a processor system." Appellees cannot rely on the Board's flawed analysis in lieu of addressing the intrinsic record. Accordingly, MyPAQ's construction is correct.

## B.    The Board Applied The Wrong Construction

Appellees argue that substantial evidence supports the Board's finding that Chagny discloses enabling "components of the processor system." Appellee Br., 36. As discussed above, the Board's holding is based on an erroneous construction of "components of a processor system." At best, a processor is a single component of a processor system. Nothing in Chagny discloses any "internal" components of a processor, and nothing in Chagny discloses enabling operation of any processor system component other than a processor.

Appellees argue "the Board recognized Petitioners' explanation that a POSITA 'would have understood that Chagny's processor 292 is a processor system with multiple components.'" Appellee Br., 36. The issue raised by MyPAQ is not whether a processor could be understood to have multiple components in a vacuum.  The

issue is that the claims require enabling multiple "components *of a processor system*" and a processor is at best a single component of a processor system. Appellant Br., 41-48.

Appellees argue that "a single disclosure of how a 'processor system' may be constructed does not show a 'clear intention to limit the claim scope' of 'processor system' as requiring components peripheral to the processor." Appellee Br., 37. Again, Appellees misdirect. The specification states that "a processor system … is often constructed … with a number of system components." Appx129, ['514 Patent], 13:29-33. Claims 11 and 16 require "a processor system" that has a number of system "components." Appx136-137, ['514 Patent], claims 11 and 16. Thus, claims 11 and 16 expressly claim the multi-component embodiment discussed at column 13, lines 29-33.

The specification further discloses that "system components such as memory, hard drives, and specialized circuit cards [ ] are specified and installed when the system is assembled for a particular application." Appx129, ['514 Patent], 13:29-33. Thus, this passage informs a POSITA that "components" are things like "memory, hard drives, and specialized circuit cards." Every disclosed "component" of the processor system is external to the processor.

This passage also informs a POSITA that "components" are "specified and installed when the system is assembled." *Id.* This sentence is, again, directed to

assembling and installing components of a computer or similar processor system, not manufacturing a microprocessor as argued by Appellees. The next sentence reinforces MyPAQ's point, stating "[t]hus, power system drains are generally unknown until such a system is specified and assembled." Appx129, ['514 Patent], 13:33-35. Again, the "power system drain" being discussed is clearly the power being drawn by the various components of a computer (e.g., "memory, hard drives, and specialized circuit cards") when it is assembled.

Appellees argue that "the Board had substantial evidence" to find that Chagny disclosed "a power system controller configured to enable operations of components of a processor system." Appellee Br., 37-38. But the Board's finding was based on its incorrect construction of "components of a processor system" instead of the intrinsic record.

MyPAQ points to multiple additional embodiments supporting its construction that Appellees fail to address. Appellant Br., 41-48. Conversely, Appellees have not identified a single piece of intrinsic evidence that supports their position that undisclosed "internal" components of a microprocessor are "components of a processor system" within the meaning of the claims. Accordingly, the Board's construction is incorrect.

### C. The Prior Art Does Not Disclose This Limitation Under The Proper Construction

Appellees argue that, even under MyPAQ's correct construction, Chagny discloses "components of a processor system." Appellant Br., 38-40. This misstates the issue. The issue is whether Chagny discloses the entire limitation "a power system controller configured to enable operation of components of a processor system to establish a state of power drain thereof" under the proper construction. Appx449-450 ['514 POR]; Appx564-566 ['514 Sur-reply]. Appellees provide no evidence or arguments that Chagny's alleged "power system controller" has anything to do with anything other than Chagny's processor, let alone enables operation of other components that Chagny does not disclose.

Specifically, the Petition relied on Chagny's "software program 296" that "monitors the processor 292 loading" as disclosing the claimed "power system controller." Appx210 ['514 Petition]. Chagny's "software program 296" has nothing to do with any system components other than the processor. Thus, Chagny's "software program 296" does not "enable operation of components of a processor system to establish a state of power drain thereof" under the correct claim construction. Appx449-450 ['514 POR]; Appx563-565 ['514 Sur-reply]. The same is true for the Hwang reference, which does not describe enabling any components of a processor system to establish a state of power drain thereof. Appx436-438 ['514

POR]; Appx565-566 ['514 Sur-reply]. Thus, Appellees have failed to carry their burden to prove Chagny or Hwang disclose these limitations under the proper construction of "components of a processor system." Accordingly, the Board should be reversed.

## III.  "DUTY CYCLE"

### A.    The Board Applied The Wrong Construction

The proper construction of "duty cycle" is "a ratio represented by a conduction period of a power switch to a switching period thereof." Appellee Br., 40. The Board did not apply this construction, instead holding that "Chagny describes a duty cycle because Chagny discloses that charge switch 220 is turned on and off." Appx35 ['514 FWD]; Appx66-67 ['759 FWD]; Appellant Br., 59-60. Thus, the issue MyPAQ raises is whether the Board applied the correct construction for "duty cycle," which is subject to *de novo* review.

Appellees argue that "MyPAQ improperly reads the Board's statement in isolation." Appellee Br., 41. But the Board's statement is central to the Board's holding. Indeed, the Board's determination was based on its finding that Chagny's switch "is turned on and off." Appx34-35 ['514 FWD]; Appx66-67 ['759 FWD].

Appellees argue that "[t]he 'conduction period' is simply the on-time of the power switch." Appellee Br., 41-42. But the "conduction period" is a fixed "period"

of "on-time" during each switching period. Chagny does not disclose when the switch is on or off, thus there is no "conduction period."

Appellees argue that "the Board cited MyPAQ's own admission during the hearing that Chagny discloses a conduction time." The Board and Petitioner misquote MyPAQ. The transcript states "[Chagny's] FET is turned on and off yes, so that's correct. But the issue here is Chagny does not … tell you how the duty cycle is controlled." Appx649 at 44:1-3. In explaining this, MyPAQ's attorney stated "Chagny only discusses how the frequency is controlled. *It doesn't actually discuss the conduction time or how that on/off cycle works*, and that's the missing component… ." Appx649 at 44:20-23 (emphasis added). Thus, what MyPAQ actually said is that Chagny's FET can be turned on and off, but the required conduction period is absent.

Appellees discuss that Chagny discloses a switching period. Appellee Br., 42-43. But the agreed construction of "duty cycle" requires both a "switching period" and a "conduction period." Chagny does not disclose the "conduction period" and therefore does not disclose a "duty cycle," let alone "a signal to control said duty cycle" as required by claims 2, 7, 12 and 17 of the '514 Patent and claims 1, 6 and 16 of the '759 Patent.

Appellees state "Chagny discloses turning the power switch on and off during each repeating switching cycle." Appellee Br., 43. Appellees quote Chagny at 5:38-

40, which states "The opening and closing of the charge and discharge switches 220 and 230 is controlled by the charge and discharge control signals 212 and 214 respectively." Appx1057 [Chagny], 5:38-40. The fact that the switches can be turned on and off does not mean there is a conduction period.

Appellees argue that "by turning on and off Chagny's power switch at a selected frequency, the result is that each on-and-off cycle has a conduction period" (Appellee Br., 43). But they cite no evidence that Chagny's disclosed switch has a conduction period, let alone that there is an "on-and-off cycle" related to the selected frequency.

Accordingly, the Board applied the wrong construction.

## B.    Chagny Does Not Disclose A Conduction Period Under The Agreed Construction

Chagny does not explicitly disclose a duty cycle. Appellee Br., 44-45. Instead, Appellees argue that a POSITA would infer that Chagny discloses a duty cycle. Appellee Br., 44-45. "[A]nticipation by inherent disclosure is appropriate only when the reference discloses prior art that must *necessarily* include the un-stated limitation…" *King Pharms., Inc. v. Eon Labs, Inc.,* 616 F.3d 1267, 1274 (*quoting Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1373 (Fed. Cir. 2002) (emphasis in original). But nothing Appellees identify discloses a conduction period, or explains why a POSITA would understand Chagny's charge switch 220

27

necessarily has a conduction period. Appellees state that "the Board credited Dr. Kiaei's unrebutted testimony that the output voltage of a 'buck' power converter (like that in Chagny) equals the input voltage times the duty cycle." Appellee Br., 45. But Dr. Kiaei's statement about buck power converters assumes that a duty cycle already exists in Chagny without showing that it does.

Similarly, Appellees argue that the Board found that "Chagny discloses turning on and off the power switch at a selected frequency, thereby resulting in a conduction period and a switching period." Appellee Br., 46. But again, nothing in Chagny discloses when charge switch 220 is turned on or off, let alone that it is turned on and off at a specific conduction period within each switching period. Accordingly, this Court should reverse because Chagny does not disclose a duty cycle.

## IV.    "POWER SYSTEM CONTROLLER"

### A.    MyPAQ's construction is correct

Appellees argue that MyPAQ's construction of "power system controller" as "hardware or software that controls the power system" is incorrect. Appellee Br., 50-53. But MyPAQ's construction comports with the term's plain meaning and Appellees do not meaningfully distinguish it. Appellees do not dispute that a "power system controller" can be "hardware or software," but instead argues that the proper construction for "power system controller" should include "firmware embodiments"

in addition to "hardware or software." Appellee Br., 50-51. MyPAQ understands "firmware" to be a type of "software"—that is, "computer program code." Appx136, ['514 Patent], 27:10-19. Thus, Appellees' suggestion adds nothing to MyPAQ's construction. Nonetheless, MyPAQ does not object to adopting Appellees' proposed construction of "hardware, software, or firmware that controls the power system."

Appellees argue that a "power system controller" need not control the entire power system and that MyPAQ's construction reads embodiments into the claims. Appellee Br., 51-52. There are two problems with this argument. First, MyPAQ's construction of "hardware or software that controls the power system" is simply the plain meaning of the term "power system controller." Appx646 [Hearing Tr.], 41:18-21. A power system controller necessarily controls the entire power system; it would not be a power system controller if it only controlled a single element of the power system as urged by Petitioner. Appellant Br., 64.

Second, Appellees' argument ignores the intrinsic record. Appellees argue MyPAQ's "only alleged support" "comes from a single portion of the specification." Appellee Br., 51. This is incorrect. MyPAQ cites numerous different portions of the specifications demonstrating that the intrinsic record is consistent with MyPAQ's construction and that the "power system controller" controls the entire power system. *See, e.g.,* Appellant Br., 64-67. Appellees do not address most of this intrinsic support.

Instead, Appellees focus on a single citation discussed by MyPAQ. Appellee Br., 51-52 (discussing Appx129 ['514 Patent], 13:29-43). But this citation closely tracks the claim language and explains to a POSITA what a power system controller is. *Compare, e.g.,* '514 Patent, claim 11 *with* '514 Patent, 13:29-43. Appellees argue "[n]othing in this passage defines what components make up the 'power system,' much less what components would qualify as the 'entire' power system." Appellee Br., 51. As discussed in the '514 Patent, the components that "make up the power system" are "specified and installed when the system is assembled for a particular application." Appx129 ['514 Patent] at 13:29-33. Thus, the specific components of a power system vary depending on the application.

Further, the '514 and '759 Patents are directed to improving power system control for computers and similar systems by providing dynamic power control over the entire system, not just the processor. Appellee Br., 64-67. The "entire power system" (Appellee Br., 51) is a system that controls the power for the entire computer.

Appellees argue, without support, that the intrinsic record portions discussed in MyPAQ's opening brief "do not distinguish the prior art based on some sort of loosely defined 'system-wide control." Appellee Br., 52. Appellees' statement is contradicted by the intrinsic record. Appellant Br., 64-67. *See, e.g.,* Appx134 ['514 Patent], 23:60-63, Appx160 ['759 Patent], 19:49-52 ("In such manner, a higher

30

operating efficiency can be achieved on a system-level basis than can be achieved in an environment without such system-level communication."); Appx125 ['514 Patent], 5:19-22, Appx152 ['759 Patent], 3:65-4:1 ("[p]ower conversion systems of the prior art have only partially responded to such system operational state considerations … particularly at a system level."

Appellees argue that "the specifications purport to improve upon the prior art by adjusting an internal operating characteristic of a power converter based, for example, on a signal indicating a state of the load coupled to the output of the power converter." Appellee Br., 52. But Appellees' example relates to a *power converter controller*, not the *power system controller*. These are different aspects of the invention. The power system controller monitors the entire system and sends signals to the various power converter controllers, which respond accordingly for the specific components the power converter controllers monitor. *See, e.g.,* Appx118, 133, 135 ['514 Patent] Fig. 11, 21:65-22:2, 25:7-9, Appx149, 159-160 ['759 Patent] Fig. 11, 18:24-28, 20:40-43. Thus, Appellees' argument highlights the fact that the power system controller controls the entire power system.

Appellees argue MyPAQ does not "point to any disavowal of the embodiments … that would require the 'power system controller' to exert some sort of additional 'system-wide control.'" Appellee Br., 53. But MyPAQ's position is simply that a "power system controller" by its plain language controls the entire power system

31

and that plain meaning is supported by the intrinsic record. Accordingly, MyPAQ's construction is correct.

## B. Chagny Does Not Disclose A "Power System Controller" Under The Proper Construction

Appellees argue that "[s]ubstantial evidence supports the Board's factual finding that Chagny discloses each of the different functionalities recited in the claims." Appellee Br., 47-48. As discussed in MyPAQ's opening brief, Appellees and the Board essentially read the term "power system controller" out of the claims. Under the proper construction, Chagny does not disclose a "power system controller" because it teaches a system that controls the activity level of a microprocessor rather than the entire power system. Appellant Br., 67-69. Appellees cite to nothing in Chagny that is a "power system controller" under the proper construction. Accordingly, the Board should be reversed.

## C. MyPAQ Argued This Issue Below

Appellees argue that "[n]owhere in the record below did MyPAQ propose a construction for the term 'power system controller' … ." Appellee Br., 49-50. This is incorrect. Throughout the IPR, MyPAQ argued that none of the prior art teaches a "power system controller" specifically because the "power system controller" must control the power system as a whole. *See, e.g.,* Appx320, 326 ['514 POPR]; Appx3834, 3844-3845, 3854 ['759 POPR]; Appx374 ['514 DI]; Appx3902 ['759

DI], Appx450-454, 470-472 ['514 POR]; Appx3970-3975, 4003-4006, 4013-4018 ['759 POR]; Appx566-567 ['514 Sur-reply]; Appx4093-4094, 4102-4103 ['759 Sur-reply].

This argument continued throughout oral argument. One of the judges asked whether any "claim or claim construction" required that "power system controller" cannot be defined by the claimed functionality. Appx645-646 [Hearing Tr.], 40:3-41:21. In response, MyPAQ's attorney explained that "[power system controller] is more than just a black box defined by the functionality[.] This is actually a controller that provides logical decision-making for the entire power system, not just a reporting function." Appx646 [Hearing Tr.], 41:18-21. Thus, both the Board and MyPAQ were expressly discussing the construction of "power system controller" and MyPAQ was advancing essentially the same construction.

In the Final Written Decisions, the Board addressed this exact issue and specifically construed "power system controller" as the "function recited in the claim." Appx24 ['514 FWD]; Appx76 ['759 FWD] (same). Thus, MyPAQ and the Board disputed the same claim construction issue, and MyPAQ advanced substantially the same claim construction during the IPR.

## V.   CONCLUSION

Due to the issues set forth above and in Appellants' opening brief, the Final

Written Decisions must be reversed.

Date: November 24, 2023            Respectfully submitted,

_/s/_ Stephen P. McBride
Stephen P. McBride
James T. Carmichael
Minghui Yang
CARMICHAEL IP, PLLC
8607 Westwood Center Drive, Suite 270
Tysons, VA 22182
(703) 646-9255
jim@carmichaelip.com
schreiner@carmichaelip.com
stevemcbride@carmichaelip.com
mitch@carmichaelip.com

_Counsel for Appellant MyPAQ Holdings Ltd._

## CERTIFICATE OF SERVICE

I hereby certify that on the undersigned date, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all parties who are registered CM/ECF users.


*/s/* Stephen P. McBride
*Counsel for Appellant*


November 24, 2023

**CERTIFICATE OF COMPLIANCE**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 6987 words.

Dated: November 24, 2023

Respectfully submitted,

*/s/* Stephen P. McBride
*Counsel for Appellant*